UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Cause No.: 1:17-CR-0183-TWP-TAB |
| | ) | |
| BUSTER HERNANDEZ, | ) | |
| (a.k.a. Brian Kil, Brianna Killian, Brian Mil, | ) | |
| Greg Martain, Purge of Maine, | ) | |
| uygt9@hushmail.com, jare9302@hushmail.com, | ) | |
| Dtvx1@hushmail.com, Leaked_hacks1, | ) | |
| Closed Door, Closed Color, Clutter Removed, | ) | |
| Color Rain, Plot Draw, and Invil Cable) | ) | |
| | ) | |
| *Defendant*. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTION TO
ADMISSION OF UNCHARGED CONDUCT AND
GOVERNMENT'S MOTION TO ADMIT EXHIBITS 1-199 (Dkt. 97)**

The United States, by Josh J. Minkler, United States Attorney, through
Tiffany J. Preston and Kristina M. Korobov, Assistant United States Attorneys,
hereby submits its Response to the Defendant's Objection to the Government's Notice
of Intent to Use Uncharged Conduct Evidence and the Government's Motion to Admit
Exhibits 1-199 (Dkt. 97).

## I.   **Background**

As set forth in the Government's Preliminary Exhibit List (Dkt. 73), the United
States intends to admit Government Exhibits 1-199 into evidence.  The Government
moved to admit this evidence (Dkt. 95), and also noticed it intent to admit it not only

under Federal Rules of Evidence 401 and 402, but also Federal Rule of Evidence (404(b)). (Dkt. 71). The defendant objected. (Dkt. 97).

Government Exhibits 1-199 are the social media and E-mail accounts that the defendant used to commit the charged offenses, and to threaten and extort other victims using the exact same means and methods set forth in Paragraphs 23 and 24 of the Superseding Indictment. As set forth in the Government's Motion to Admit (Dkt. 95), the United States will lay a sufficient foundation to show that the messages in these accounts were authored by the defendant. These records are relevant and admissible because they are direct evidence that the defendant sextorted Victims 1-6 and 11, threatened to kill, injure, and kidnap all of the victims listed in the Superseding Indictment, and threatened to use explosive devices at Plainfield and Danville High schools, the Shops at Perry Crossing, and Walmart. They are also relevant and admissible because they are being offered to prove the identity and *modus operandi* of the defendant. Accordingly, the accounts are direct proof of the charged offenses under Federal Rules of Evidence ("F.R.E.") 401 and 402, and are also proof of the defendant's identity and modus operandi under Rule 404(b).

The defendant objects to their admission. First, the defendant argues that the Government does not have direct evidence under F.R.E. 401 and 402 linking the defendant to these accounts ignoring the litany of evidence summarized by the Government in its Motion to Admit (Dkt. 95). Second, the defendant argues that the records are not evidence of identity or *modus operandi* under Federal Rule of Evidence 404(b), disregarding the defendant's unique criminal tradecraft as set forth

in Paragraphs 23 and 24 of the Superseding Indictment.  Third, the defendant argues that these messages are hearsay.  The Government will address each of these arguments in turn.

## II.   The Social Media Accounts are Relevant under Federal Rules of Evidence 401, 402, and 404(b)

### A. Government Exhibits 1-199

Government Exhibits 1-199 comprise data obtained from social media and E-mail accounts from applications such as Facebook, Hushmail, and Twitter.  They are the heart of the Government's case.  As set forth in the Government's Motion to Admit, forty of the forty-one counts in the Superseding Indictment require the Government prove that the defendant used the social media and E-mail accounts (facilities of interstate commerce) to extort and coerce the victims to produce child pornography, and that the defendant received and distributed child pornography using those accounts.  Further, the Government must prove that the defendant threatened to use explosive devices at certain locations, threatened kill, injure and kidnap Victims 1 and 7-10, tampered with Victims 1, 3-7, and retaliated against Victims 1 and 7-11 using the same facilities of interstate commerce. Count forty-one will also require the introduction of social media and E-mail evidence, as the defendant routinely discussed via his messages his methods to thwart law enforcement's efforts to identify and connect him to his criminal acts.

The defense does not intend to argue that these cybercrimes did not occur. Rather, the defense will argue that the defendant was not the person behind the computer.  Thus, identity is <u>the</u> key issue in this case.  And, Government Exhibits 1-

199 are essential to the Government's case in chief as each account is direct evidence that the defendant is indeed the perpetrator of the charged offenses.

The accounts can be divided into two categories. The first category is as follows: 42 of the accounts were used to commit the charged offenses set forth in the Superseding Indictment. Namely, the defendant used those specific accounts to exploit, coerce, and extort Victims 1-6, and 11, to threaten to use explosive devices at certain locations, to threaten to kill, injure and kidnap Victims 1 and 7-10, to tamper with Victims 1, 3-7, and to retaliate against Victims 1 and 7-11. These 42 accounts are relevant as they were used to commit the charged offenses. And, through the evidence outlined in the Government's Motion to Admit (Dkt. 95), the United States will be able to directly connect the accounts to the defendant. The second category is the remaining 157 accounts. Importantly, the remaining approximately 157 accounts are also **direct proof** under F.R.E. 401 and 402 that the defendant committed the charged offenses—something that the defense skipped over in its analysis. They are also admissible under F.R.E. 404(b).

B. The Accounts are Relevant Under F.R.E. 401 and 402

1. *Accounts Used by the Defendant and the Victims in the Superseding Indictment*

The government must show that the content of the messages are relevant. "Evidence is relevant and therefore admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Ozuna,* 561 F.3d 728, 738 (7th Cir. 2009) (citing Fed. R. Evid. 401; *United States v.*

*Van Allen*, 524 F.3d 814, 825 (7th Cir. 2008)) (internal quotations omitted). Again, the defendant didn't commit these offenses in person. Rather, the defendant weaponized nearly 199 social media and E-mail accounts by using those accounts to communicate his extortionate demands and threats. Then, he attempted to obfuscate his true identity by using hundreds of online aliases, and by masking his true Internet Protocol ("IP") Address using the Tor Network. Therefore, at issue in this case is whether the defendant is the person who used these accounts to commit the charged offenses. "Here, the relevance of the Facebook records hinges on the fact of authorship." *Browne*, 834 F.3d at 410. Thus, "[t]o authenticate the messages, the Government [i]s therefore required to introduce enough evidence such that the jury could reasonably find, by a preponderance of the evidence, that [Hernandez] and the victims authored the Facebook messages at issue." *Id*. And that can be with circumstantial evidence. *Barber*, 937 F.3d at 970.

The United States will be able to introduce more than enough evidence for the jury to reasonably find, by a preponderance of evidence, that the defendant and the victims authored the social media and E-mail messages at issue. The Government's proof is not, as the defendant suggests, a "complex, complicated, a tangled web of data," that shows identity "based on supposition, tangentially related account data, and common criminal conduct for similar sextortion offenses." Dkt. 97, page 2. To the contrary, the Government's evidence connecting the defendant to each and every one of those accounts is based on simple, forensic evidence.

The Government set forth that evidence in its Motion to Admit, and will not

repeat it in its entirety here.  In summary, the Government will show that Victim 2 had been the victim of the defendant's sextortion beginning in 2012 when she was just 14 years' old.  On June 9, 2017, the defendant was using an account under the alias "Jare930" (Gov. Ex. 84) to continue to sextort Victim 2, and demand that she send the defendant a pornographic video.  The FBI interceded, and Victim 2 agreed to allow the FBI to use her account to embed a Network Investigative Technique ("NIT") with a non-pornographic video she produced.  It worked.  The defendant, assuming he was receiving a pornographic video from Victim 2, opened the video, and the NIT revealed the defendant's true IP Address at his residence in Bakersfield, CA. Accordingly, the "NIT" and the accounts the defendant used to obtain child pornography of Victim 2, are direct evidence that the defendant sextorted Victim 2.

The evidence will show that in 2015 and 2017, the defendant admitted in messages to Victim 2 that he was "Brian Kil"-- the individual who sextorted Victims 1 and 3, threatened to kill, kidnap, and injure Victims 1, 3, and 7-10, retaliate and tamper with Victims 1, 3, and 4-7, and bomb four locations (Counts 1-5, 9, 12-13, 18-35, 39-41.)  Additionally, the evidence will show that the defendant shared a video of Victim 2 (that he obtained through extortion) with Victim 3 (the subject of Count 22). The defendant also admitted through account messaging to Victim 3 that he was "Brian Kil," and asked Victim 3 to attend and record the Plainfield Community Forum regarding the "Brian Kil" threats (which she did).

That leaves connections to Victims 4, 5, and 6.  As set forth in the Government's Motion to Admit, the evidence will show that the defendant used the same accounts

to sextort, follow, and research Victims 1, 3, 4, and 6, and that the same account was used to sextort Victims 3 and 5. That evidence, as discussed more thoroughly below, is forensic in nature (cookies linking the accounts together by the same machine) and can't lie. Accordingly, every single act alleged in the Superseding Indictment can be tied directly to the defendant through the "NIT"—a fact completely disregarded in the defendant's motion. The 42 accounts are direct evidence of the defendant's guilt in the charged offenses, and should be admitted.

2. *The Remaining Accounts are also Direct Evidence of the Defendant's Guilt*

From there, the Government will be able to show through forensic evidence that the defendant was also the author of the remaining 157 accounts that are part of Government Exhibits 1-199. His authorship of those accounts is also direct proof of the defendant's guilt in the charged offenses. The forensic evidence is not complicated, as the defendant suggests. It's actually quite simple. Although the defendant was able to hide his true IP address and location until June 9, 2017, he couldn't stop the social media and E-mail platforms he used from collecting "cookie" data when he logged into different accounts during the same browsing session. The Government will show that "cookies" are small amounts of text-only data saved on an individual's machine (such as computer or cell phone) while he or she browses a certain website. The information can be used by the website, such as Facebook, to help create custom pages for you upon your return visits or save session information. For example, when you go to Amazon and put an item in your cart, but decide to buy it later, the item will still be in your cart when you return to Amazon at a later date.

That's because Amazon, like Facebook and other social media applications, uses "cookie" data.[1]  Here, the Government will be able, through summary evidence, as it is based on voluminous data, to link each and every single one of the 199 accounts together, and to the defendant through "cookies," common victims, and then the NIT.[2]

Through that evidence, as well as the litany of evidence set forth in the Government's Motion to Admit, the Government will be able to lay more than sufficient evidence to establish that the defendant was the "author" of those remaining 157 accounts.  They should be admitted to show his guilt in the charged offenses.

The defendant is mistaken to argue that this is "bad character" evidence."  This is <u>direct evidence</u> of the defendant's guilt because the evidence will show that <u>ALL 199 of those accounts</u> went dark the moment the defendant was arrested on August 3, 2017.  Put a different way, the Government's evidence will show that not one of the numerous victims who received the defendant's messages through those 199 accounts ever heard from their sextortionist again once the defendant was finally in custody.  This is incredibly powerful and direct evidence of the defendant's guilt of

---

[1] A cookie is very similar to the ticket you get when you take your clothes in for dry cleaning that helps the dry clean finder your clothes when you return.  In this case, they linked the accounts the defendant used to commit these offenses because he used the same machine to connect to those accounts.

[2] As set forth in its Motion to Admit, the Government intends to admit all of these accounts in their entirety, but will only publish the content of approximately 42 of the accounts.  Said another way, for the accounts that were used to communicate with the charged and testifying (but uncharged in Indiana) victims, the Government will admit evidence of the communication with the relevant data as well as other data and communications that show the identity of the account holder.

The Government will not dive into the content of the remaining accounts. Indeed, some of these accounts were used to sextort multiple victims for more than 5 years.  They are voluminous.  The Government does not intend to publish the tens of thousands of pages of data to the Jury during the trial.  Rather, the Government intends to introduce summary charts under Federal Rule of Evidence 1006 for approximately 157 of those accounts.

the charged offenses and should be admitted.  The defendant can then feel free to argue the weight of the evidence, but admissibility is clear.

C.  <u>The Accounts are also Relevant as Identity and *Modus Operandi* under F.R.E. 404(b).</u>

As set forth in the Government's Motion to Admit, these criminal acts were not committed in person, but through social media and E-mail messages authored by the defendant under various aliases, such as "Brian Kil" and "Purge of Maine."  As the Superseding Indictment sets forth in Paragraph 23, the defendant used unique means and methods to extort images and videos of child pornography from this victims.  In other words, and as alleged in the Superseding Indictment, the evidence will show that the defendant had a unique signature that set him far apart from other sextortionists.

The defendant objects to this evidence.  He argues: 1) that there are too many accounts to be considered and the sheer volume will make the jury think that the Defendant is a bad guy and, therefore should be convicted; 2) that there is other evidence that can be used to prove identity, and therefore, the Government does not "need" to introduce acts from the online accounts; and 3) that there is nothing distinguishable about the accounts and the Defendant's conduct to constitute identity and a *modus operandi*.  The Government will address each of these arguments in turn.

1. *The defendant's "sheer volume" argument.*

First, the defendant alleges that because there are so many accounts, that the jury will become "so upset with defendant and think of him as a monster that has

9

hundreds of other victims who should be convicted not simply based on the direct evidence, but from the overwhelming amount of other uncharged conduct evidence too. This could lead the jury to become upset and reach a decision on the basis of their anger rather than the actual evidence, which is largely circumstantial." That is incorrect. First, there are 42 accounts associated with the victims identified in the charged offenses. Some, but not nearly all, of the content will be introduced because it is the Government's burden to prove coercion, enticement, threats to kill, injure, bomb, and kidnap, retaliation, and witness tampering. The content of the messages is necessary to prove the elements of the charged offenses, and is admissible.

As to the remaining accounts, the Government does not intend to introduce the content of the messages, nor will it introduce the child pornography that the defendant received as a result of his coercion. First, that would take months. Second, it is not necessary. What is necessary is for the Government to be allowed to prove its case beyond a reasonable doubt. To do so, and to balance the need for efficiency and minimize the danger of prejudice, the Government intends to merely summarize the voluminous data contained within those 157 accounts (thus, minimizing their potential, if any, prejudicial affect) and only introduce the evidence for the limited purpose of showing identity and *modus operandi*. Accordingly, this objection has no merit.

> 2.   *The defendant argues that other evidence can be used to prove identity.*

The Defendant argues that the "Government doesn't need to admit this other

bad act evidence because it has other means to try and prove the identity of the perpetrator through additional evidence that it already has." This is flawed, and requires the Court to ignore the defense's vigorous denial of identity and intended credibility attacks on the Government's witnesses. The Government's burden is proof beyond a reasonable doubt. If the Defendant wants to concede that Buster Hernandez is the person accused of the crimes charged, then the Government will withdraw its motion. But, the Defendant has indicated through counsel that he is not the person who committed the charged crimes. The Defendant cannot assert such a defense and then attempt to limit the evidence of *contemporaneous signature acts which point surely and unerringly to his identity of the perpetrator of the charged offenses.*

True, the NIT evidence is powerful evidence, but more is needed to prove the defendant's guilt beyond a reasonable doubt as to the charged offenses in the Southern District of Indiana. Although the NIT is direct evidence of the Defendant's guilt as to the offenses against Victim 2 which are the subject of the charges in the *Eastern District of Michigan*, the Government must prove through the introduction of the other accounts (the "jare930" Twitter account is the account that opened the NIT video) that the same individual who used "jare930" is linked to the Victims 1, and 3-10. The jury should hear all of that evidence, and then decide what weight to give it. Whether the NIT evidence links Buster Hernandez to the charged victims *beyond a reasonable doubt*, should be a question for the jurors to answer based upon all of the admissible evidence of identity.

The defense further argues that because the Government will present

evidence of Hernandez's admissions to cooperators and evidence seized from the Defendant's home, the Court should prohibit other acts evidence: The defense will undoubtedly challenge the credibility of any witness who testifies that the Defendant confessed to his offenses or made incriminating admissions. Hernandez is never going to concede that evidence from a cooperator is sufficient to prove the Defendant's guilt beyond a reasonable doubt. The defense will also challenge the absence of evidence found in the Defendant's home and the conclusions that the Government has drawn from the items found. Hernandez does not concede that evidence from the search of the Defendant's home is sufficient to prove the Defendant's guilt beyond a reasonable doubt.

It is the Government's responsibility to prove the Defendant's guilt on each element of every crime charged against the Defendant. Because of that burden, the Government is entitled to use admissible evidence to show the connections between the victim accounts and other accounts which show that the Defendant is the man who exploited, extorted and coerced the victims. Hernandez will tell jurors that they cannot assume that just because a juror concludes that the Defendant committed the crime against one victim, it does not mean that we can prove that he committed the offenses against another victim – that we must prove guilt against each victim individually. This is a correct statement and a burden that the Government accepts.

3. *The defendant argues that his behaviors do not constitute a signature.*

The defendant intends to deny he is the perpetrator of these offenses. Thus,

the identity of the perpetrator is disputed.  Here, the Government timely filed its notice under Rule 404(b), and the Court has ruled that the Government "may present limited evidence of uncharged other bad act evidence to try and prove the identity" of the perpetrator (Dkt. 99. P. 9).  But nevertheless, the defendant argues that his criminal behaviors are akin to "garden variety" sextortion, and are not distinctive enough to constitute a signature.  In other words, the defendant seeks to limit the Government' ability to prove his identity.[3]

The defense argument is the same as arguing that every robbery consists of merely an approach, a taking of property by force, and a getaway, with no room for distinction between robbers.  Following the analogy of a bank robbery, the Government presents the following scenario:

- A defendant is charged with robbing 3 cell phone stores in the Southern District of Indiana over a period of 4 months.  During that same time period, the ATF linked the Defendant to 5 other robberies of cell phone stores in the Northern District of Indiana and the Northern District of Ohio.  The streak ends when the Defendant is caught robbing a cell phone store in Cleveland, and he is charged with the 3 robberies in the Southern District.  As with every robbery, there is an approach to the victim, a taking of property and a departure.  That's the nature of robbery.  If the Government sought to prove the identity of the robber by using evidence

---

[3] While the Court has ruled that any evidence that meets the legal standard of Fed. Rule of Evid. 414 is admissible, many of the charged victims were over the age of 13 during portions of time that the charged conduct occurred (e.g. For that reason, the Government is seeking admissibility rulings under Fed. Rule of Evid. 404(b).

from the out-of-venue robberies, the Government could present the following types of evidence:

- o The robber always entered the cell phone stores when no other customers were in the stores

- o The robber wore a "Scream" mask in all 8 robberies

- o When a female clerk was present (in 5 out of the 8 robberies) the robber called her a "bitch" and said "maybe I ought to take you with me."

- o The robber only took Samsung products

- o The robber told the victims that he would find their families and kill them if they cooperated with police.

As this example illustrates, a robbery can follow a basic pattern and still have distinguishing features; moreover, the repeating of these specific behaviors over the course of multiple robberies increases the likelihood that they are committed by the same person. And the longer that this pattern continues increases the likelihood that the perpetrator is the same.

The defendant's argument belies the overwhelming evidence in this case regarding his unique criminal tradecraft.  As set forth below, the evidence the Government will introduce strongly connects this defendant to similar crimes that are sufficiently distinctive to qualify as "signature crimes."  The crimes are similar (actually, to be more precise, they are the same) in nature, and were committed in so distinctive and unusual a manner as to be like a signature.

It is true that "sextortion," much like a bank robbery, has certain features. The *Brookings* article referenced by defense counsel defines "sextortion" as "old-fashioned extortion of blackmail, carried out over a computer network, involving some threat – generally but not always a threat to release sexually explicit images of the victim – if the victim does not engage in some form of further sexual activity."[4] As for a definitional pattern, sextortion requires an outreach to a victim and a demand for sexual currency (images, contact, sexual images of another person) that involves negative consequences if the intended victim does not comply.

But, the defendant's reliance on the *Brookings* publication is flawed. First, it was based on data recovered as of April 18, 2016 that summarized 78 cases, and the study itself acknowledged that the sextortion problem is "dramatically understudied *(Id.* at 4*)*. And, when considering the study, it is important to remember what seems to be the primary purpose of the article: to draw attention for the need for a comprehensive legal definition of sextortion and a demand for uniform investigation and legal treatment of these cases. *Brookings* does not conclude that all sextortionists are alike or that their longstanding patterns of conduct do not contain distinguishing features. In fact, the very publication that the defendant cites as support for his proposition actually provides example after example of the variances that exist between offenders who commit the same types of crimes. In other words, the article does not support the defendant's assertions, it contradicts them.

---

[4] *Sextortion: Cybersexurity, teenagers, and remote sexual assault" p. 10.*

Further, the very examples cited by the *Brookings* report prove the Government's point—namely, that the defendant's criminal tradecraft as set forth in Paragraphs 23 and 24 of the Superseding Indictment was as sophisticated as it was unique.  Looking at the variances cited in defendant's article demonstrates the uniqueness of the defendant's *modus operandi*:

· Some of those offenders mentioned in the *Brookings* article were hackers who used malware and other technology to control victims and to obtain images of them that victims had stored on devices.  Hernandez used deception and threats to control his victims.

· Some of those offenders in the *Brookings* article used traceable forms of communication.  Hernandez did not.

· Some of the offenders in the *Brookings* article reached out to potential targets pretending to be another teen seeking friendship.  In the course of that "friendship," the offender got the victim to voluntarily produce images that would then be used against the victim.  Hernandez's victims always participated under duress.

· Some offenders in the *Brookings* article used a web-cam or live video communications.  Hernandez did not.

· Some offenders in the *Brookin*gs article made victims obtain sexually explicit images of other people, including by using hidden cameras.  Hernandez did not use hidden cameras or ask for images of individuals the victims didn't know.

• Some of the offenders in the *Brookings* article targeted victims they knew. Hernandez's victims were strangers.

• One offender in the *Brookings* article pretended to be Justin Beiber to lure victims. Hernandez did not pretend to be Justin Beiber.

Again, the *Brookings* article proves the points that further studies are needed, and disproves the defendant's argument that Hernandez was a "garden variety" sextortionist.

But, there are more precise distinguishing features of the defendant's crimes than that which is set forth above. And, those features, contrary to the defendant's argument, *do* constitute a unique signature because they clearly distinguish the defendant from other criminals committing the same crime." *United States v. Shackleford*, 884 F.2d 1016, 1021 (7th Cir. 1989)).

The following is a summary of what the evidence will show as it relates to F.R.E. 401, 401, and 404(b), that the defendant is the perpetrator of the offenses, and the author of all 199 accounts. Hernandez's behaviors were formulaic and constituted a signature. There was no need for him to re-invent the wheel when what he did worked.

i. The Defendant's Unique "Lure"

The Government has alleged that the Defendant engaged in the chronic criminal exploitation of girls and women, designed to extort as many females as possible to send sexually explicit images to Hernandez. Hernandez did this by sending "blast" messages to females on Facebook that began with the same signature

opening line: "hi [insert victim name] I have to ask you something. kinda important."

If the girl responded, Hernandez said "im someone you know. and its kind of a **weird**

**question** but I have to ask because it involves you so dont get mad."  Hernandez then

asked to how many people the prospective victim had sent "**dirty pics,**" and then he

told the girl "im **showing everyone**."   These words are in quotes for a reason—

Hernandez repeated this lure over and over and the lure is seen through Government

Exhibits 1-199 when the data extends back far enough to the first contact.

    Here are examples from several accounts:

| |
|---|
| hi mariah I have to ask you something. kinda important. |
| hi gabby I have to ask you something. kinda important. |
| hi jessica I have to ask you something. kinda important. |
| hi amber I have to ask you something. kinda important. |
| hi savannah I have to ask you something. kinda important. |
| hi megan I have to ask you something. kinda important. |
| hi millie I have to ask you something. kinda important. |
| hi katie I have to ask you something. kinda important. |
| hi chloe I have to ask you something. kinda important. |
| hi katy I have to ask you something. kinda important. |
| hi paige I have to ask you something. kinda important. |
| hi madison I have to ask you something. kinda important. |

    The defendant wasn't communicating with people he knew or people he

hacked.  These were strangers.

    Because they were strangers, the defendant claimed (most often times falsely)

that he had obtained sexually explicit images from another person:

| |
|---|
| How many guys have you sent dirty pics to because I have some of you. |

If victim denied having sent sexually explicit images to someone, the Defendant told her:

> You are lying. and I already know 1 of the guys you sent too since thats how I got them. So how many guys was it in all?

The Defendant told the victim that he had taken the images without "permission," suggesting that the person to whom the victim had allegedly sent the images to did know that the Defendant had accessed them. This way, if the victim tried to determine whether an ex-boyfriend knew about this, and the ex-boyfriend denied it, the victim might still believe that the boyfriend's account had been hacked and she should do what the Defendant said to do.

The Defendant told the victims that they had to send images first before he would answer questions that they had about the origin of the original images and his identity.

> I will tell you what to take and then you send. it will only be a few. Once finished I delete everything. then answer questions. then we drop it.

Sadly, this "cut and paste" lure worked, and so Hernandez used it over and over as shown in many of the 199 accounts.[5] This signature means of approaching victims sets Hernandez apart from other sextortionists.

---

[5] Indeed, some of the defendant's victims remembered the script without even having their memory refreshed by looking at account data.

ii.   <u>Hernandez's Use of Multiple Platforms</u>

Hernandez differentiated himself by spinning off Facebook, for example, to other, less well-known platforms.  If Hernandez used an E-mail account, he used Hushmail or Yandex.  When the Defendant communicated with the victims using an email address, he used email-to-text, meaning that the victims received his emails as though they were text messages. The Defendant never had the victims "text" him at a phone number and he never spoke to them on the phone.  The Defendant did not use "spoofed" phone numbers like "TextNow" or TextMe."  The Defendant set up Dropbox accounts for individual victims, where the girls were directed to send their images and videos.  The account names were personalized to the victim.  The Defendant never used Skype or Facetime to communicate with his victims.

Finally, the defendant created social media in the victim's name and then reached out to her friends to populate the page.

iii.   *The Defendant's Unique Demands and Use of Screen Shots*

From this point, the conversation was driven by the girl's responses, but Hernandez's responses were formulaic, his demand for specific images was presented in a certain way, and his communication with the girls quickly fell into his signature speech patterns.

Typically, Hernandez quickly moved communication with his victims to other platforms.  Hernandez then followed up with a series of precise demands regarding the images and videos he wanted his victims to produce.  He promised them that if they just sent what he wanted, when he wanted, he would answer any questions

about how he had found them.

- The Defendant began his sextortion with a "list" of specific images.

- The Defendant would demand a photo of the victim wearing a bra using a mirror.

- The Defendant would demand that the victim's face be in the images.

- The Defendant began with requests for images, as opposed to video, or some kind of live-stream, like Facebook live, Facetime, or Skype.

- Defendant demanded that victim use the "back camera."

- The Defendant increased his demands that the victim produce videos of herself.

- The Defendant increased the extremity of the acts included as time passed.

- Defendant would send the victim a list of videos she needed to produce, that included the duration of the videos.  The victim was given a time period in which to complete her assignment and during that time she had to upload the images to Dropbox.

- The Defendant distributed images back to the victims to demonstrate that he still had them and could use the images against the victim

- The Defendant sent images of other girls (that he had extorted) to the victims for the purpose of demanding compliance and of humiliating the victims (knowing that he was likely doing the same thing to all of his victims).

The defendant's list that he used between victims—his signature—was not,

until approximately 2017, typed out every time – he simply sent a screenshot of his

demands (see Paragraph 23 of the Superseding Indictment).

```
k 2 vids.

1. strip vid first. wear a suggestive outfit.

2. a long vid of you fucking every hole. use a nice fat brush. I
wanna see everything there is to see in this 1 vid. make it
extra graphic and extra long. leave nothing for me to want to
see ever again.

you have to talk dirty in it as well. dont care how much trouble
you could get in if you get heard.

and do a bunch of positions in it. lay on side and spread that
ass and pussy. also lean back on your elbow and lift your legs
up and back so you can get deep with the brush. spread pussy in
that position so i can get a good view. tons of spreading. tons
of fucking and pulling out brush out. fuck yourself really close
to the camera.move back and fuck yourself from afar so face is
in it. fuck yourself slow. fast. hard. soft. |


basically just do everything. and  back camera or i'll make you
redo.
```

Hernandez also made demands to victims involving the production of images

of others:

- The Defendant requested images involving sexual activity with a
boyfriend.

- The Defendant requested images involving sexual activity with multiple
people.

- The Defendant never told his victims to contact their friends to get them

to produce images.

Hernandez had a specific sexual interest and wanted his victims to engage in these precise behaviors.  He often made them redo images that failed to meet his precise instructions.  Rather than retype them over and over with all of his victims, Hernandez lazily sent several versions of screen shots.  And now, those techniques strongly connects Hernandez to his victims. Indeed, one of the hallmarks of Hernandez's signature was the unique methods by which is exerted complete control over his victims, their families, and the public.

iv.     <u>Hernandez's willingness to expose his victims</u>.

Not unlike many sextortionists, the Defendant told victims that failure to comply meant that he would disseminate their images and videos.  The difference with Hernandez, however, is that he was serious and he actually did it.  He was not afraid to engage with law enforcement or with adults.  When they tried to shut him down, he escalated his behavior.  He made disclosures to many of his victims about his tradecraft.  Hernandez did not hack into the victims' computers—he directly confronted them with a lie.  Indeed, and with the exception of Victim 6, the defendant did not actually possess images of the girls before he started communicating with them.  He tricked his victims.  And in the case of Victim 6, he obtained those images during the course of his victimization of Victim 4.

v.   <u>Hernandez's violent threats, and willingness to taunt law enforcement.</u>

The nature of Hernandez's threats, and his willingness to engage with and even taunt law enforcement is unique.  As set forth in the Brookings article, most parents and their children are taught to ignore the sextortionist, and he will likely go away.  That's not at all what happened here.  In fact, Hernandez not only threatened to kill his victims and their families, he encouraged them to commit suicide, and threatened to bomb their schools.  That is a signature that sets him far apart from other sextortion criminals.  Indeed, Hernandez:

- Threatened to kill a victim's family

- Threatened to post images on social media

- Threatened to rape family members

- Threatened to "sell" the victim to other men online

- Threatened to "expose" one of his slaves as retaliation for another victim's non-compliance.

And, the defendant neither backed down nor disappeared when victims refused to comply, told their loved ones, or contacted law enforcement.  To the contrary, he engaged further which as a huge risk for exposure.

- Defendant did not end communication, which frequently happens in sextortion cases.

- Defendant bragged about being smarter than the police.

24

- Defendant taunted the police.

- Defendant expressed no fear of having police involved and does not attempt to dissuade victim from calling police.

As set forth in Paragraph 37 of the Superseding indictment, the defendant, using the alias Brian Kil, taunted the FBI:



He didn't do this with just Victims 1, 3, and 7-10.  He did it with Victim 2—the NIT Victim, as well.

vi.   <u>Hernandez's Signature Phrases/Patterns of Speech</u>

Hernandez, across ALL 199 accounts, used the following unique phrases with his victims:

- "Let's get started"

- "we will continue"

- "Expose my slaves"

- Defendant referred to his victims as "slaves."

- His language was racist, including use of the word "nigger"

- His language was homophobic, including use of the word "Fag"

Hernandez's communications were incessant at times—indicative of someone like Hernandez, who never held a job, and spent years alone in his room day and night extorting victims.

- At times, the Defendant would incessantly message the victim and threaten to expose them if they did not "answer."

- There were also times, with these same victims, where the Defendant would go for weeks or months without messaging the victim

- The Defendant's explanation for these times was that he was "exposing another slave"

Finally, the defendant also engaged in similar conversations with his victims.

- Defendant inquired about what sexual contact the victims had with others.

- Defendant talked about his desire to control the victims.

- Defendant asked whether he was being too nice.

- Defendant engaged in friendly "banter" with the girls.

- Defendant would tell the girls that "in real life" they would never give him attention.

It doesn't get much more signature than this.  This is classic 404(b) evidence of identity and *modus operandi* and should be admitted.

### III.   <u>The Government is introducing this evidence for a limited and permissible purpose.</u>

There is no danger of unfair prejudice.  In light of the evidence that is coming from Victims 1, 2, 3, 4, 5, 6, and 11, to believe that the jury is going to be substantially and unfairly prejudiced against the Defendant is not well founded.  Merely learning that there are other accounts that connect to the Defendant, that there are accounts that the Defendant used to search for his victims, that there all activity in these accounts stopped when the Defendant was arrested – this evidence is not unfairly prejudicial.

But, the Government recognizes the Court's concerns about language like "hundreds of victims." The Court has ruled that the Government "may present limited evidence of uncharged other bad act evidence to try and prove the identity" of the perpetrator (Dkt. 99. P. 9).  That's exactly what the Government intends to do here.  Nothing more.  It is the Government's intent to rely on evidence that shows identity and to do that by proving that the Defendant has a *modus operandi,* showing his signature words and behaviors through the evidence it presents.

To reduce any danger of unfair prejudice, the Government does not intend to

introduce *any* sexually explicit images that do not involve the charged victims or that were not sent to the charged victims.  Secondly, for almost all of the accounts that were **not** used to communicate with the charged victims and Victims 2 and 11, the Government does not intend to read the messages between the defendant and his victims.  As set forth above, the Government intends to introduce this evidence by way of a summary setting forth the connections between these accounts to the defendant only.  The purpose of the evidence is to prove the essential element of each of the charged offenses, namely that the defendant was the perpetrator.

### IV.    <u>The Records are Authentic and are not Hearsay</u>

The Government addressed the defendant's hearsay and authentication objections in its Motion to Admit, and incorporates those arguments here.   In summary, and as set forth in its Motion, the social media records are authentic under Federal Rule of Evidence 901(b)(1) and 902(11) and (13).    The defendant has stipulated that they are "Certified Records Generated by an Electronic Process or System."  They are not hearsay.  They were authored by the defendant, and are admissions by a party opponent, and place the victim's responses into context.  They are also —at least for their content, *Browne*, 834 F.3d at 436—admissible as business records.  Under Rule 803, certain items are excepted from the hearsay rule:

In summary, Government Exhibits 1-199 should be admitted.  The records are authentic (i.e., true and accurate information) and relevant (i.e., linked to Hernandez), prove the defendant's identity which is disputed, and not hearsay, or

meet an exception.  Their admission will not bar the defendant from arguing to the jury that it should place little or no weight on the evidence.

WHEREFORE, counsel for the Government requests this Court to admit Government Exhibits 1-199 into evidence.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:    s/*Tiffany J. Preston*
       Tiffany J. Preston
       Assistant United States Attorney
       Office of the United States Attorney
       10 W. Market St., Suite 2100
       Indianapolis, Indiana 46204-3048
       Telephone: (317) 226-6333
       Fax: (317) 226-6125
       E-mail: Tiffany.Preston@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of January, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.