UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Cause No. |
| Plaintiff, | ) 1:17-cr-0183-TWP-TAB-01 |
| | ) Indianapolis, Indiana |
| vs. | ) March 12, 2021 |
| | ) 9:09 a.m. |
| BUSTER HERNANDEZ | ) |
| a/k/a BRIAN KIL | ) |
| a/k/a BRIANNA KILLIAN | ) |
| a/k/a BRIAN MIL | ) |
| a/k/a GREG MARTAIN | ) |
| a/k/a PURGE OF MAINE | ) |
| a/k/a UYGT9 @HUSHMAIL.COM | ) |
| a/k/a JARE9302@HUSHMAIL.COM | ) |
| a/k/a DTVX1@HUSHMAIL.COM | ) |
| a/k/a LEAKED_HACKS1 | ) |
| a/k/a CLOSED DOOR | ) |
| a/k/a CLOSED COLOR | ) |
| a/k/a CLUTTER REMOVED | ) |
| a/k/a COLOR RAIN | ) |
| a/k/a PLOT DRAW | ) |
| a/k/a INVIL CABLE, | ) |
| | ) **REDACTED** |
| Defendant. | ) |

**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING

Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                   United States District Court
                                   46 East Ohio Street, Room 340
                                   Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**


For Plaintiff:                  Tiffany McCormick, Esq.
                                Kristina Korobov, Esq.
                                Assistant U.S. Attorneys
                                United States Attorney's Office
                                Suite 2100
                                10 West Market Street
                                Indianapolis, IN  46204


For Defendant:                  Mario Garcia, Esq.
                                Brattain Minnix Garcia
                                Suite 760
                                151 North Delaware
                                Indianapolis, IN  46204

# I N D E X

**GOVERNMENT'S WITNESS:**                              **PAGE**

REID MELOY

Direct Examination by Ms. Preston ..............29
Cross-examination by Mr. Garcia ................74
Redirect examination by Ms. Preston ...........88
Recross-examination by Mr. Garcia .............91


**DEFENDANT'S WITNESS:**                              **PAGE**

JOHN MATTHEW FABIAN

Direct Examination by Mr. Garcia ...............96
Cross-examination by Ms. Preston .............110
Redirect Examination by Mr. Garcia ...........141


MELVIN E. SIEFERT

Statement read into record ...................145

MINOR VICTIM 2

Statement read into record ...................151

MINOR VICTIM 2'S MOTHER

Statement read into record ...................153

MINOR VICTIM 3

Statement read into record ...................162

MINOR VICTIM 11

Statement read into record ...................172

MINOR VICTIM 20

Statement read into record ...................182

1              (In open court.)

2         THE COURT:  Good morning.  We are on the record.  This

3    is the United States of America versus Buster Hernandez, our

4    case number is 1:17-cr-183, and we are here this morning for a

5    sentencing hearing.

6         And we will begin by having counsel state your names

7    for the record and introduce those who are associated with you

8    and at your table, beginning with the government.

9         MS. PRESTON:  Good morning, Your Honor.  Tiffany

10   Preston on behalf of the United States.  Seated with me here

11   today is Special Agent Andrew Willmann of the FBI.  Sitting in

12   the jury box to my right is Special Agent Brian Barrett and

13   Assistant United States Attorney Kristina Korobov.

14        THE COURT:  Thank you.

15        On behalf of the defendant?

16        MR. GARCIA:  Good morning, Your Honor.  Mario Garcia.

17   And with me is the defendant, Buster Hernandez.

18        THE COURT:  Good morning, Counsel.

19        For the record, Matthew Renshaw is here from the

20   United States Probation Office, and our court reporter is David

21   Moxley.

22        On February 6 of last year, the defendant, Buster

23   Hernandez, entered a plea of guilty to Counts 1 through 41 of

24   the superceding indictment without the benefit of a plea

25   agreement.  At that hearing, the Court determined that

1    Mr. Hernandez was fully competent and capable of entering an

2    informed plea, that he was aware of the nature of the charges

3    and the consequences of the plea.  The Court found that the

4    plea of guilty was knowing and voluntary, it was supported by

5    an independent basis in fact that contained each of the

6    essential elements of the 41 offenses.

7         The plea was accepted and Mr. Hernandez was adjudged

8    guilty of Counts 1 through 8, sexual exploitation of children

9    through production of child pornography; Counts 9 through 11,

10   coercion and enticement of a minor; Counts 12 through 17,

11   distributing and receiving child pornography; Counts 18 through

12   21, threats to use explosive devices; Count 22, threats and

13   extortion; Counts 23 through 32, threats to kill, kidnap, and

14   injure; Count 39, obstruction of justice; and Counts 40 and 41,

15   retaliation against a victim or witness.

16        And it's my understanding, lawyers, that we are

17   prepared to proceed with sentencing.  Has the government had an

18   opportunity to review the Presentence Investigation Report that

19   was prepared by the United States Probation Office?

20        MS. PRESTON:  We have.

21        THE COURT:  And do you have any objections or

22   corrections to that report, Ms. Preston?

23        MS. PRESTON:  No, Your Honor.

24        THE COURT:  Mr. Garcia, have you and your client had

25   an opportunity to review the Presentence Investigation Report?

1          MR. GARCIA:  We have, Your Honor.

2          THE COURT:  And, Counsel, you have filed an objection,

3     which we will discuss at this time.

4          MR. GARCIA:  Thank you, Your Honor.

5          THE COURT:  Okay.  The defendant objects to

6     paragraph 309.  Defense counsel, you object to the five-level

7     Chapter 4 enhancement.  That enhancement is that the offense

8     of conviction is a covered sex crime.  Neither Section 4B1.1,

9     the career offender; or the subsection, Section 4B1.5, applies,

10    and the defendant engaged in a pattern of activity involving

11    prohibited sexual conduct.  Therefore, the defendant is a

12    repeat and dangerous sex offender against minors, and that

13    would warrant a five-level increase.  So, Counsel, do you want

14    to discuss your objection?  It's in writing, but go ahead and

15    discuss -- and it's in your memo, but go ahead.

16         MR. GARCIA:  Yes.  Thank you, Your Honor.  And,

17    briefly, just to elaborate, we do not believe the term

18    "prohibited sexual conduct" means uncharged offenses, or

19    offenses that are not part of the conduct in this case.  The

20    enhancement here requires the defendant commit a prior offense

21    before committing the prohibited sexual conduct in this case.

22         Mr. Hernandez, as you know, has no criminal history.

23    He was never convicted of a prior sexual offense or prior

24    prohibited sexual conduct.  I believe the probation officer has

25    indicated that his offense conduct in this case established the

pattern sufficient to warrant the enhancement, but we do not
believe that the guidelines are clear and unambiguous, and we
do not believe, for those reasons, that it should be applied in
this case.

THE COURT:  And, Ms. Preston, if you would respond?

MS. PRESTON:  Your Honor, as set forth in our
sentencing memorandum, this application is clear and
unambiguous.  When talking about a prior conviction, there's a
separate statute that addresses that, as we set forth in our
argument here.  What we are talking about is a guideline
enhancement.  And under 4B1.5, five levels should be added to
the adjusted offense level if, in any case in which the
defendant's instant offense of conviction is a covered sex
crime and neither 4B1.1 or Section (a) of this guideline
applies, and the defendant engaged in a pattern of activity
involving prohibited sexual conduct, then the application
applies.

First, Mr. Hernandez does not dispute that Counts 1
through 11, to which he pled guilty, are covered sex crimes,
nor could he, because it is absolutely clear that Counts 1
through 11 are covered sex crimes under Chapters 110 and 111.
Probation said that, we said that, and they're right.  As set
forth in Exhibits A and B, Hernandez was convicted of sexually
exploiting and coercing minor victims to produce child
pornography under Sections 2251(a) and 2422(b), again, Counts 1

1   through 11.  So he clearly meets the first prong.

2          Hernandez also clearly meets the second prong of the

3   application, because he engaged in a pattern of activity

4   involving prohibited sexual contact with minors.  And, as set

5   forth in my brief, it defines what "prohibited sexual conduct"

6   means.  It means any offense described in 2426(b)(1)(A) or (B).

7   It also means the production of child pornography, or it

8   means -- sorry, or trafficking in child pornography, but only

9   if prior to the commission of the instant offense, the

10  defendant sustained a felony conviction.  And, of course, it

11  does not include receipt or possession of child pornography.

12         So what the guidelines tell us is how to determine

13  pattern of activity.  In general, it says the defendant engaged

14  in a pattern of activity involving prohibited sexual conduct if

15  at least on two separate occasions he engaged in prohibited

16  sexual conduct with a minor.

17         Your Honor, he admitted to numerous, numerous patterns

18  of activity, numerous instances in prohibited sexual conduct

19  with a minor.  Now, importantly, an occasion of prohibited

20  sexual conduct may be considered for purposes of Section B

21  without regard to whether the occasion occurred during the

22  course of the instant offense or resulted in a conviction for

23  the conduct that occurred.

24         THE COURT:  What are you reading from, Counsel?

25         MS. PRESTON:  I'm sorry.  Under the Guidelines Section

1    (b)(1)(2).  It is the explanation of what and how you determine

2    pattern of activity.

3            Now, so what we have here is, we know from that that

4    prohibited sexual conduct includes the production of child

5    pornography.  Mr. Hernandez pled guilty to Counts 1 through 8,

6    production of child pornography.  Accordingly, he pled guilty

7    to eight, eight counts of producing child pornography.  That

8    constitutes engaging in prohibited sexual conduct with minors

9    on at least two separate occasions.  Here we have eight, Your

10   Honor, counts of conviction, eight separate occasions.

11           And it doesn't matter, as I just said, that that

12   occurred in the course of the instant offense, the offenses for

13   which we are here today.  And it doesn't matter if it resulted

14   in a conviction for that conduct, although here it did.  There

15   is nothing ambiguous here, Your Honor, and Probation agrees.

16           As it's set forth, it's clear under the different

17   prongs -- and if you look at the PSR, Mr. Renshaw laid it out

18   perfectly for Mr. Hernandez and Mr. Garcia -- there is no

19   requirement that he has committed a prior felony for production

20   of child pornography or another offense.  I think what's

21   happening is that Mr. Hernandez and Mr. Garcia are confusing

22   that with the statute that applies for enhanced statutory

23   penalties.  This is a guideline provision, and it clearly

24   applies here.

25           THE COURT:  Mr. Garcia, did you have any further

1   argument?

2         MR. GARCIA:  No.  We've set it all forth in our

3   materials, Your Honor.  Thank you.

4         THE COURT:  All right.  The objection is overruled.

5   As noted by the probation officer who prepared the Presentence

6   Investigation Report, the enhancement does apply, because

7   Mr. Hernandez does satisfy the second criteria for a repeat and

8   dangerous sex offender against minors, as well as the first

9   criteria.  And the Court determines that the guideline note is

10  not ambiguous.

11        The three factors that are set forth in the guideline,

12  any offense described in Title 18 United States Code, Section

13  2426(b)(1)(A) or (B), the second criteria, the production of

14  child pornography; or Section 3, trafficking in child

15  pornography only if, prior to the commission of the instant

16  offense of conviction, the defendant sustained a felony

17  conviction for that trafficking in child pornography.

18        Because these factors are separated by semicolons and

19  the language "or" is used, the requirement for each is

20  contained within that semicolon.  Only one of the criteria is

21  required.  Defense counsel has not objected to the requirement

22  that the defendant's offense is a covered sex crime, and that's

23  because Counts 1 through 11 are all covered sex crimes under

24  the statute.

25        The second criteria, the production of child

1    pornography, is also satisfied.  The Court rejects defense

2    counsel's argument that says that the pattern of prohibited

3    sexual conduct is somehow unclear or ambiguous so as to whether

4    it requires the defendant committed a prior offense before

5    committing the prohibited sexual conduct in the instant

6    offense.  The fact that Mr. Hernandez does not have a prior

7    felony conviction is irrelevant, because he only needs to

8    satisfy one criteria.  More, as the government noted, on at

9    least two separate occasions, more than two separate occasions,

10   the defendant did engage in prohibited sexual conduct.  So the

11   objection is overruled.

12          Are there any other objections, Mr. Garcia, or any

13   corrections that need to be made to the Presentence Report on

14   behalf of the defendant?

15          MR. GARCIA:  Yeah.  Thank you, Your Honor.  The only

16   other, I guess, correction that we would ask, paragraphs 330

17   and 331 concern the defendant's mental and emotional health.

18          THE COURT:  Okay.  Hold on.  Let me get there.  330

19   and 331?  Okay.

20          MR. GARCIA:  I think it's fair to say, from the

21   extensive written submissions that the Court has received from

22   both Dr. Meloy and Dr. Fabian, that there are numerous

23   potential diagnoses, mental health issues, behaviors that

24   Mr. Hernandez will need treatment for.  I know a lot of times,

25   the Bureau of Prisons will simply look to the Presentence

1    Report.

2         And what we would ask in your findings when we make

3    our recommendations is that the Court strongly recommend

4    Mr. Hernandez to be evaluated for any mental health issues he

5    may have and any recommended treatment, and that the report

6    does not adequately detail those, but subsequent information

7    does.

8         THE COURT:  That's fine, Counsel.  We will submit

9    both, psychiatric reports or psychological reports, with his

10   Presentence Investigation Report.

11        MR. GARCIA:  Thank you, Your Honor.  That is all.

12        THE COURT:  Okay.  All right.  So I'm -- do you -- I

13   don't think I need to actually make any correction to those

14   paragraphs, because 330 is just saying that the defendant

15   reported no history of mental illness, and I think that's

16   accurate.  He did not believe he suffered from any mental

17   health issue.  He doesn't have that belief, and then his

18   mother's statement is that she's unsure of his mental health

19   status.  So we'll leave the report as is, and I will instruct

20   the probation officer to attach both of the mental health

21   reports to the Presentence Report.

22        MS. PRESTON:  And, Your Honor, if I may, just for the

23   record, note, since we've been talking about mental health in

24   this paragraph, there's certainly nothing here on the record

25   that has ever suggested that Mr. Hernandez is not in perfect

1    cognitive health, so there's never been an issue in this case

2    of competency, and I want to make sure that's clear on the

3    record.

4              THE COURT:  Do you agree?

5              MR. GARCIA:  Yes.  We're not asserting anything

6    dealing with his competency.

7              THE COURT:  Right.  He's very competent.

8              All right.  So with that being said, Counsel, the

9    Court is going to accept the Presentence Investigation Report

10   for the record under seal.  In the event of appeal, counsel on

11   appeal will have access to the report, but not the

12   recommendation portion, which shall remain confidential.

13             Pursuant to the sentencing guidelines, the Court is

14   going to determine -- the Court determines that all of the

15   counts, the 41 counts, form a total of 24 groups for guideline

16   calculation purposes.

17             With respect to Counts 1, 9, and 12, the production of

18   child pornography, coercion and enticement of a minor, and

19   distributing or receiving child pornography, the base offense

20   level is 32.  For the specific offense characteristic that the

21   defendant knowingly engaged in distribution, two levels are

22   added.

23             For the specific offense characteristic that the

24   offense involved the use of a computer or an interactive

25   computer service to induce a minor to engage in sexually

1    explicit conduct, two levels are added.

2            The adjustment for obstruction of justice applies

3    because Mr. Hernandez willfully obstructed, impeded, or

4    attempted to instruct or impede the administration of justice

5    with respect to the investigation, prosecution, or sentencing

6    of the instant offense of conviction, and the obstructive

7    conduct related to his offense of conviction and any relevant

8    conduct or a closely related offense.  Therefore, two levels

9    are added, and the adjusted offense level is level 38.

10           With respect to Counts 33 and 39, witness tampering

11   and obstruction of justice, the base offense level is 30.

12   There are no specific offense characteristics.  The adjusted

13   offense level is 30.  And the greater adjusted offense level of

14   Group 1 is 38.

15           Group 2 is Count 2, production of child pornography.

16   This is with respect to Victim Number 1.  The base offense

17   level is 32.  For the specific offense characteristic that the

18   defendant knowingly engaged in distribution, two-levels are

19   added.  For the specific offense characteristic that the

20   offense involved the use of a computer to induce a minor to

21   engage in sexually explicit conduct, two levels are added.  The

22   obstruction of justice application applies because

23   Mr. Hernandez willfully obstructed, impeded, and attempted to

24   instruct and impede the administration of justice with respect

25   to the investigation and prosecution.  Therefore, two levels

are added.  The adjusted offense level is 32.

Group 3, which is Counts 3 and 13, the base offense level is 32.  This is production of child pornography and distributing and receiving child pornography.  The specific offense characteristic that the defendant engaged in distribution applies, so two levels are added.  The specific offense characteristic that the offense involved the use of a computer to induce a minor to engage in sexually explicit conduct applies, so two levels are added.  The obstruction of justice application applies because the defendant willfully obstructed, impeded, or attempted to instruct or impede the administration of justice with respect to the investigation of these counts, so two levels are added, and the adjusted offense level subtotal is 38.

Group 4, Count 4, production of child pornography, and this is Victim 1.  The base offense level is 32.  For the specific offense characteristic that the defendant knowingly engaged in distribution, two levels are added.  For the specific offense characteristic that the offense involved the use of a computer to induce a minor to engage in sexually explicit conduct, two levels are added.  The adjustment for obstruction of justice applies because the defendant willfully obstructed, impeded, or attempted to obstruct or impede the administration of justice with respect to the investigation, two levels are added, and the adjusted offense level subtotal

is 38.

Group 5, Count 5, production of child pornography, Victim 1.  The base offense level is 32.  For the specific offense characteristic that the defendant engaged in distribution, two levels are added.  For the specific offense characteristic that the offense involved the use of a computer to induce a minor to engage in sexually explicit conduct, two levels are added.  The adjustment for obstruction of justice applies because the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the investigation of his conduct, two levels are added.  The adjusted offense level subtotal is 38.

Group 6, Counts 6, 10, and 35.  The base offense level is -- let's see, the base offense level -- these offenses are grouped, and only one set of guideline calculations is shown. For Counts 6 and 10, production of child pornography and coercion, enticement of a minor, the base offense level is 32. For the specific offense characteristics that this offense involved a minor who was between the ages of 12 and 16, two levels are added.  For the specific offense characteristic that the defendant knowingly engaged in distribution, two levels are added.  For the specific offense characteristic that the offense involved the use of a computer, two levels are added. The adjustment for obstruction of justice applies because, again, the defendant willfully obstructed, impeded, or

attempted to obstruct or impede the administration of justice
with respect to the investigation, two levels are added.  And
the adjusted offense level subtotal is 40.

Count 35, witness tampering.  The base offense level
is capped at 30.  The adjusted offense level subtotal is 30,
and the greater adjusted offense level for Group 6 is level 40.

Group 7, Counts 7, 14, and 15, involve the same
victim.  This is Victim 4.  For Counts 7, 14, and 15,
production of child pornography and distributing and receiving
child pornography, the base offense level is level 32.  For the
specific offense characteristic that this offense involved a
minor who was between the ages of 12 and 16, two levels are
added.  For the specific offense characteristic that the
defendant knowingly engaged in distribution, two levels are
added.  For the specific offense characteristic that the
offense involved the use of a computer, two levels are added.
The adjustment for obstruction of justice applies because the
defendant willfully obstructed, impeded, or attempted to
obstruct and impede the investigation, two levels are added,
and the adjusted offense level subtotal is 40.

Group 8, this is Counts 8, 11, and 36, this is with
respect to Victim Number 5.  With respect to Counts 8 and 11,
production of child pornography and coercion and enticement of
a minor, the base offense level is 32.  For the specific
offense characteristic that this offense involved a minor who

1    was between the age of 12 and 16, two levels are added.  The

2    defendant knowingly engaged in distribution, so two levels are

3    added.  For the specific offense characteristic that this

4    offense also involved the use of a computer to induce a minor

5    to engage in sexually explicit conduct, two levels are added.

6    The adjustment for obstruction of justice applies because,

7    again, he willfully obstructed or impeded or attempted to

8    obstruct and impede the investigation, two levels are added.

9    And the adjusted offense level is level 40.

10           Count 36, witness tampering, this is capped, the base

11   offense level is capped at 30.  The adjusted offense level

12   subtotal is 30, and the greater adjusted offense level for

13   Group 6 is 40.

14           Group 9, this is Counts 16 and 37, the -- let's see.

15   This is Victim 6.  For Count 16, distribution -- distributing

16   and receiving child pornography, the base offense level is 32.

17   For the specific offense characteristic that this offense

18   involved a minor who was between the age of 12 and 16, two

19   levels are added.  For the specific offense characteristic that

20   the defendant knowingly engaged in distribution, two levels are

21   added.  For the specific offense characteristic that the

22   offense involved the use of a computer, two levels are added.

23   The adjustment for obstruction of justice also applies for a

24   two level increase, and the adjusted offense level subtotal is

25   40.

Count 37, witness tampering, the base offense level is capped at 30.  The adjusted offense level subtotal is 30, and the greater adjusted offense level for Group 9 is 40.

Group 10, Count 17.  Group -- Count 10, distributing and receiving child pornography of Victim 6, the base offense level is 32.  Two levels are added because the offense involved a minor who was between the age of 12 and 16.  Two levels are added because the defendant engaged in distribution.  Two levels are added because the offense involved the use of a computer.  And the adjustment for obstruction of justice applies to this count, also, because the defendant willfully obstructed, impeded, or attempted to obstruct and impede the administration of justice, two levels are added, and the adjusted offense level is 40.

Group 11, Victim 11, the base offense level is 32. The specific offense characteristic that this offense involved a minor who was between the ages of 12 and 16, two levels are added.  The defendant engaged in distribution, two levels are added.  The offense involved the use of a computer, two levels are added.  And, again, the adjustment for obstruction of justice applies, two levels are added, and the adjusted offense level is 40.

Group 12, Victim 12.  Victim 12 was less than 16 years old, so the base offense level is 32.  For the specific offense characteristic that the minor was between the ages of

1    12 and 16, two levels are added.  The defendant knowingly

2    engaged in distribution, two levels are added.  This offense

3    involved the use of a computer to engage in sexually explicit

4    conduct with a minor, two levels are added.  The adjustment for

5    obstruction of justice applies, two levels are added, and the

6    adjusted offense level is 40.

7         Group 13, Counts 18 and 26.  This is threat to use

8    explosive devices and threats to kill, kidnap, or injure.  The

9    base offense level is 12.  For the specific offense

10   characteristic that the offense involved more than two threats,

11   two levels are added.  For the specific offense characteristic

12   that the offense resulted in a substantial disruption of

13   business functions or services, four levels is added.  The

14   adjustment for obstruction of justice applies, two levels are

15   added, and the adjusted offense level subtotal is 20.

16        Group 14, Counts 19 and 27, threat to use explosive

17   devices and threats to kill, kidnap, or injure.  The base

18   offense level -- this is Danville High School.  The last group,

19   13, was Plainfield High School.  The base offense level is

20   level 12.  For the specific offense characteristic that this

21   offense involved more than two threats, two levels are added.

22   For the characteristic that this offense resulted in a

23   substantial disruption of business functions or services, four

24   levels are added.  And the adjustment for obstruction of

25   justice applies, which adds two levels, and the adjusted

offense level subtotal is 20.

Group 15, Counts 20, 29, and 30, this is the threats at The Shops at Perry Crossing.  Counts 20, 29, and 30, threat to use explosive devices and threats to kill, kidnap, or injure.  The base offense level is 12.  For the specific offense characteristic that this offense involved more than two threats, two levels are added.  Because the threats resulted in a substantial disruption of business function or services, four levels are added.  The adjustment for obstruction of justice applies, and two levels are added.  The adjusted offense level is level 20.

Group 16, this is Count 21.  This involves the Walmart, threats to use explosive devices.  The base offense level is 12.  For the specific offense characteristic that this offense involved more than two threats, two levels are added. For the specific offense characteristic that this offense resulted in the substantial disruption of business functions or services, four levels are added.  The adjustment for obstruction of justice applies, two levels are added.  And the adjusted offense level is 20.

Group 17, which is Count 22, threats and extortion to Victim Number 3.  The base offense level is 18.  There are no specific offense characteristics, and the adjusted offense level is 18.

In Group 18, Counts 23, 38, and 41, this is threats to

kill, injure, or kidnap.  The base offense level is 12.  The adjusted offense subtotal is 12.

Counts 38 and 41, witness tampering and retaliation against a witness or victim, the base offense level is 14. Because this offense involved using -- involved causing or threatening to cause physical injury to a person in order to obstruct the administration of justice, eight levels are added. The adjusted offense group level for Group 18 is 22.

Count 19 -- Group 19, which is Count 24, threats to kill, kidnap, or injure Victim Number 8, the base offense level is 12.  The adjusted offense level subtotal is 12.

Group 20, this is Counts 25 and 40.  Count 25, threats to kill, kidnap, or injure Victim 1, the base offense level is 12.  For the -- the adjusted subtotal is 12.  Count 40, retaliation against a witness or victim, the base offense level is 14.  For the specific offense characteristic that the offense involved causing or threatening to cause physical injury to a person in order to obstruct the administration of justice, eight levels are added.  The adjusted offense level is 22.  The greater of the adjusted offense levels for Group 20 is 22.

Group 21, this is Count 28, threats to kill, kidnap, or injure Victim 1, the base offense level is 12.  The adjusted offense level is 12.

Group 22, Count 31, threats to kill, kidnap, or injure

Victim 1, the base offense level is 12.  The adjusted offense level is 12.

Group 23 is Count 32, threats to kill, kidnap, or injure Victim Number 10, the base offense level is 12.  The adjusted offense level is 12.

Group 24, this is our final group, this is Count 34, witness tampering of Victim Number 3, the base offense level is 14.  The adjusted offense level is 14.

Under the multiple-count adjustment, the total number of units is 12.  The greater of the adjusted offense levels above is 40.  The offense level is increased pursuant to the number of units assigned to the amount indicated in the table under the guidelines.  The maximum is five, so those five levels will be added.  The combined adjusted offense level is level 45.

The Chapter 4 enhancement applies because the offense of conviction is a covered sex crime.  The defendant therefore is a repeat and dangerous sex offender against minors.  The five level enhancement applies, and the offense level -- the Chapter 4 enhancement, the offense level would be level 50.

The defendant did accept responsibility by pleading guilty, so he's entitled to the two-level reduction.  Government, are you going to make any motion with respect to the additional one-level --

1          MS. PRESTON:  No.

2          THE COURT:  -- reduction?

3          MS. PRESTON:  I'm sorry, Your Honor.

4          THE COURT:  And will you explain for the Court of

5     Appeals why?

6          MS. PRESTON:  Yes.  Your Honor, the defendant pleaded

7     guilty on February 6, 2020.  His trial -- it was a Thursday.

8     His trial was scheduled for Monday.  This was going to be a

9     lengthy, at least two-week, trial.  The government expended

10    several months of resources preparing for this trial, including

11    the preparation of exhibits and witnesses, including victim

12    witnesses.  They were all prepared, and we had all made travel

13    arrangements, and we were ready to go.  And the Court had spent

14    an incredible amount of time ruling on several pleadings in

15    this case.  It was not timely, Your Honor.

16         THE COURT:  Okay.  Did you want to address the

17    government's decision not to apply the additional one level --

18         MR. GARCIA:  Sure.

19         THE COURT:  -- Mr. Garcia?

20         MR. GARCIA:  Thank you.

21         THE COURT:  All right.  We'll let him address this,

22    Counsel.

23         Go ahead, Mr. Garcia.

24         MR. GARCIA:  For the record, Your Honor, I certainly

25    understand the position of the government.  We would object for

the record.  Mr. Hernandez's plea of guilty, although on the

eve of trial, did save the government considerable time and

expense in not having to sit through two weeks of trial, and so

for those reasons we believe that it is warranted.  Thank you.

THE COURT:  Well, that's why he's getting the

two-level reduction, Mr. Garcia.  The additional one level is

100 percent completely the discretion of the government, and

the Court agrees with the government in this case.  We had

done, and you also had probably done, just about everything we

could have done to prepare for trial.  We had voir dire

questions, we had a jury subpoenaed, we were -- we were ready

to go.  So a lot of time and resources were expended, so the

Court accepts the government's decision not to apply the

additional one-level reduction.

The guideline calculation, once we subtract the two

levels, is 48.  However, the maximum that we use under our

guidelines is level 43, so the offense level will be treated as

a level 43.

Under the sentencing guidelines, the defendant has no

criminal history, no criminal convictions, so he is in

criminal -- his criminal history score is zero.  Under the

guidelines, a criminal history score of zero establishes a

criminal history category of I, and under the guidelines, the

sentence in this case should be life imprisonment.

At this time, lawyers, we are going to --

1     (Off the record.)

2         THE COURT:  Okay.  All right.  So we need to pause for

3 a minute, because the Wi-Fi went out in the overflow room, so

4 she's got to get them back on-line, and then we can address

5 you, Mr. Garcia.

6         MS. PRESTON:  I believe it might be out here, as well.

7 I lost my connection, as well.

8         COURTROOM DEPUTY:  Yes.  All Wi-Fi is out.

9         THE COURT:  Oh, it's the whole building?

10        COURTROOM DEPUTY:  I think so.

11    (Off the record.)

12        THE COURT:  Tanesa informed me that the doctor and two

13 victims are on video, so we have to get the Wi-Fi back up for

14 them.

15    (Off the record.)

16        THE COURT:  All right.  IT has requested that we take

17 a brief recess, so don't go far, everyone.  We'll come back to

18 your exact same locations in about 5 or 10 minutes.  We'll be

19 in a very brief recess.

20        THE COURTROOM DEPUTY:  All rise.

21    (Recess at 9:48, until 10:03.)

22        THE COURT:  Okay.  It looks like we're good to go.  We

23 are back on the record.

24        And, Counsel, I did misspeak when I did the

25 calculations.  On Count -- I'm sorry.  Group 2 -- let me pull

1   up Group 2.  Group 2, the adjusted subtotal is 38.  I believe I
2   said 32, but it's actually 38.  So I'll make that correction
3   for the record.
4           And, Mr. Garcia, did you have something you wanted to
5   say before we resume?
6           MR. GARCIA:  No.  That's what I noted, Your Honor.
7           THE COURT:  Oh, okay.  All righty.
8           So before we begin the presentation of evidence, the
9   Court notes that the government has filed a motion for a
10  preliminary order of forfeiture at docket 185.  Mr. Garcia, do
11  you want to be heard or do you have any objection to the Court
12  granting the government's motion for preliminary forfeiture of
13  Mr. Hernandez's devices?
14          MR. GARCIA:  I conferred with my client.  We have no
15  objection, Your Honor.
16          THE COURT:  All right.  So I will grant that motion
17  and I'll sign that order.
18          MS. PRESTON:  Thank you, Your Honor.
19          THE COURT:  It's my understanding that both parties
20  have witnesses.  Ms. Preston, you filed victim impact
21  statements, but you also wish to present victim testimony
22  today; is that correct?
23          MS. PRESTON:  Yes, Your Honor.  The witnesses will be
24  presenting impact statements.  They will not be sworn, but they
25  would -- there are some witnesses who would like to address the

1  Court in person.

2          THE COURT:  All right.  And you also have an expert

3  witness?

4          MS. PRESTON:  Yes.

5          THE COURT:  And, Mr. Garcia, you have an expert

6  witness?

7          MR. GARCIA:  Yes.

8          THE COURT:  And so what order do you want to proceed,

9  lawyers?  Are we going to hear from the experts first or the

10  victims first?

11          MS. PRESTON:  Your Honor, if we could hear from the

12  expert witnesses first, I think that may make the most sense,

13  particularly since one of those is appearing virtually --

14          THE COURT:  Okay.

15          MS. PRESTON:  -- and it's working right now.

16          THE COURT:  All right.  Who wants to go first?

17          MS. PRESTON:  I can go first, Your Honor.

18          THE COURT:  All right.  You may call your witness.

19          MS. PRESTON:  Your Honor, I believe I can see him in

20  the screen.

21          Dr. Meloy, can you hear me for the record?

22          THE WITNESS:  Yes, I can.

23          THE COURT:  All right.  Let me get him sworn.

24          Doctor, would you stand and raise your right hand so

25  that you can be sworn.

1    (The witness is sworn.)

2         THE COURT:  You may be seated.

3         And, Counsel, you may examine your witness.

4         MS. PRESTON:  Thank you, Your Honor.  Your Honor, for

5    the record, before I begin, appearing on the share screen

6    today, which I believe you can see, are some slides to assist

7    us in the direct examination of Dr. Meloy.  All of the slides

8    that the government is using today, both in Dr. Reid Meloy's

9    testimony, the cross of Dr. Fabian, as well as my sentencing

10   argument, are numbered and will be filed either this evening or

11   over the weekend for the appellate record.

12        THE COURT:  All right.  Thank you, Counsel.

13        MS. PRESTON:  And, again, for the record, Your Honor

14   kindly granted permission for certain witnesses and victims to

15   appear virtually, and for the record, Dr. Meloy is appearing

16   virtually.  He can be seen and heard by defense counsel and

17   defendant on the video screen.

18        THE COURT:  Correct.

19         **REID MELOY, GOVERNMENT'S WITNESS, SWORN**

20              **DIRECT EXAMINATION**

21   BY MS. PRESTON:

22   Q.  Good morning -- good morning, Dr. Meloy.

23   A.  Good morning, Ms. Preston.

24   Q.  You just swore an oath to tell the truth.  For the record

25   and for the participants in the gallery, can you please

*MELOY - DIRECT/PRESTON*                                    30

1    introduce yourself to the judge this morning.

2    A.   Yes.  My name is Dr. Reid Meloy, and I'm here from San

3    Diego, California, presenting remotely to the court.

4    Q.   Dr. Meloy, what do you do for a living?

5    A.   I'm a forensic psychologist.  That means that I am licensed

6    as a psychologist, and I'm also board certified in forensic

7    psychology.

8    Q.   Dr. Meloy, are your qualifications -- including your

9    education, training, and experience; professional and board

10   memberships; peer-reviewed and published scientific papers,

11   abstracts, letters, chapters and manuscripts, books and

12   monographs, book reviews; scientific instruments and tests; and

13   select presentations; as well as your expert witness

14   experience -- set forth in your 41-page curriculum vitae?

15   A.   Yes, they are.

16         MS. PRESTON:  For the record, Your Honor, we provided

17   Dr. Reid Meloy's expert report, as well as his CV that is

18   contained at docket 170.  And with permission, Your Honor,

19   Dr. Meloy has asked that he may be allowed to reference that

20   report, as well as Dr. Fabian's report, as he testifies.  And

21   since you can't see his hands, I wanted to make sure that that

22   permission was granted.

23         THE COURT:  Do you have any objection?

24         MR. GARCIA:  None.

25         THE COURT:  All right.  That permission is granted.

*MELOY - DIRECT/PRESTON*                                   31

BY MS. PRESTON:

Q.  Dr. Meloy, did you author a report in this case setting

forth your opinions, the basis for your opinions, and the

supporting documentation you used to form those opinions?

A.  Yes, I did.

Q.  Again, that --

        THE COURT:  And, Counsel, before you proceed, do you

move that the Court declare Dr. Meloy an expert forensic

psychologist?

        MS. PRESTON:  Yes, Your Honor.  We're going to move to

tender him in a number of areas, and I can either do that now

or after I go through his qualifications.

        THE COURT:  All right.  You can do it as you go

through qualifications.

        MS. PRESTON:  Thank you so much, Your Honor.

BY MS. PRESTON:

Q.  All right.  Dr. Meloy, were you retained by the government

to render a psychological diagnosis and conduct a risk

assessment of the defendant, Buster Hernandez?

A.  I was.

Q.  Now, as you know, sir, this is a sentencing hearing, there

is no jury, and the Court has reviewed your lengthy curriculum

vitae, as well as your report.  So, knowing that, I'm going to

ask you today a few targeted questions about your background

that pertain specifically to your opinions today; is that all

1  right?

2  A.  Yes.

3  Q.  Could you briefly describe your education and training in

4  the field of forensic psychology?

5  A.  Yes.  I graduated -- my undergraduate degree is from the

6  College of Wooster in Ohio.  I took two master's degrees in

7  Chicago.  One was in theology and the other one was in

8  psychiatric social work.  The second one was from the

9  University of Illinois.

10      And during that period of time immediately following my

11  receiving of my master's degrees and licensing as a clinical

12  social worker, I worked for a mental health clinic in Oak Park,

13  Illinois.  And there, I was director of the day treatment

14  program, where we -- where we treated individuals who were

15  severely mentally ill.

16      I then relocated to San Diego, California, and continued my

17  work as a clinical social worker, providing outpatient

18  psychotherapy, individual therapy, group therapy, other

19  treatment methodologies for the San Diego County Mental Health

20  Department.  And during that time, I pursued my doctorate in

21  clinical psychology and received my doctorate in 1981 from

22  Alliant International University.  I was licensed as a

23  psychologist in 1982.

24      And immediately after I was licensed, I then was hired to

25  establish and direct a psychiatric -- small psychiatric

1  hospital in the San Diego detention facilities.  This was a

2  maximum security setting.  We had a 24-bed hospital.  We

3  treated individuals that were typically charged with felony

4  crimes, specifically violent felonies.  And these were

5  individuals that had had psychiatric disorders.  And so I

6  directed that program for four years, and --

7  Q.  I'm going to stop you there, Dr. Meloy, just to break this

8  up just a little bit.

9  A.  Sure.

10  Q.  Now, you just mentioned your educational background, you

11  talked about the licenses that you hold.  I believe what you

12  were getting to was your experience; is that correct?

13  A.  Correct.

14  Q.  And I just want to make sure, before we move forward for

15  the record, that that is set forth on pages 2 and 3 of your CV;

16  is that right?

17  A.  Correct.

18  Q.  And before we get into some of the details, because I do

19  want to ask you a bit more about that work that you were just

20  mentioning, is it fair to say that for approximately 20 years,

21  did you treat psychiatric patients in various capacities?

22  A.  Correct.

23  Q.  And have you held positions in psychotherapy and

24  psychodiagnostics evaluations during the 20-year period?

25  A.  Correct.

1    Q.  Okay.  I'd like to talk to you then, now, about your

2    extensive experience in treating criminal defendants who have

3    committed crimes of violence.  And I believe you were just

4    talking about this.  You said you were the director of the

5    psychiatric security unit in the San Diego County detention

6    facility; correct?

7    A.  Correct.

8    Q.  Is that that 24-unit facility that you were just

9    mentioning?

10   A.  Yes.  That was a 24-bed psychiatric hospital inside the

11   detention system.

12   Q.  And go on, because I interrupted you, what is it that you

13   did there?

14   A.  What we did was, we attempted to treat individuals that

15   manifested psychiatric symptoms and psychiatric disorders in

16   the custody of the San Diego County Sheriff, and those

17   individuals would be admitted to the unit.  Many of those cases

18   were acute, meaning they were short-term treatment.  Some of

19   those cases were long-term treatment cases, so the individuals

20   would literally stay in the hospital, within the facility, for

21   months at a time.  And then we also would have individuals that

22   would attempt to be admitted to the facility that were

23   malingering a psychiatric disorder and, in fact, did not have

24   one.

25   Q.  Were you also the chief of the forensics mental health

1    division in the San Diego County Department of Public Health?

2    A.   Yes.  After I had established and run the psychiatric

3    security unit for four years, I was asked to be the chief of

4    the forensic mental health division for San Diego County.  And

5    in that capacity, I oversaw programs for both men and women

6    that were either in custody or were placed on what we refer to

7    as an involuntary outpatient program that was under the

8    supervision of the court.  And these individuals, again, were

9    either charged or convicted of crimes and were manifesting

10   psychiatric disorders and needed to be in treatment.

11   Q.   Was that the conditional release program that you told me

12   about?

13   A.   Yes.  The involuntary outpatient program in California is

14   called a conditional release program.  And it's a program

15   primarily for people found not guilty by reason of insanity,

16   but there are also people in that program that have been found

17   incompetent to stand trial, and they remain under the

18   supervision of the court, and we would treat those individuals

19   with court approval of their treatment plans.

20        And then, if they needed to be returned to custody or to

21   the state hospital, we would go before the judge and petition

22   the court to do that based upon our experience with that

23   particular -- with that particular patient.  And the judge

24   would decide.

25   Q.   In that capacity, were these individuals subject, I believe

1  you said, to certain restrictions by the court; is that

2  correct?

3  A.  Yes.  The court would have to approve the intensive

4  supervision of these individuals, correct, and their treatment

5  plans.

6  Q.  And so you have direct experience in individuals who have

7  been released and are supposed to abide by the conditions and

8  restrictions set forth by a judge; is that right?

9  A.  Correct.

10  Q.  Would that be similar, for example, to the conditions that

11  are set forth in federal criminal cases, but instead of

12  conditional release, we call it supervised release?

13  A.  Correct.

14  Q.  Okay.  I'd like to briefly discuss your consulting work in

15  forensic psychology.  When did that begin?

16  A.  So I was in the -- worked in the public sector for 20

17  years, and then -- approximately 20 years.  And then I

18  established my own forensic consulting company, and in that

19  capacity, I would then consult on various cases.  And those

20  cases generally fell into two categories.  One was what we

21  refer to as threat assessment, where I consult the various

22  entities to prevent violence, to prevent crime that might

23  occur; and then the second area that I worked in was areas that

24  were post-offense litigation, where I would be retained as an

25  expert and would be typically testifying in state or federal

*MELOY - DIRECT/PRESTON*                    37

1    court concerning a defendant who had committed a crime or a

2    series of crimes.  So those are the two general areas of the

3    consultation.

4        I would be retained on these -- these various tasks.  And

5    that work has -- the retention on that work has been done by

6    colleges, universities, private corporations, public figures,

7    various government entities.  I've been retained in -- one of

8    those, for example, is I've been retained by the Behavioral

9    Analysis Unit of the FBI and have been a consultant --

10   Q.  And before -- and I'm sorry to interrupt again, because I

11   wanted to ask you some questions about that.

12       Before you talk about your work with the Behavioral

13   Analysis Unit for the FBI, can you tell the Court, what does

14   the BAU, the Behavioral Analysis Unit, do for the FBI?

15   A.  The BAU is actually composed of five units.  And what they

16   do is they provide an internal consultation to FBI field

17   offices throughout the country.  So agents can use the

18   individuals within the Behavioral Analysis Unit to consult on

19   their own internal cases within the FBI.

20       And then, also, the BAUs provide consultation to local law

21   enforcement throughout the United States if they are invited by

22   local law enforcement to come into a case and provide their

23   services.  It typically can range from direct assessments,

24   indirect assessment, to criminal profiling.

25   Q.  Now, you mentioned you have been asked to consult with

1    them.  Have you -- and I'd like you to talk about that first,

2    and then I'm going to ask you about your teaching for them.

3    So, first, can you tell the Court your experience in being

4    consulted by the BAU in various cases and capacities?

5    A.  Yes.  I've been one of their -- one of their forensic

6    consulting psychologists for 20 years.  And in that capacity, I

7    consult on a variety of different cases, ranging from criminal

8    matters to counterintelligence cases to counterterrorism cases.

9    Q.  Does that occasionally require you to maintain or obtain

10   security clearance?

11   A.  Yes.  I have active security clearances.

12   Q.  Do you teach there?

13   A.  Yes.

14   Q.  What types of classes, generally speaking, have you taught

15   at the BAU?

16   A.  They've -- they've been a range of classes.  Some of them

17   have focused specifically on counterterrorism work that I have

18   done, where I'm teaching risk assessment and threat assessment

19   in that area.  I also teach -- we've also just completed a

20   course for the BAUs on another risk assessment instrument we

21   developed, called the Workplace Assessment of Violence Risks.

22   So it's an internal risk assessment instrument.

23       And then, also, on a regular basis, I teach agents that are

24   coming into the Behavioral Analysis Unit, that have been

25   accepted to be within that unit, which is considered only

available to very experienced agents.  And in that capacity, I

typically teach two courses.  One is narcissistic and

antisocial personality disorders, and that's a day-long course;

and then the second course I teach at the BAUs is on indirect

assessment.

Q.  Okay.  Dr. Meloy, in total, how long have you practiced in

the field of mental health?

A.  Well, I've been practicing in the field of mental health

since 1975, so it's been -- it's been 45 years.

Q.  And in addition to your teaching positions at the BAU, I

see that your curriculum vitae sets forth several other

teaching positions that you've held over the years; is that

right?

A.  That's correct.

Q.  And it includes a clinical professor at the Department of

Psychiatry for the University of California?

A.  Correct.

Q.  As well as you're a faculty member for the San Diego

Psychoanalytic Center; is that right?

A.  Correct.

Q.  You serve as a fellow, or have served as a fellow, on the

American Academy of Forensic Scientists?

A.  Yes.  That's a -- that's not exactly service, but it's an

appointment, yes.

Q.  Were you also a president of the American Academy of

1   Forensic Psychology?

2   A.   Correct.

3   Q.   Pages 4 through 20 of your CV set forth your peer-reviewed

4   and published scientific papers, abstracts, letters, and

5   chapters; is that correct?

6   A.   Correct.

7   Q.   Does it sound about right that you have listed 261 of them?

8   A.   Yes, that sounds about right.

9            MS. PRESTON:   Rest assured, Judge, we'll not be going

10  through all of those today.

11  BY MS. PRESTON:

12  Q.   I just wanted to highlight a few.   And if you could,

13  they're on slide 2, which should be in front of your screen

14  now.   Do you see that, Dr. Meloy?

15  A.   Yes, I do.

16  Q.   Can you explain to the Court, as she is looking at this

17  slide, why these particular peer-reviewed scientific

18  publications are relevant to your work in this case?

19  A.   Yes.   What I did, Your Honor, was to go through the -- go

20  through my CV and just select out what I felt were

21  case-relevant examples of publications I've had from the 1980s

22  up to, I think, 2018 is the last one we have.   And they're

23  basically papers that have looked at, as you can see,

24  dangerousness and the release of patients, all patient

25  psychotherapy.

1       I've specialized for many years on understanding

2    psychopathic personality specifically and antisocial

3    personality disorder in general.  And I've also been very

4    interested over the years in -- this is primarily through case

5    consultation, is the relationship between personality and

6    sexual deviancy.  And that -- you see that as the last paper on

7    this -- on this particular slide.

8       And, Ms. Preston, if you could go to the next two slides,

9    we can do this pretty judiciously -- or pretty efficiently.

10      The -- the first paper there is in relationship to bombing

11   or the threats of bombing.  The second paper there focused on

12   sadism.  The first author on that was a graduate student of

13   mine, Susan Holt, who did a very good study on sadism in

14   relationship to violence and psychopathy.  The third paper

15   there focuses on attachment and attachment disorders in

16   relationship to criminality, and that was published in a -- in

17   what's called the Comprehensive Handbook of Psychology.  And

18   then the last one is a paper on stalking and its relationship

19   to psychopathy.

20      And then on the third slide you will see I've been asked

21   now, over the course of the -- of the DSMs, I think starting

22   with DSM-IV, and then IV was revised into the current DSM-V,

23   which is essentially the diagnostic book for the American

24   Psychiatric Association.  I've been asked to write the

25   treatment chapter on antisocial personality for the treatment

1    volumes that are -- the companion volumes for DSM-V.  And that

2    is highlighted there in the second bullet point.

3        And then the last one is something I've also been very

4    interested in, that I did with colleagues from Canada.  And

5    this was a very recent paper that came out in 2018, where we're

6    looking at psychopathic traits, not through the lens of

7    disorder, but through the lens of evolutionary adaptation.  And

8    there we focused on looking at social sexual and violent, what

9    we call predation, or predatory behavior.  And then are there

10   psychopathic traits that are adaptive or, in a sense,

11   facilitate those kinds of behaviors?

12   Q.  Okay.  Thank you, Dr. Meloy.  In addition to the

13   publications that you just discussed there, you had the

14   privilege of being asked to peer review scientific papers and

15   manuscripts authored by other experts in your field; is that

16   right?

17   A.  Yes.

18   Q.  And you've spoken at least on 477 occasions as a lecturer

19   or guest speaker in the field of forensic psychology; correct?

20   A.  I think so.  I've never counted those.  I just typically

21   enter them -- enter them into my CV after I've given the talk.

22   Q.  I did try to count, and hopefully I counted correctly, but

23   does it sound about right?

24   A.  Yes.

25   Q.  Okay.  Now, finally, let's talk about your experience as an

expert witness.  And I move to the next slide.  As you can see

there, you have set forth in your CV the states in which you

have been qualified as an expert witness; is that correct?

A.  That's correct.

Q.  And it includes multiple federal jurisdictions, as well;

right?

A.  Correct.

Q.  And it says there that your ratio of plaintiff prosecution

to defense is 60/40; is that correct?

A.  Yes.  And that -- of course, that varies across the years,

but, generally, that's what it is in terms of my being

retained.

Q.  You have conducted formal, or written, forensic evaluations

around 400 times; is that right?

A.  Yeah.  That's a conservative estimate.

Q.  And you have testified at trial approximately 150 times?

A.  Correct.

Q.  And conducted more than 2,000 clinical evaluations; is that

right?

A.  Yeah.  And those were -- those were clinical evaluations

typically in criminal settings, so that would be forensic

hospitals, jails, prisons, death row evaluations, things of

that nature.

Q.  And you cut out a bit there.  You said jail what?

A.  I said jails, prisons, and death row evaluations.

1   Q.  In your 45 years of experience in this field, have you

2   developed any areas of recognized expertise?

3   A.  Yes.  What I've -- what I've done -- what I list in my CV

4   is areas where I believe that I have recognized expertise based

5   upon my education, training, and experience, and also my

6   publications.  And these are, I felt, case-relevant areas of

7   expertise that I've asked you to display on the slide here.

8   Q.  And they include violence risk and threat assessment,

9   targeted violence, sexual aggression, personality disorder, and

10  psychopathic and antisocial personality disorder.  Did I read

11  the slide correctly?

12  A.  Correct.

13  Q.  Dr. Meloy, more specifically, do you specialize in the

14  understanding of personality and sexual deviancy and the

15  motivation and psychology of violent criminals?

16  A.  Yes.  I formulated that in, not only thinking about this

17  case, but also thinking about the, you know, the work over the

18  course of the decades.

19  Q.  Have you authored a book about psychopathy?

20  A.  Yes.  Actually, I've offered several.  My first book, which

21  was published in 1988, was called *The Psychopathic Mind*, and

22  that was a textbook on the psychodynamics and psychobiology of

23  the psychopath.  And then I did an anthology book on the

24  psychopath that was published in 2001, called the *Mark of Cain*.

25  And then there was a third book, published in 1992, called

*MELOY - DIRECT/PRESTON*                    45

1    *Violent Attachments*.  And about a quarter of that book was

2    focused on the psychopathic personality and also the victims of

3    the psychopathic personality.

4    Q.  Now, before we discuss your purpose for being here and your

5    expert qualifications further, and because it's particularly

6    relevant today, I'd like to talk to you, just for a bit, about

7    indirect versus direct assessments; all right?

8    A.  Yes.

9    Q.  In your -- and you mentioned that is one of your areas of

10   expertise; correct?

11   A.  Yes.

12   Q.  In your 45 years of experience, have you been called upon

13   to form opinions about a particular patient or criminal whom

14   you've had -- whom you haven't, excuse me, personally treated

15   or interviewed?

16   A.  Correct.

17   Q.  Do you have any idea how many times you've been called upon

18   to do that?

19   A.  Actually, I don't, because it's a combination of typically

20   threat assessment cases and also formal evaluations after the

21   offense has been committed, but I would say it's probably

22   several hundred times.

23   Q.  So, for the record, an independent (sic) assessment is when

24   you, as a forensic psychologist, form opinions even though you

25   haven't personally interviewed the subject; is that right?

1    A.  I think you meant to say "indirect assessment."

2    Q.  Oh, I'm sorry.  Indirect.

3    A.  Yes.  It's -- my preference, of course, is to in most

4    cases, although there are some circumstances where it's best to

5    not interview the person directly, especially in a threat

6    assessment situation.  In most cases, however, I prefer to have

7    direct face-to-face time with the patient or with the

8    defendant, correct.

9    Q.  Are indirect assessments accepted in the field of forensic

10   psychology as being reliable and valid?

11   A.  Yes, but we also need to be very clear on the limits of

12   that kind of assessment.  There are certain things that I would

13   not render within an indirect assessment, such as very specific

14   and detailed diagnostic formulation.  I think it's best to have

15   direct contact with the person where you can interview them and

16   then also administer testing.

17   Q.  Are indirect assessments relied on by other forensic

18   evaluators in the field?

19       Are you there, sir?

20   A.  I just lost -- I don't know if you can hear me, but I just

21   lost -- okay.  You're back.

22   Q.  Okay.  There you are.  I'm sorry.

23   A.  Yep.

24   Q.  Are indirect assessments frequently relied upon by

25   psychologists in the field?

*MELOY - DIRECT/PRESTON*                    47

1  A.  Yes.  Indirect assessments are done hundreds of times a day

2  throughout this country, particularly in the area of threat

3  assessment --

4  Q.  Are they --

5  A.  -- by --

6  Q.  I'm sorry.  Go ahead.

7  A.  -- by psychologists, psychiatrists, and other allied

8  professionals, including security professionals and law

9  enforcement that have been trained in threat assessment.

10  Q.  Indeed, do various agencies, such as the Secret Service and

11  the United States Marshals Service, frequently rely on indirect

12  assessments for their security details and assessing security

13  risks?

14  A.  On a constant basis, government agencies that provide

15  security, like security for a federal judge, is -- and Your

16  Honor in this particular case -- are relied upon by the U.S.

17  Marshals.  And they actually have a threat management unit, and

18  I've taught some of the folks that are in their threat

19  management unit.

20      And then, also, the Secret Service, who in, a sense,

21  developed some of the frontier work in threat assessment back

22  in the 1990s, they do this work literally hundreds of times a

23  day.  And then other agencies in the government, ranging from

24  the FBI to the U.S. Coast Guard, have very specific threat

25  assessment programs.

Q.  Dr. Meloy, now you mentioned, of course, it's preferable to interview your subject.  In this case, did you ask, before forming your opinions, to interview the defendant, Buster Hernandez?

A.  Yes, I did.

Q.  Was that request accepted or denied by the defendant?

A.  It was denied.

Q.  Okay.  I'd like to end by talking about just one of your notable criminal cases in which you conducted an indirect assessment.  Did you conduct an indirect assessment associated with the Oklahoma City bombing?

A.  Yes.  That was the first time that my -- the indirect assessment that I did was done in a federal case.  The first one I did was on Timothy McVeigh, and that was because I was retained by the U.S. Attorney General as the -- as a forensic psychologist on the Oklahoma City bombing case, and so I did an indirect assessment on McVeigh, even though I could not evaluate him, because he had not proffered a mental disability defense.  That was submitted to the court and to the prosecution and the defense.

     And then I also did the second trial in the Oklahoma City bombing case.  This was the trial of Terry Nichols.  And I also did an indirect assessment of Terry Nichols, and that was -- that was submitted to Judge Matsch in the course of the sentence -- that was at the sentencing phase of that case.

Q.  And now I recognize and want to state for the record that
this was not for a criminal matter, because there was no
prosecution, but following the May 2nd, 2011, raid in
Abbottabad, Pakistan, did you have an opportunity to conduct an
indirect assessment of Osama Bin Laden?

A.  Yeah.  This was -- this was not in a -- you know, for a
forensic purpose, per se, but I was asked to be a member of a
team by National Geographic to look at a lot of the data that
had been removed from the 2011 attack, 2011 assault in
Abbottabad, that resulted in the death of Osama Bin Laden, but
to look at a lot of the data that was extracted that had been
declassified, and then develop an indirect assessment
personality profile of Osama Bin Laden, and that was put
together into a program.  Again, there was a -- I was the
forensic psychologist on that team, and that program was first
broadcast last September 10th of 2020.

Q.  Now, when it comes to indirect assessments, I know that you
set forth some information about that to the Court.  So, just
briefly, can you talk to the Court about what factors you rely
on in indirect assessments and how you use those factors to
assess the value of the indirect assessment itself?

A.  Yes.  The more data that we can get on a case, typically,
the better.  And when we do a forensic evaluation, typically
there -- if we can interview the person, there are three
domains where we are gathering information.  The first domain

1   is a direct face-to-face contact with the defendant.  The

2   second domain is what we call collateral information.  Any

3   information that we can derive from other individuals that have

4   known that person well over, typically, the course of years, if

5   possible, or in many cases it may just be lots of victim

6   (inaudible) interactions with victims --

7               THE REPORTER:  I'm sorry.  You're cutting out.

8               MS. PRESTON:  Can you repeat that last part, Doctor?

9   You cut out a bit.

10  A.  The second domain is what we call collateral data, so this

11  is information on the defendant from other individuals that

12  have known him very well.  So that could range from relatives

13  to close associates to supervisors at work.  Also, it could

14  include victims that have had interactions with the defendant

15  over the course of time.

16      Typically, if there are multiple victims and the length of

17  time has been great, the longer the duration, the greater the

18  frequency of the contacts and the more victims there have been,

19  the richer the database for us to draw inferences about

20  psychology of the defendant.

21      And then the third area is what I refer to as any official

22  generated investigative reports on the defendant or other

23  sources of data that are independent of the defendant.  Now,

24  that could include school records, educational records,

25  military history, other psychological or psychiatric

1  evaluations, but it also could include parole investigations,

2  probation reports, other judicial litigation activity the

3  defendant has been involved in.  So those are the three, in a

4  sense, domains of data.

5      When I can't do a face-to-face, then I have to rely on

6  those other two domains.  And, typically, the more data I have

7  from a variety of sources, the more credible and confident I

8  can be in my opinions.  But I also try to be very careful to

9  keep the inferences about my opinions, in a sense, very, very

10  tightly and closely tied to the data or evidence in the case.

11  BY MS. PRESTON:

12  Q.  Okay.  And I'm trying to be mindful of the time here, so

13  can you briefly tell us, one of the data sets that you reviewed

14  in this case was approximately 20,000 messages that the

15  defendant himself offered -- authored; is that correct?

16  A.  Correct.  I was able to -- I was able to review over 20,000

17  text messages or direct messages that Mr. Hernandez had with --

18  with victims in this case.  And, again, it was a series of

19  victims in the case, not all of them, but there were seven

20  victims in which I reviewed data.  And across -- and the data

21  was, again, these 20,000-plus text messages, exchanges, that

22  were dated and timed on the basis of data that you provided to

23  me.

24  Q.  Okay.  So that is your information on an indirect

25  assessment.  Now, when we get to direct assessments, that's

1    where there is a face-to-face interview with the defendant; is

2    that right?

3    A.   Correct.

4    Q.   And again, briefly, is there some risk in terms of the

5    authenticity or validity of the statements made by the

6    interviewer -- or, I'm sorry, by the interviewee when you

7    conduct a direct interview?  And that's a bad question, so let

8    me rephrase that.

9        In a direct assessment interview, what are the risks that

10   you take when you're interviewing a subject who knows the

11   purpose of the interview?

12   A.   As forensic examiners, we're always mindful of distortion

13   in a forensic interview.  And, typically, in a criminal

14   forensic case, when you're interviewing the defendant, the

15   distortion will likely be in the direction of mitigation of

16   responsibility.  In other words, a defendant will present

17   certain aspects of his history or his psychology or his

18   emotional states to serve his self-interests in reducing

19   responsibility for the crimes -- for the crimes charged.  And

20   so we have to be very mindful of that in every interview.

21       We also have to be very mindful of any kind of deception,

22   which could take essentially several different forms.  It could

23   be omission of information, it could be commission of a

24   specific lie, or it also could be just distortion of data.  So

25   we're always weighing whatever the defendant says to us with

*MELOY - DIRECT/PRESTON*                    53

1    other evidence of the case that are independent of what the --

2    of what the defendant is saying to us, to, again, weigh and

3    determine the credibility of the information.

4        And then we also use tests and measures that typically have

5    built within them what are called validity scales, and they

6    help us measure to what degree is the defendant distorting his

7    responses to questions.

8    Q.  Now, in this case, Dr. Fabian was hired by the defense and

9    retained by the defense in this case; is that right?

10   A.  That's correct.

11   Q.  And Mr. Hernandez consented to be interviewed by

12   Dr. Fabian; is that right?

13   A.  Correct.

14   Q.  And have you seen Dr. Fabian's report?

15   A.  Yes.

16   Q.  Now, your report was drafted on February 12, 2021; correct?

17   A.  Correct.  It was -- well, it was submitted to you on

18   February --

19   Q.  Thank you.  Dr. Fabian's report was submitted on March 5th,

20   2021; correct?

21   A.  Correct.

22   Q.  So you're then aware that Dr. Fabian did interview the

23   defendant and summarize or directly quoted from that interview

24   in his report that you reviewed; right?

25   A.  Correct.

*MELOY - DIRECT/PRESTON*                    54

1  Q.  What, if any, impact did Dr. Fabian's report or the

2  interview of the defendant have on your opinions?

3  A.  Yes.  Dr. Fabian did a very comprehensive report, and this

4  was very helpful in me understanding more fully Mr. Hernandez.

5  However, it did not alter any of my opinions in the case.

6  Q.  Dr. Meloy, have you been qualified as an expert in the

7  fields of personality traits in relationship to criminal

8  behavior, mental states in relationship to criminal behavior,

9  psychopathy, narcissistic personality, sadism, as well as the

10 value of an indirect assessment?

11 A.  Yeah.  Those have all been a part at various times I've

12 been qualified over the years.

13         MS. PRESTON:  Your Honor, at this time the United

14 States tenders Dr. Meloy as an expert in those fields, namely

15 personality traits in relationship to criminal behavior, mental

16 states in relationship to criminal behavior, psychopathy,

17 narcissistic personality, sadism, and the value of an indirect

18 assessment.

19         THE COURT:  Do you have any objections?

20         MR. GARCIA:  No objections, Your Honor.

21         THE COURT:  All right.  The Court -- the witness is so

22 qualified as an expert in those fields.

23 BY MS. PRESTON:

24 Q.  Dr. Meloy, I'd like to turn your attention to your report

25 in this matter and make sure that this is clear for the record.

On pages 2 and 3 of your report, did you detail each and every

piece of evidence you reviewed prior to submitting your expert

report?

A.  Yes, I did.

Q.  Now, to be clear, at no time were you given data obtained

from an interview with Mr. Hernandez by the United States

Attorney's Office and the FBI on February 6, 2020?

A.  That is correct.

Q.  And at no time have you been made privy by the government

or the FBI about the data or content of an interview that the

BAU conducted of Mr. Hernandez on September 18th, 2020?

A.  That is correct.

Q.  Now, you mention those communications that you had reviewed

for Mr. Hernandez.  Those were text messages or other messages

generated in social media or other accounts; correct?

A.  Correct.

Q.  All right.  I'm showing on slide 8 now.  Are these -- is

this chart a summary of the victims' messaging from

Mr. Hernandez to these victims, that you reviewed?

A.  Yes, it is.  And that was data that I compiled and provided

to you in my report, with the exception of the column on the

far right.

Q.  Correct.  And so it indicates there which victim, how many

lines of text you read, the dates, the range dates of those

texts, and the duration of the messaging; is that correct, that

1  you reviewed?

2  A.  That's correct.

3  Q.  Now, that fourth column that you mentioned, that was added

4  by me; right?

5  A.  Yes.

6  Q.  And what it indicates is that for some victims, let's take

7  Minor Victim 1, for example, you reviewed messaging for

8  almost, if not all of the entire duration of her sextortion; is

9  that right?

10  A.  Correct.

11  Q.  Whereas for Minor Victim 2, you read about six months out

12  of four to five years of her sextortion; is that right?

13  A.  That's correct.

14  Q.  And the reasoning behind that is simply because the text

15  messaging over that period of time was quite simply voluminous;

16  is that right?

17  A.  Yes.

18  Q.  And, in total, it looks like you reviewed approximately

19  20,000 messages in this case; correct?

20  A.  Yes.  There was more than 20,000 messages, but that was

21  my -- that was my best estimate when looking at all the data.

22  Q.  Those messages spanned a four-year period in the

23  defendant's life; right?

24  A.  Correct.

25  Q.  Now, the audience of those messages were his victims;

*MELOY - DIRECT/PRESTON*                          57

1  correct?

2  A.  Correct.

3  Q.  Not his mitigation specialist?

4  A.  Correct.

5  Q.  Not Dr. Fabian?

6  A.  Correct.

7  Q.  Not the Court?

8  A.  Correct.

9  Q.  In your opinion, was that enough data, in addition to all

10 the other things you reviewed, to develop inferences regarding

11 Mr. Hernandez's personality?

12 A.  Yes.

13 Q.  Okay.  Let's turn to your opinions.  I put up on the screen

14 a cut-and-paste from your general findings and opinions that

15 are set forth in your expert report.  Do those accurately

16 summarize those opinions?

17 A.  Yes.  These are the -- these are the first general opinions

18 that I had in the case.

19 Q.  And, again, mindful of the time, could you very briefly

20 summarize those opinions from each bullet point, knowing that I

21 am going to ask you specific questions about them?  So what

22 are, very briefly, your opinions as set forth there?

23 A.  Yes.  The first opinion there on the slide is that the

24 primary behaviors of Mr. Hernandez were to surprise, threat,

25 deceive, manipulate, dominate, control, and at times taunt his

1   victims over the course of years from an anonymous position

2   with the goal to extract against their will graphic sexual

3   imagery, both videos and -- as well as still photographs.  And

4   then he would use these to masturbate when he chose to and felt

5   like it.  And, in summary, there, that you put in bold, it's

6   sexualization of domination, control, deception, excitement,

7   and sadism.

8       The second, as I worked on this case, it became very

9   apparent to me that this -- that Mr. Hernandez's personality

10   could be framed by what's referred to as the dark tetrad.  And

11   is composed of Machiavellianism, narcissism, psychopathy, and

12   sadism --

13   Q.  Was that psychopathy, sir?

14   A.  Yes, psychopathy and sadism.  And these are -- these are

15   traits, not staid characteristics.  And I'll elaborate on that

16   in a bit.

17       And I also arrived at the general opinion that these

18   were -- I used the terms "enduring" and "endogenous," meaning

19   coming out from his personality, given a number of factors that

20   his adult age at the time of his offending -- he was born in

21   1990, meaning when I first began (inaudible) in this case, he

22   was --

23       THE REPORTER:  I'm sorry.

24   BY MS. PRESTON:

25   Q.  I'm sorry.  You cut out.  Can you repeat that last part?

*MELOY - DIRECT/PRESTON*                                   59

A.   Yes.  As I first began to look at data on this case, it
became apparent to me that he was of adult (inaudible) not only
in terms of his actual age, but in terms of his brain
development (inaudible) --

         THE REPORTER:  I'm sorry.  You're cutting out.

BY MS. PRESTON:

Q.   Okay.  I'm sorry, Doctor.  It's cutting out a bit.  So,
slowing down, let's try one --

A.   Okay.

Q.   -- more time.

A.   Sure.  That it became apparent to me that he was an adult
when he was -- when he began this offending, that he had been
born in 1990, so he was essentially in his mid-20s as he was
doing this offending.  So he was at, not only chronological
maturation, but also, typically, biological maturation.

     And, also, that it was very important that I had a number
of victims to make this inference that these were very much
prior to his personality, because this behavior did not change
across victims.  They were enduring because of his frequency of
his contacts with the victims and the fact that, for some of
these victims that I studied, and the interactions, they
extended over four years.

     So there was stability over time and in frequency of his
contacts.  And then, also, the duration of his contacts, given
multiple victims over the course of years.  And when I think

about personality, I think about how the person behaves

regardless of person, place, time, or circumstance.  And in

this case, we had stability of behavior over the course of

years.

    And this was also something that he, in his self-report to

the victims, admitted to a number of these personality

characteristics, not necessarily using the specific terms, but

describing them very well.  And we also know that these

personality traits are typically unlikely to change.

Q.  And --

A.  And then the --

Q.  Sorry.  Go ahead.  That final subsection --

A.  Yeah.

Q.  -- when it comes to the specific traits of the dark tetrad,

with the exception of narcissism, are there any known mental

health treatments?

A.  No.  There are no known mental health treatments with the

exception of narcissism.

Q.  Okay.  Now, we've already talked about the four elements of

the dark tetrad, Machiavellianism, narcissism, psychopathy, and

sadism.  As part of your report, did you see substantial and

convincing evidence that Mr. Hernandez exhibits personality

traits that are described as Machiavellian?

A.  Correct.

Q.  And could you describe for the Court, what is -- what does

*MELOY - DIRECT/PRESTON*                    61

1    being a Machiavellian mean?  What traits does it show?

2    A.  Yeah.  Machiavellianism, as a personality trait, has been

3    researched now for -- actually, the research began about 40

4    years ago.  And this describes an individual who's crafty, but

5    the craftiness is to seize power over another person, typically

6    through some deception, and then to basically hold onto that

7    power over that person, typically through the use of fear.  So

8    there's a seizing and a holding onto power through the use of

9    deceit and deception to do this.  And the domination is

10   maintained oftentimes through threats.

11       It also refers to the development of much more elaborate

12   schemes and scams as a way to orchestrate control over other

13   individuals.  And what is one of the most interesting aspects

14   of this is, a lot of times the manipulation and coercion is not

15   done through physical constraint, but is done through emotional

16   manipulation.

17   Q.  And are --

18   A.  The --

19            THE COURT:  Counsel, Doctor, I did read every single

20   word in both doctors' reports.

21            THE WITNESS:  Okay.

22            THE COURT:  This report was about 90 pages, and I read

23   every single word.  So if you're offering this testimony for my

24   benefit, it can be much greater summarized, because I have read

25   everything.

BY MS. PRESTON:

Q.   And, Dr. Meloy, that's what -- so keep in mind, when I say
"brief," we're going to need to keep this moving.  And the
judge has read your report.

A.   Okay.

Q.   And so one of the things I want to focus on is, can you
give -- now, there are many, many, many examples in that
report.  I just want to focus on one, and one only.  Up on your
screen, can you illustrate and just walk us through why this
particular message of many demonstrates the defendant's
Machiavellianism?

A.   Yeah.  Typically -- yeah.  Typically, this particular note
illustrates surprise, deceit, demand, and threat.  And you can
see it here.  We pick up in this exchange.  The victim is in
the bold and Mr. Hernandez is in the lettering that is not
bold.  And what you see here is, he's told her initially, with
a surprise text message, that he has dirty pictures of her.
And that was oftentimes the phrase that he used.

     And then, she says, as you can see in that first grouping
there, "What do you want from me?"  And he responds.  So that's
the surprise and the deceit, that he has dirty pictures of her.
Her response -- his response is then, "I'll delete, but I want
something in return."  This is what we refer to as the demand.
"I want more pics of you.  New ones taken right now.  Do that
and I'll delete everything and drop it."

1    Now, another very important aspect of this is the urgency

2    and the time demand to raise fear and anxiety in the victim.

3    And she says, "Why?  LOL," meaning lots of laughs, "I'm at work

4    now."  And then he says, "I'm willing to keep your secret but

5    not for free."  Again, the demand.  "You can either do what I

6    ask and this all goes away or you don't and I show everyone.

7    Simple as that."

8        And you see now the anxiety and the fear increasing.

9    "Well, I can't.  I'm at freaking work.  It's going to have to

10   wait."  And, again, the coercion is the press of time.  "I'm

11   going to start by spreading it on Facebook.  Let's see what

12   everyone says about you."  I think a reasonable inference here

13   is that the victim, being surprised by this for the first time,

14   now feels intense anxiety and fear, and she says, "Oh, my God,

15   can you please wait?"  And he says, "No."  This is the typical

16   pattern.  Again, surprise, deceit, demand, threat.

17   Q.  Now, as part of your data to make this determination that

18   he exhibits patterns of Machiavellianism, did you also see

19   evidence in this case that Mr. Hernandez even used

20   counterintelligence methods in his criminal tradecraft?

21   A.  Yes, I did.

22   Q.  And can you give us an example of Mr. Hernandez's use of

23   counterintelligence and define what that is?

24   A.  This will be very brief.  Here I'm focusing on the

25   timeframe of December 2015 to January 2016, where Mr. Hernandez

actually orchestrated a very elaborate scheme where, subsequent
to his threat to both kill people and to also bomb certain
things, such as Plainfield High School, Danville High School,
The Shops at Perry Crossing, and Walmart -- but over the course
of that month, as this -- as his -- as his threats are
accelerating, what he did was he was able to coerce Victim
Number 3 to attend a meeting on January 19th that involved
members of the community, up to and including federal law
enforcement, that was being held because of the series of
demands and threats that these young women had received.  He
planted a coerced Victim 3 to attend this meeting as a way to
gather very specific information from the meeting on the
behavior of those in attendance.  And then Victim 3 complied
and did that.  She went to the meeting, gathered this
information, reported back to Mr. Hernandez in detail.

     And then, what he did the following day, on January 20th,
he posted, I think -- I think it was Facebook, I'm not
absolutely sure of that, but it was on social media, open
social media, he posted details of what -- how different people
were dressed and what they said at the meeting, leaving the
impression that he was there at the meeting, which tended to --
which will heighten anxiety and fear among those that were at
the meeting and in the community at large, even though he was,
in fact, not at that meeting.

     He was using what we refer to as an undercover person, an

asset, a cutout, an individual who, in a sense, will, from an

anonymous position, will go in and gather data.  This is what's

referred to as tradecraft.  It's used by law enforcement in

infiltration of gangs and other groups that may pose a threat.

It's also used by the counterintelligence community, you know,

as a means by -- as a means by which to gather information,

using an asset, using somebody to go undercover to be able to

ferret out information that is otherwise not known.

Q.  Okay.  And, Dr. Meloy, from your review of this messaging

and the supporting documents, does -- and you do not need to

give an example -- did you see evidence that Mr. Hernandez

exhibits careful planning?

A.  Yes.

Q.  Do you see evidence that he conducts a self-interest

calculated assessment?

A.  Yes.

Q.  And based on -- for the reasons set forth in your report,

is Machiavellianism significant from the perspective of

sexual -- sorry, successful treatment because there is no known

mental health treatment?

A.  Yes.  To my knowledge, there's no known treatment for

Machiavellianism.

Q.  And is it significant from the perspective of a threat and

risk assessment?

A.  Yes.

*MELOY - DIRECT/PRESTON*                    66

1    Q.   And why, very briefly, is that?

2    A.   Because -- it's significant because of the use of deceit

3    and deception and to be able to carry out criminal activities

4    in ways that are both very effective and very clandestine,

5    despite being close to other people in the real world.

6    Q.   Now, I don't want to spend too much time on this next

7    factor.  In fact, I'll just say that you noted in your report

8    that there is substantial and convincing evidence that

9    Mr. Hernandez exhibits personality traits described as

10   narcissistic; is that correct?

11   A.   That's correct.

12   Q.   Including, I believe you said, contemptuous use of others

13   to advance his own special wishes and desires at others'

14   expense?

15   A.   Yes.

16   Q.   And does that also indicate to you that he has a diminished

17   capacity for empathy?

18   A.   Yes.  Typically, as grandiosity or entitlement increases in

19   the narcissistic personality, there will be a decrease in

20   empathy or regard for other individuals.

21   Q.   And here we see on slides 12 and 13 some examples of that,

22   namely as bolded.  "You are probably the worst human being I've

23   ever known."  And that was for Minor Victim 1.  And he said

24   that he was honored; correct?

25   A.   Yes.  He saw that as a badge of honor.

1   Q.  And here, even when Minor Victim 1 told the defendant --

2   or, I'm sorry, Mr. Hernandez that she was at the hospital and

3   her great grandmother was dying, he simply responded, "All

4   right?  So what time are you gonna be home"; correct?

5   A.  Correct.

6   Q.  And from a -- from the perspective of a threat and risk

7   assessment, why is that relevant?

8   A.  It's relevant because self-interest will typically override

9   any concern for the welfare of others.

10  Q.  Now, you also found substantial and convincing evidence

11  that Hernandez exhibits personality traits described as

12  psychopathic; is that right?

13  A.  Correct.

14  Q.  And that's important, as you noted, because it is

15  accounting for so much of the predictive power when it comes to

16  future antisocial behavior; is that correct?

17  A.  Correct.

18  Q.  And here in the messaging, you see and you noted here,

19  Victim 3 asks Mr. Hernandez, "You're a full-on criminal.  Are

20  you a white guy?"  And he responds, "Depends.  Do you hate

21  white people?"  Why is that indicative of psychopathy, among

22  many other examples in your report?

23  A.  Well, that particular phrase doesn't, but what you see as

24  you read the rest of this -- and, again, I won't read it, but

25  what I wanted to do is just highlight the enjoyment he got from

1    actual criminal behavior that he self-reports across multiple

2    individuals, and states this with a sense of pride and a sense

3    of accomplishment.

4    Q.  And a trait of psychopathy is significant from a mental

5    health perspective because there is no known mental health

6    treatment for psychopathy; correct?

7    A.  Correct.

8    Q.  And for the same reasons, it's significant from the

9    perspective of threat and risk; correct?

10   A.  Correct.

11   Q.  And, finally, turning to the last category, which is

12   sadism, you noted that there was a presence and analysis of

13   sadism in his communications; right?

14   A.  Correct.

15   Q.  And enjoyment of the suffering of others.  Is that a fair,

16   very brief summary of sadism?

17   A.  Correct.

18   Q.  And here, you again noted in your report there is no known

19   mental health treatment for sadism; correct?

20   A.  Correct.

21   Q.  And, briefly, why is the personality trait of sadism

22   relevant when conducting a threat assessment?

23   A.  Again, typically, individuals that have evident sadistic

24   traits will tend to actually increase their sadistic behavior

25   over time to get the same level of enjoyment from it.  And this

*MELOY - DIRECT/PRESTON*                    69

1   is -- also becomes very specific if sexual sadism is involved.

2   But, typically, the sexual sadists will need to do greater

3   cruelties in order to maintain the same level of sexual arousal

4   from the victim.

5   Q.  Okay.  Thank you, Dr. Meloy.

6       So, in summary, let me ask you this.  Knowing all of that,

7   what you said about the no known mental health treatments, what

8   if Mr. Hernandez receives some form of treatment or therapy at

9   the Bureau of Prisons?  Will that change the fact that no

10  matter how long he's in and how much therapy he gets in, will

11  he still be Machiavellian, psychopathic, and a sadist?

12  A.  There's no known treatments for those personality traits,

13  and, yes, those will continue to be a part of his personality.

14  If he was given adequate treatment for narcissistic aspects of

15  his personality, he might be able to modulate those if the

16  treatment was well done and competent and he was motivated.

17  Q.  Now, Dr. Meloy, Mr. Hernandez is asking this Court to

18  release him 30 years from now, when he will be, depending on

19  some factors, approximately 59 years old.  Based on your review

20  of his messaging, Dr. Fabian's direct interview of the

21  defendant, will he still exhibit the personality traits of

22  Machiavellism, psychopathy, and sadism 30 years from now?

23  A.  Yes.

24  Q.  Taken together, what does that say to you from a threat and

25  risk assessment?

*MELOY - DIRECT/PRESTON*                              70

A.  If he has -- well, it means that there would still be a

potent threat there for Mr. Hernandez toward the public,

specifically if he can access and weaponize the Internet as he

so effectively did over the course of these years.

Q.  Now, Dr. Fabian diagnosed -- well, let me back up on that.

You said if he can access the Internet; correct?

A.  Correct.

Q.  Now, given what you know about the defendant and everything

that you have reviewed, is the defendant the type of

personality who is good at following rules and restrictions?

A.  No.

Q.  Now, Dr. Fabian diagnosed Mr. Hernandez with sexual sadism;

correct?

A.  Correct.

Q.  Now, why didn't you -- or, I'm sorry.  Why didn't you make

that similar finding?

A.  I had insufficient data to do so.  I did -- I was not

aware -- and I learned this through Dr. Fabian's report.  I was

not aware that there was specific evidence where Mr. Hernandez

was sexually stimulated, sexually aroused directly by the

suffering of his victims and the induction of fear that he was

generating in his victims.  And that, right there, is the

definition of sexual sadism if it occurs over time.  And

Dr. Fabian's report was --

                THE REPORTER:  I'm sorry.

BY MS. PRESTON:

Q.   I'm sorry, Dr. Meloy.  Can you back up?  That last section, we couldn't hear you.

A.   Sure.  I was able to see in Dr. Fabian's report that he had found evidence of that connection between sexual arousal and the suffering of Mr. Hernandez's victims, and so that, again, if it occurs over time, that is the definition of sexual sadism.

Q.   So, knowing those facts, do you defer to Dr. Fabian's finding and judgment with regard to Mr. Hernandez's diagnosis by Dr. Fabian of sexual sadism?

A.   Yes.  He had more data than I did, because he was able to interview him.

Q.   Now, Dr. Fabian also noted that he was, "partially a psychopath."  Have you ever heard that before?

A.   I never heard the term "partial psychopath."  No, that was a new one for me.

            THE COURT:  I think he said "moderate psychopath."

            MS. PRESTON:  I believe, Judge, there is a -- and I can find it when I look at his cross, and I'm going to cross Dr. Fabian on that point.  In his actual psychological assessment section, in parens, where it says "psychopath," it says "possibly partial."

            THE COURT:  Is there such a thing as a moderate psychopath?

1    THE WITNESS:  Yes, Your Honor, there is.  And that is

2    typically how we think about this.  We think about it

3    dimensionally, mild, moderate, or severe psychopathy.

4    THE COURT:  All right.  That might have been a typo,

5    or misspoke, so let's -- is that correct, Doctor?

6    DR. FABIAN:  Unfortunately, Your Honor, there are a

7    few typos.

8    THE COURT:  Okay.

9    DR. FABIAN:  The way we score that instrument is,

10   basically, no probably partial or --

11   THE REPORTER:  I'm sorry.

12   THE COURT:  Okay, he's not able to pick you up.  Let's

13   keep moving.

14   MS. PRESTON:  Got it.

15   THE COURT:  And remember, Counsel, this is not a

16   trial.  I've read everything.  We just -- this is just --

17   you're just --

18   MS. PRESTON:  Okay.

19   THE COURT:  -- summarizing everything for me.  And

20   point out what's important.

21   MS. PRESTON:  Your Honor, the last section that I want

22   to ask Dr. Fabian about is -- or, I'm sorry, Dr. Meloy.

23   BY MS. PRESTON:

24   Q.  Dr. Fabian, in his report, went to great lengths to

25   describe Mr. Hernandez's traumatic past.  Do you recall reading

1  those sections?

2  A.  Oh, yes.

3  Q.  Now, assuming -- assuming, for argument's sake, that all

4  that happened, assuming that was true, what does his upbringing

5  tell you about whether his personality traits will be enduring?

6  A.  The -- how he is now as an adult is reflective of both his

7  personality dispositions that he was born with, as well as his

8  upbringing.  And that also then goes to the enduring aspects of

9  these personality traits, that they will continue to be as they

10  are.

11      Typically, personality -- once an individual reaches into

12  adulthood, specifically into the 20s, the personality is

13  crystalized, and the traits that you begin to see there are

14  ones that are also going to endure.  And we know that, for

15  instance, when we also measure psychopathy, that you will see

16  enduring traits over time, particularly factor one.

17  Q.  Now, Dr. Meloy, the Court has already read your opinion

18  regarding traumatic bonding, and you saw evidence of that here;

19  correct?

20  A.  Correct.

21  Q.  Okay.  And, finally, do you think, based on your review in

22  this case, that there was sexual violence in this case?

23  A.  Oh, yes.

24          MS. PRESTON:  That's all I have, Your Honor.

25          THE COURT:  All right.  Thank you very much.

*MELOY - CROSS/GARCIA*                    74

1          You may cross-examine.

2          MR. GARCIA:  Your Honor, the government just went over

3    about an hour and 10 minutes or so with their expert.  I

4    probably have 30, 40 minutes or so.  Would this be an

5    appropriate time to take a break before we get into the session

6    before lunch?

7          THE COURT:  Is that what -- do you need a break, Court

8    Reporter?

9          THE REPORTER:  I'm okay for a while.

10         THE COURT:  He's okay.

11         MR. GARCIA:  Okay.

12         THE COURT:  It's 11:13, so let's finish this doctor up

13   before we take our lunch break.

14         MR. GARCIA:  Very good, Your Honor.

15                        **CROSS EXAMINATION**

16   BY MR. GARCIA:

17   Q.  Dr. Meloy, can you hear me?

18   A.  Yes, I can, sir.

19   Q.  My name is Mario Garcia, and I'm going to ask you a number

20   of questions today.  If you can't hear me, please let me know.

21   A.  I will.

22   Q.  You were hired by the government to perform a psychological

23   diagnosis and risk assessment of Buster Hernandez?

24   A.  Correct.

25   Q.  Ordinarily, as you indicated, you would meet with the

1    subject?

2    A.   Yes.   That's my preference.

3    Q.   You'd run a number of tests?

4    A.   Correct.

5    Q.   You might interview family and friends about the subject?

6    A.   Correct.

7    Q.   And while indirect assessments like you performed here may

8    be valid, your preference would be to conduct a direct

9    assessment?

10   A.   Yes, to include that as part of my evaluation and to be

11   able to render both a formal diagnosis from DSM-V, as well as

12   to do a formal risk assessment, as Dr. Fabian did.

13   Q.   So your opinions here today, and contained in your report,

14   are essentially theoretical psychoanalysis?

15   A.   No, I would disagree with that.   They are limited by the

16   constraints that you placed upon me.

17   Q.   You're essentially profiling who you believe Mr. Hernandez

18   may be based on the records you've seen?

19   A.   No, I would disagree on that, too, that this isn't

20   profiling.   Profiling, typically we have an unknown subject,

21   you're looking at crime scene data, so this isn't considered

22   profiling.

23   Q.   Let's talk about some of the antisocial behaviors and

24   personality disorders we've been talking about today.   Would

25   you agree that these types of disorders are generally found

1    pervasive through one's life and activities?

2    A.  Typically, yes.  Yeah, you do see pervasive behaviors to

3    diagnose a personality disorder, that's correct.

4    Q.  And would you agree that it does not appear Mr. Hernandez

5    showed many, if any, signs of these disorders outside of his

6    offense conduct in this case?

7    A.  Yes.  I was frankly surprised at the channeling that he was

8    able to engage in in his criminality, and I did not see

9    Dr. Fabian report -- with the exception of some disruptive

10   bullying when Mr. Hernandez was an adolescent, I did not see

11   any behaviors that would rise to the level of what we diagnose

12   as conduct disorder as reported to Dr. Fabian.

13   Q.  Pretty remarkable, there was not even much juvenile

14   delinquency, for example, that he exhibited?

15   A.  Correct.

16   Q.  Are you familiar with the Adverse Childhood Experiences

17   examination?

18   A.  I'm familiar with it in a very skeleton way.  I don't use

19   that, but I understand that it is a measure to correlate with

20   adult behavior.

21   Q.  And is it your understanding, based on that limited

22   experience with it, that the higher number out of ten would

23   indicate the possibility of developing issues later in life?

24   If, for example, Mr. Hernandez scored a ten out of ten based on

25   his ACE exam, he's most likely to exhibit some form of disorder

*MELOY – CROSS/GARCIA*                            77

1    later?

2    A.   Yes.   I'm not -- I'm not familiar with the units of measure

3    and what they mean, but I did read in Dr. Fabian's report that

4    there was a -- that there was a strong correlation between the

5    adverse childhood experiences and Mr. Hernandez's criminality.

6    Q.   And you wouldn't have any reason to disagree with that

7    finding specifically?

8    A.   No.

9    Q.   Let's talk about age of offenders.   Would you agree with me

10   that as one progresses in age, say past 40 or 50 years old,

11   that the chances of them recidivating decrease?

12   A.   Generally, yes, with the exception of individuals who are

13   severely psychopathic.   You don't see a decrement in their

14   criminality.

15   Q.   Would you agree that once you pass about age 45, adults

16   start to diminish in terms of the risk or danger to the

17   community even with those behaviors present?

18   A.   Well, the large data sets do reflect that, correct.

19   Q.   So that --

20              THE COURT:   Even a psychopath?

21              THE WITNESS:   No.   That would be the exception.

22              THE COURT:   Okay.

23   BY MR. GARCIA:

24   Q.   But in terms of risk, you don't see a diminishment in that

25   area?

1    A.  No.  Typically, psychopaths will plateau in their behavior

2    over time as they age.  To my knowledge, we don't have any --

3    we don't have any elderly studies of psychopaths that have been

4    published.

5    Q.  So then you're not sure?

6    A.  Yes.  The science isn't there yet.

7    Q.  Let's talk about the diagnoses.  You spoke a little bit

8    with Ms. Preston about the theoretically framed dark tetrad?

9    A.  Yes, I did.

10   Q.  And those are personality constructs that overlap with one

11   another?

12   A.  Yes.  They are not equivalent, but they do overlap, they do

13   correlate with each other.

14   Q.  They are hypothesized causes for certain behavior?

15   A.  Well, they're -- they're -- they're theoretical constructs

16   that have been empirically investigated now for about 30 to 40

17   years.

18   Q.  But only one of those, narcissistic personality disorder,

19   is contained within the DSM?

20   A.  Well, actually, none of them are specific diagnoses.

21   They -- you know, the narcissism is describing a construct, a

22   measurable construct that's been tested empirically over and

23   over again in many, many studies.  It does not speak

24   specifically to narcissistic personality disorder.  And I

25   understand that that was not diagnosed by Dr. Fabian.

1  Q.  Would you agree the dark tetrad is not contained within the

2  DSM?

3  A.  Oh, correct, yeah.  These are -- these are empirically

4  sound personality constructs.

5  Q.  They're based on hypotheticals, the dark tetrad?

6  A.  Well, the theory has been empirically demonstrated to be

7  accurate.

8  Q.  When you looked at the 20 or so thousand messages, along

9  with the other related documents from this case, did you see

10  any evidence that Mr. Hernandez manifested these traits outside

11  of his offense conduct here?

12  A.  Can you repeat that question again for me, please?

13  Q.  Sure.  Is it fair to say, and would you agree with me, that

14  when Mr. Hernandez exhibited these behaviors that you've

15  diagnosed him with, that he was on-line when he was committing

16  these offenses?

17  A.  Yeah, correct.  They're not diagnoses, but, yes, these

18  occurred on-line, because that was the data source that I --

19  that I had.

20  Q.  And you didn't see anything where he exhibited these

21  behaviors outside of being on-line?

22  A.  Specifically, that is correct.

23  Q.  Narcissism, schizophrenia, sadism, Machiavellianism, you

24  didn't see anything outside of the offense conduct, and

25  specifically his messages, that he exhibited these behaviors?

1  A.  Yes.  I don't think you meant to say "schizophrenia."  That
2  was not part of --
3  Q.  Sorry.  I was looking at sadism and Machiavellianism.
4  A.  Sadism, correct.  Yeah, I -- again, I was surprised at the
5  degree of how clandestine and carefully channeled the
6  criminality was in this case.
7  Q.  Let's talk about the offense conduct occurring through the
8  computer.  Would you agree that the Internet has essentially
9  created new opportunities for people to assume different
10  characters or act like different people?
11  A.  Yeah.  The -- you know, yes, Mr. Hernandez did assume --
12  you know, he took on an avatar role, he became an avatar on the
13  Internet and weaponized it for his gratification.  And that
14  is -- we see that very commonly now, where the criminality can
15  also move into cyberspace.
16  Q.  And that's because one can create essentially fantasy
17  worlds or role play through the Internet with others?
18  A.  Correct, that does happen.
19  Q.  Is it fair to say that Mr. Hernandez, when he was using the
20  computer and sending those messages, was exhibiting completely
21  different behavior than what you saw or learned from outside of
22  the computer or Internet?
23  A.  That is correct, from what I learned from Dr. Fabian's
24  report.
25  Q.  Would you agree that you would assess someone as presenting

1   a higher risk, or you would be afraid of someone who exhibits

2   demanding, dangerous, controlling behavior to others versus one

3   who's antisocial?

4   A.  I don't -- I don't understand your question.

5   Q.  Sure.

6   A.  Could you clarify that for me?

7   Q.  Are you more concerned about someone who exhibits demands,

8   activity, danger, control of others versus someone who's

9   withdrawn and antisocial?

10  A.  I'm more -- yeah, I'm more concerned with the former.

11  Q.  And would you also be more concerned with someone who

12  committed physical acts or sex offenses out in the public

13  versus someone who remained anonymous over a computer?

14  A.  No.

15  Q.  You're not aware of any evidence that Mr. Hernandez

16  physically touched anyone, himself, in a sexual manner?

17  A.  Correct.  There was no mention of that by Dr. Fabian.

18  Q.  No other evidence that would cause you to believe he had

19  committed violent acts, outside of the offense conduct here,

20  towards other minors in life?

21  A.  Correct.  I saw no evidence of that.

22  Q.  Would you agree that the context of his violence and

23  threats was almost exclusively over the Internet?

24  A.  Yes.  That was his weapon of choice.

25  Q.  When forming your opinions, it's imperative that you rely

*MELOY – CROSS/GARCIA*                    82

1  upon the evidence?

2  A.  Correct.

3  Q.  And there's a danger in forming opinions that's not based

4  on evidence?

5  A.  Correct.

6  Q.  And you've previously offered opinions in criminal

7  proceedings that were not supported by the evidence?

8  A.  Typically, when I've testified, I've relied on evidence

9  that's been presented to me and have tried to stay very close

10  in my inferences regarding the evidence.

11  Q.  Okay.  So let me be clear with that question.  You have

12  previously offered opinions in criminal proceedings that were

13  not supported by the evidence; isn't that true?

14  A.  No, that's not true.

15  Q.  You didn't testify recently that you offered an opinion in

16  the Tim Master's case that was not supported by the evidence?

17  A.  Evidence was withheld from me, that was true.  That did

18  alter my opinion once I was given that evidence, but I was not

19  privy to that evidence when I testified in court.  It was

20  withheld by the prosecution.

21  Q.  Let's talk about, finally, the risk assessment.  Near the

22  end of your testimony earlier, you indicated that Mr. Hernandez

23  was not capable of following rules or restrictions; isn't that

24  right?

25  A.  Correct.

1  Q.  Other than his offense conduct here -- which, admittedly,

2  it was illegal -- you can't cite any other instances of

3  significant breaches of rules or restrictions that were placed

4  on him, can you?

5  A.  Correct.  I saw no indication of that in Dr. Fabian's

6  report with perhaps the exception of a reference to bullying

7  and disruption that Dr. Fabian spoke to.

8  Q.  So when you talk about him not being capable of following

9  rules and restrictions, you're referring to the offenses that

10 he has pled guilty to and been convicted of?

11 A.  Oh, his -- yeah.  Again, the deliberation and clandestine

12 nature and careful channeling of his criminality shows to me

13 that he is able to make decisions, be very discrete about rules

14 that he follows and rules he chooses to not follow, and is very

15 skilled at being able to maneuver around rules that he does not

16 want to follow.

17       THE COURT:  Mr. Garcia, let me ask a question of the

18 doctor.

19       Doctor, what about the uncharged conduct that he

20 described to Dr. Fabian regarding identity theft and the credit

21 card fraud?  Do you recall reading that in Dr. Fabian's report?

22       THE WITNESS:  Yes, I did.

23       THE COURT:  Because he -- Mr. Hernandez said that it

24 all started out with him doing credit card fraud and identity

25 theft over the Internet, and then he began extorting adults who

*MELOY - CROSS/GARCIA*                    84

1   maybe he would get in their Internet and their e-mail accounts

2   and maybe find an adult who had cheated on their spouse, and he

3   would extort those people for money.  What about that activity?

4   That's not charged in this case.

5              THE WITNESS:  Yes.  Clearly, I would agree with that,

6   that there was other activity that he reportedly engaged in up

7   to three years prior to the beginning of the specific sexual

8   offenses in this case charged.  The activity, though, is

9   primarily for financial gain, again, using the Internet as the

10  weapon.

11             THE COURT:  Next question, Mr. Garcia.

12             MR. GARCIA:  Thank you.

13  BY MR. GARCIA:

14  Q.  So in terms of following rules and restrictions, nothing

15  you saw indicated that he couldn't, for example, follow the

16  rules of his household?

17  A.  Correct.

18  Q.  He wasn't a behavioral problem to his parents?

19  A.  No.  I saw no indication in Dr. Fabian's report that his

20  mom reported any behavior problems.

21  Q.  He didn't have any remarkable truancy at school?

22  A.  I'm not -- I'm not sure what you -- what you mean by

23  "remarkable truancy."  I'm not sure if that's different from

24  unremarkable truancy.  But I actually don't remember his

25  truancy data.

1  Q.  He didn't have any of criminal history that he was arrested

2  or convicted of?

3  A.  That is correct.

4  Q.  You're familiar, as I believe you indicated, with federal

5  supervised release and the role of the United States Probation

6  Office?

7  A.  Yes.  I'm as familiar as an outsider can be to the federal

8  probation, yes.  I've done other -- I've been involved in other

9  cases where individuals have been under federal release.

10 Q.  Based on your thousands of assessments, is it fair to say,

11 and based on your experience and knowledge, that people with

12 psychopathy are often released from the Federal Bureau of

13 Prisons, or state department of corrections for that matter?

14 A.  I would not know the numbers there, so I don't know if I

15 can characterize "often," but I'm sure there are individuals

16 that are moderately and severely psychopathic that are released

17 on probation and parole throughout the country.

18 Q.  And we don't just lock up people who are sadistics or

19 narcissistics for life; right, generally?

20 A.  That's correct.

21 Q.  And we believe and trust that probation officers will

22 ensure offenders comply with the terms and conditions if

23 they're released, once released from prison; right?

24 A.  I believe that they will do the best they can, given the

25 constraints of their jobs.

1   Q.  And would you agree, if the Court were to restrict

2   Mr. Hernandez from having any access to the Internet, that that

3   could likely lower his risk of danger to the community for

4   reoffending?

5   A.  I don't know if that's possible going forward in time,

6   particularly out of custody, given Mr. Hernandez's skills and

7   clear brilliance around criminalizing the Internet.  But if

8   that was possible, that could reduce his risk.

9   Q.  Okay.  So let me make sure I'm clear there.  You're not

10  aware of any potential future technology that he might be able

11  to access without permission or knowledge of his probation

12  officer?

13  A.  No, but I wasn't even aware of the technology that he used

14  in this case until I learned about it --

15  Q.  Sure.

16  A.  -- in the data, and was, again, being frankly impressed

17  with his skill set.

18  Q.  So if he were restricted from accessing -- and what I mean

19  by that is, if he had no access to the Internet, would you

20  agree with me that his risk of danger to the community would

21  lower?

22          THE COURT:  Mr. Garcia, it's impossible.  It's

23  impossible to completely restrict someone from the Internet.

24  All you need is a cell phone.

25          MR. GARCIA:  I understand, Your Honor.

1          THE COURT:  And Probation is only -- can only do so

2     much.

3          MR. GARCIA:  I understand, but I --

4          THE COURT:  We catch people all the time in the

5     library, you know, so let's move on.

6          MR. GARCIA:  Yeah.

7          THE COURT:  If you want to find -- to get on the

8     Internet, you can get on the Internet.  Probation can't stop

9     you.

10          MR. GARCIA:  I certainly appreciate that, and I've

11     represented many who have been faced with that situation.  What

12     I'm trying to ask the doctor, and I just want to make sure the

13     record is clear with that question, is if Mr. Hernandez did not

14     have access, would that lower his risk.

15          THE COURT:  The only way we can keep him without

16     having access is in a prison.  He can't get access unless he

17     goes to the prison library.  And then we've had defendants go

18     in the prison library, who are not allowed to get on the

19     Internet, get on the Internet.

20          MR. GARCIA:  I understand.

21          THE COURT:  It is virtually impossible to keep

22     somebody off of the Internet.

23          MR. GARCIA:  I understand, but that was not my

24     question to him, though.

25          THE COURT:  Your question is, if he were not ever

*MELOY – REDIRECT/PRESTON*                    88

1  allowed to get on the Internet --

2          MR. GARCIA:  If he did not have access to the

3  Internet, would that lower his risk or danger to the community.

4  And I think he can answer that question.

5          THE COURT:  You may answer that question.

6  A.  Yeah.  In the -- in the Utopia you're describing sometime

7  in the future, where there's no Internet, that would -- that

8  would lessen his risk.

9  BY MR. GARCIA:

10  Q.  There's no indication he's at high risk for hands-on

11  physical violence towards others, is there?

12  A.  There's nothing in his history, as reported by Dr. Fabian,

13  that would indicate he's at risk for physical violence toward

14  others.

15          MR. GARCIA:  No further questions, Your Honor.

16          THE COURT:  Okay.  Any redirect?

17          MS. PRESTON:  Your Honor, just three points.

18          THE COURT:  You may.

19                    **REDIRECT EXAMINATION**

20  BY MS. PRESTON:

21  Q.  Dr. Meloy, you were asked about Mr. Hernandez's age as it

22  relates to risk.  This case was not a case -- was not a -- did

23  not involve crimes that involved physical violence; correct?

24  A.  Correct.

25  Q.  You can commit cyber crimes when you're 60, 70, 80, 90

*MELOY – REDIRECT/PRESTON*                              89

1    years old; is that right?

2    A.   Sure.

3    Q.   And Mr. -- or Mr. Garcia asked you about whether you were

4    less concerned about someone committing an act of physical

5    violence if they're withdrawn and antisocial; do you recall

6    that?

7    A.   Yes.

8    Q.   Certainly, Mr. Hernandez, you wouldn't describe him as

9    withdrawn or antisocial in his messaging, through his weapon of

10   choice; correct?

11   A.   Correct.

12   Q.   And Mr. Garcia asked you whether this case involved

13   physical acts; do you recall that?

14   A.   Correct.

15   Q.   In this case, however, did Mr. Hernandez require his

16   victims to perform physical acts, including somewhat violent

17   physical acts, against themselves; correct?

18   A.   Yes.

19   Q.   Now, Mr. Garcia asked you whether Mr. Hernandez -- if you

20   knew of any particular circumstances where he breached or broke

21   the rules outside of this offense conduct; do you recall that?

22   A.   Correct.

23   Q.   Now, I have not given you the probation officer's report,

24   have I?

25   A.   Correct.

1   Q.  And if you were to have known, for instance, that in that

2   report, on pages 4 -- on page 4 and part of 5, the probation

3   officer notes that while he's been in prison, he's engaged in

4   several offending conducts while he was supposed to be

5   following the rules in prison.  Were you aware of that when you

6   answered that question?

7   A.  No.  That's new information for me.

8   Q.  And when he asked you about following the rules at home, he

9   did this behind his girlfriend of 12 years' back in their home;

10  right?

11  A.  Yes.  Mr. Hernandez is a smooth criminal.  He was

12  remarkably clandestine and controlled behavior.

13  Q.  Last question, Dr. Meloy:  Does this defendant, from the

14  evidence that you've seen, have any respect for law

15  enforcement?

16  A.  No.

17  Q.  In fact, he reported to Dr. Fabian he gets thrilled, using

18  his words, by the control he has over law enforcement and

19  burning through its resources, using his words; is that

20  correct?

21  A.  Correct.

22          MS. PRESTON:  No further questions.

23          THE COURT:  Any questions on those, Mr. Garcia?

24          MR. GARCIA:  Just one.

25

**RECROSS−EXAMINATION**

BY MR. GARCIA:

Q.  Mr. -- or Dr. Meloy, when he was committing this, and when

you looked at the 20,000 or so messages, is it fair to say that

it would have taken a significant amount of time for him to

engage with all of these victims and send 20,000 or more

messages?

A.  Correct.

MR. GARCIA:  No further questions.

THE COURT:  And I have one question, Doctor.  With

respect to psychopathy, you mentioned that there are -- there

are degrees of psychopathy.  Dr. Fabian has an opinion that the

defendant is a moderate psychopathic -- has moderate

psychopathic traits.  What are the degrees of psychopathy?

THE WITNESS:  Yes, I would agree with that, Your

Honor, that, typically, we think about it, for forensic

purposes, as mild, moderate, and severely psychopathic.  And

so, given the measurement that Dr. Fabian did using the PCLR,

he arrived at a score of psychopathy that places Mr. Hernandez

right at the average range for male inmates in prison in North

America.

THE COURT:  So you do agree is he likely a moderate

psychopath?

THE WITNESS:  I would trust -- Dr. Fabian is a skilled

forensic psychologist.  I would trust his assessment given the

*MELOY – RECROSS/GARCIA*                92

1    evidence that he had access to on the case and would place him

2    at that level, again, depending on Dr. Fabian, because I was

3    not able to evaluate Mr. Hernandez.

4          THE COURT:  And is it correct that there is no course

5    of treatment for even moderate psychopathy?

6          THE WITNESS:  Yes, there is no treatment for

7    psychopathy, per se.  Typically, people that focus on treatment

8    and management of psychopathy think about it as, how long is

9    psychopathy going to interfere with the treatment plan that

10   we've designed for this individual and to what degree.

11         THE COURT:  Okay.

12         THE WITNESS:  So we think of it as an obstacle to

13   treatment.

14         THE COURT:  Thank you very much.

15         Any questions on the Court's questions?

16         MS. PRESTON:  No, Your Honor.

17         THE COURT:  Mr. Garcia?

18         MR. GARCIA:  None.

19         THE COURT:  All right.  Well, thank you, Doctor.

20         Can we excuse this witness, Government?

21         MS. PRESTON:  Yes, Your Honor.  Thank you.

22         THE COURT:  You may sign off if you'd like, Doctor.

23         THE WITNESS:  Thank you, Your Honor.  My pleasure.

24         THE COURT:  Thank you.

25       (Witness excused.)

1          THE COURT:  All right, it is 11:39.  Do you want to --
2   I'll bet the court reporter needs a break now, so we'll take a
3   very early lunch, and we're going to take 45 minutes.
4          And, Mr. Garcia, you're going to -- how long do you
5   think you're going to be with your witness?
6          MR. GARCIA:  Your Honor, I think --
7          THE COURT:  Yesterday, you all told me 30 minutes per
8   witness.
9          MS. PRESTON:  I apologize, Judge.
10          MR. GARCIA:  I think, based on hearing the confidence
11   that we know the Court went through, letter by letter, all of
12   the materials, I will do my best over the lunch hour to shorten
13   particularly some of the credentials, and I'll confer with the
14   government, as well, over it, but we'll -- I'll be quicker.
15          THE COURT:  Right.  If the government could stipulate
16   to the doctor's qualifications and expertise, that would save a
17   lot of time.
18          MS. PRESTON:  I've read his CV, and I will stipulate
19   right now.
20          THE COURT:  Very good.  And I assure you, Mr. Garcia,
21   I've read all of his qualifications, also.
22          MR. GARCIA:  Sure.
23          THE COURT:  So the Court will --
24          MR. GARCIA:  I'll open his testimony and move to admit
25   him in citing that stipulation.

1    THE COURT:  Great.  Okay.

2    MS. PRESTON:  Thank you, Your Honor.

3    THE COURT:  All right.  Let's go ahead and take our

4    lunch break.  So that means we'll be back at about 12:30.

5    12:30, we will resume.

6    THE COURTROOM DEPUTY:  All rise.

7    (Recess at 11:41, until 12:34.)

8    THE COURT:  Good afternoon, everyone.  We are back on

9    the record, the United States of America versus Buster

10   Hernandez.

11   And, Mr. Garcia, is your witness available?

12   MR. GARCIA:  He is not, Your Honor.  I know he had to

13   check out from his hotel, and perhaps he ran into some

14   difficulty there, so if you -- I'll ask the Court's indulgence

15   to move maybe to another witness and then we'll come back to

16   him.

17   THE COURT:  Very good.

18   All right.  You may proceed with your victim

19   witnesses.

20   MS. PRESTON:  Thank you, Your Honor.  For the record,

21   under the Crime Victims' Rights Act, we did notify the known

22   and identified victims in this case.  Your Honor has received

23   victim impact statements from Minor Victim 1 and Minor -- I'm

24   sorry, Victim 7, who submitted a letter on behalf of herself

25   and Minor Victims 1 and 8.  You received letters from Minor

1    Victim 4, Victim 10, Minor Victim 12, Minor Victim 13, Minor

2    Victim 17.  And for the record, appearing here today virtually,

3    thanks to Your Honor, are Minor Victims 12 and 13.  I just

4    wanted to acknowledge that they are here virtually and

5    listening, Your Honor.

6          I believe what we should do -- and the numbers will be

7    a bit out of order here, Judge -- is we can begin by asking

8    Minor -- well, Victim 3 to address the Court.  She wishes to

9    address the Court in person.

10         THE COURT:  All right.  Is that a minor or an adult?

11         MS. PRESTON:  She is an adult now.

12         THE COURT:  All right.

13         MS. PRESTON:  And she -- referring to the superceding

14   indictment, she is the subject matter of an extortion and

15   threat counts, because at the time Mr. Hernandez extorted her,

16   she had just turned 18.

17         THE COURT:  Okay.  Which counts are -- is she?

18         MS. PRESTON:  Your Honor, she is the subject matter

19   of -- I apologize.  One second.

20         She is the subject matter of these sex -- I'm sorry,

21   extortion counts.

22         THE COURT:  Okay.

23         MS. PRESTON:  And I see Dr. Fabian is here, so it's up

24   to Your Honor.  We can proceed with victims or proceed with the

25   doctor.

 1              THE COURT:  It's up to you, Counsel.

 2              MS. PRESTON:  I just looked at Mr. Garcia.  Let's get

 3    Dr. Fabian out of the way.

 4              THE COURT:  Okay.

 5              MS. PRESTON:  And I'll get those counts for you,

 6    Judge.

 7              THE COURT:  All right.

 8              All right, Dr. Fabian, if you'd come up to the witness

 9    stand.  What happened to you?  You're late.

10              THE WITNESS:  I know.  I'm sorry.

11              THE COURT:  Okay.  If you would raise your right hand,

12    please.

13         (The witness is sworn.)

14              THE COURT:  You may have a seat.

15              MR. GARCIA:  I should have asked.  Do you want me here

16    or there?

17              THE COURT:  Whichever you prefer, Counsel.

18              MR. GARCIA:  Well, so Ms. Genier doesn't have to clean

19    that, I'll stand here.

20              THE COURT:  Okay.

21          **JOHN MATTHEW FABIAN, DEFENDANT'S WITNESS, SWORN**

22                       **<u>DIRECT EXAMINATION</u>**

23    BY MR. GARCIA:

24    Q.  Good afternoon.

25    A.  Good afternoon.

*FABIAN - DIRECT/GARCIA*                              97

1   Q.  Please state and spell your name.

2   A.  My name is John Matthew Fabian, J-O-H-N, M-A-T-T-H-E-W,

3   F-A-B-I-A-N.

4   Q.  And, Mr. -- Dr. Fabian, what do you do?

5   A.  I'm a forensic psychologist and neuropsychologist.

6   Q.  You've provided me, and in turn I've filed with the Court,

7   your curriculum vitae at docket number 181.  Is that CV the

8   most recent CV you have?

9   A.  Yes.

10  Q.  And does it go into detail, extensive detail, about your

11  experience and qualifications?

12  A.  It does.

13  Q.  And, in particular, it goes into your experience and

14  qualifications with regard to forensic and clinical

15  neuropsychology and forensic and clinical psychology?

16  A.  Yes.

17          MR. GARCIA:  Your Honor, I believe the government is

18  willing to stipulate, and I would so move now, that Mr. --

19  Dr. Fabian be qualified as an expert in those areas.

20          MS. PRESTON:  So stipulated.

21          THE COURT:  And the Court will acknowledge the doctor

22  as an expert in those fields.

23          MR. GARCIA:  Thank you.

24  BY MR. GARCIA:

25  Q.  I'm just going to touch on a couple of things so that the

1  record is clear.  Dr. Fabian, you've testified about 375 times

2  in civil and criminal proceedings?

3  A.  Yes, in about 20 states.

4  Q.  And you've completed about 4,000 evaluations similar to the

5  evaluation you prepared in this case?

6  A.  Yes.

7  Q.  Were you present for Dr. Meloy's testimony?

8  A.  Yes.

9  Q.  And did you have the occasion to review Dr. Meloy's report?

10  A.  Yes, I did.

11  Q.  Okay.  I think the Court has a good sense of some of the

12  issues here today, so I'm going to ask you, briefly, just a

13  number of questions regarding your opinions and his; is that

14  okay?

15  A.  Yes.

16  Q.  So, first, can you tell us, in terms of the process and

17  procedure, how did your examination differ from Dr. Meloy's?

18  A.  I reviewed much of the same information, so collateral

19  records that you had sent me.  And I was able to conduct two

20  evaluations with Buster Hernandez that were -- one was in

21  person for about eight hours and the other one was on

22  televideo.

23  Q.  If you'll keep the microphone there in front of your face.

24  Sorry.

25  A.  Sure.  Okay.

1    So I was able to review records and videos, different

2    pieces of discovery, and then do an evaluation with him, two

3    evaluations.  And I did speak with his sister and mother, who

4    are here in court today, and his brother, and girlfriend.

5    Q.  And what was the purpose in speaking with them?

6    A.  To get a better understanding of Buster Hernandez.  I mean,

7    as an expert, Dr. Meloy had mentioned, you know, that we have

8    to, you know, be concerned about only evaluating the defendant,

9    because they can tell us, you know, only certain parts of their

10   life, and so it's good to have a more genuine, thorough

11   evaluation by interviewing family, people that know him.

12   Q.  Do you have an opinion in terms of what you examined from

13   his report in comparison to what you examined in your report in

14   terms of the substantiveness of the process?  Was yours more

15   thorough?

16   A.  Well, of course, because I did evaluations with him and

17   talked to family members.  I mean, he basically looked at --

18   you know, his report said, "I'm doing a psychological

19   evaluation on his mental state from text messages."  I did an

20   evaluation with that and I spent hours with him and his family

21   members, so, I mean, it is more of a thorough, complete

22   analysis.

23       And, ethically, as an expert, we have to be cautious in

24   doing the type of work he's doing, Dr. Meloy, meaning there has

25   to be an asterisk against it because he never met him.  And

1    what he testified to are really theoretical constructs, they're

2    not diagnoses.  They may be relevant, but, basically, he looked

3    at the mental state, offending behaviors, looked at the traits

4    that matched those, in his opinion, and that's the opinion.

5        So I look at more of the foundation of this case, which, in

6    my opinion, is complex trauma, how this manifested, the

7    etiology of it.  And, of course, my role here was to examine

8    this from a mitigation perspective.

9    Q.  So, before we get into some of those specific details, can

10   you just tell the Court, generally, then, in what way did your

11   opinion differ from Dr. Meloy's?

12   A.  Well, you used the term "profile," and Dr. Meloy said,

13   well, profiling is for a suspect that they don't know about.

14   But, in part, this is profiling for a suspect you do know

15   about; okay?  So these, again, are theoretical constructs, not

16   diagnoses.

17       And, ethically, we have to, as an expert, say hey with

18   caution to our reader, or trier of fact, our limitations of our

19   evaluation; okay?  So he didn't clearly do that, but I am,

20   because he was limited with what he could do to evaluate.  But

21   he also brought in constructs that are not always used in

22   clinical and forensic psychology.

23   Q.  And so in what ways did your opinion that you arrived at

24   with respect to Mr. Hernandez, having completed that more

25   thorough assessment, in your opinion, in what ways did it

*FABIAN - DIRECT/GARCIA*                           101

1    differ from what Dr. Meloy determined?

2    A.  Well, Dr. Meloy, again, only looked at this case in a

3    vacuum, because that's kind of what he was limited to do -- and

4    that's the mental state, text message evidence -- and then

5    talked about threat, but did not ultimately render an opinion

6    as to threat or violence risk.  And I want to be able to

7    educate the Court as to, you know, differences of psychopathy,

8    because he was -- mentioned that word or that term, that

9    construct, but I evaluated it; okay?

10   Q.  And so what did your evaluation reveal to you?

11   A.  So, Your Honor, we use the Hare, H-A-R-E, Psychopathy

12   Checklist-Revised, known as the PCL-R.  And there's a lot of

13   research stemming from the 1980s to now on that instrument.

14   And to make it in simplistic terms, there's two factors.

15   Factor one is the affective emotional component of a

16   psychopath, which is the lack of empathy, lack of remorse,

17   conscience.  The --

18           THE COURT:  He has that, right, no remorse, no

19   conscience?

20           THE WITNESS:  Well, the grandiosity, but then -- and

21   I'll answer that in a second.

22           THE COURT:  Okay.

23   A.  And factor two, which is more of the antisocial behavior

24   aspect; okay?  And antisocial personality disorder is in the

25   DSM-V, psychopathy is not.  And it's been rejected a few times,

 1    but there's a lot of research on it as a clinical construct.

 2         And I will say this for the Court.  I would say, safely,

 3    that all psychopaths have antisocial personality disorder, but

 4    only a few are -- all psychopaths have antisocial personality

 5    disorder, but most folks that qualify for antisocial

 6    personality disorder are not psychopaths.  So we have that

 7    PCL-R scale, which has 20 items.  About half are that emotional

 8    affective prong and half are the behavioral, criminal

 9    behavioral prong.

10         He had a score of 18.  So a score up to 40, and I would,

11    probably, say Ted Bundy would be a 38, if not a 40, and those

12    are very rare.  But a score of 28 to 30 and beyond is when we

13    say this person qualifies for psychopathy, using that

14    instrument.  So a score of 18 is in the moderate range.  And

15    Mr. Hernandez does not qualify fully for antisocial personality

16    disorder in much part because of a lack of juvenile delinquency

17    and conduct disorder.  So I want to clarify that for the Court.

18    And, also, there was an issue as to age.

19              THE COURT:  Uh-huh.

20              THE WITNESS:  I don't know if you want me to address

21    that.

22              THE COURT:  Sure.

23              MR. GARCIA:  Sure.

24              THE WITNESS:  I know you want this streamlined.

25              So I will correct Dr. Meloy.  There are studies on age

1    and psychopathy.  One is the *Assessment of Psychopathy as a*

2    *Function of Age*, and that's written by Harpur, H-A-R-P-U-R, and

3    Hare, 1994.  The other one, *Are There Age-Related Effects in*

4    *Antisocial Personality Disorder in Psychopathy*, and that's a

5    2004 article.  And both articles are consistent in that they

6    say, with both antisocial personality disorder and psychopathy,

7    they diminish as one gets older.  And every study for sexual

8    violence, criminal violence, general recidivism, shows that.

9              THE COURT:  So you mean older, like 70, 80, 90?

10             THE DEFENDANT:  No.  40 to 45 is when these

11   individuals start desisting.  I would just look at it like kind

12   of like a linear curve as you get older.  And so they have

13   found that the emotional affective traits of psychopathy are

14   more enduring than the criminal behavioral traits.  So the

15   criminal behavior traits, they are quicker to desist in that 40

16   to 45 range.  The emotional, you know, type of traits regarding

17   empathy, let's say, you know, are carried on as one gets older.

18   But, with that said, the risk assessment of the person with

19   antisocial personality disorder or psychopathy, they find these

20   individuals are certainly less violent at about 40 to 45, and

21   on.

22             THE COURT:  Okay.

23   BY MR. GARCIA:

24   Q.  Let's talk about the risk assessment, then.  You heard

25   Dr. Meloy touch a little bit upon his risk assessment, even

1    though he didn't formalize it in his opinion.  Tell us about

2    your risk assessment of Buster Hernandez and why it is you came

3    to that conclusion.

4    A.  Sure.  Well, the risk assessment is also built on my

5    evaluation, so I won't -- I could do a three-hour narrative on

6    childhood trauma, which I won't do, but that is the building

7    blocks, Your Honor, of this case.  And I think you've read

8    through some of that, so I don't need to repeat it, but, you

9    know, there was damage attachment, complex trauma.

10   And when we talk about adverse childhood experiences, he

11   scored a ten out of ten.  I don't see that every day.  And just

12   statistically, it places him at higher risk to have a lot of

13   his issues he had, unemployment, his legal problems, addiction,

14   mental illness.

15   And what was sad about this case is that this was like a

16   multigenerational history of poverty, sexual abuse, physical

17   abuse.  And, unfortunately, in many cases, especially with

18   minority offenders, I'm the first one that ever asks them any

19   of these questions.  So none of these people -- mom, sister,

20   Buster -- have never seen a psych, talked to one in their

21   lives, except for me.  This is the first time.

22   And so when you have a history of sexual abuse, emotional

23   abuse, and physical abuse early on, we call it

24   polyvictimization, and evidence of complex trauma, the earlier

25   its onset, the more diverse, or the more different types of

1    traumas, the more frequent and the more chronic and the more

2    severe, the worse the outcome.  It makes sense in a dose-based

3    relationship.  And so we look at that as to some mitigation and

4    etiology as to some of his disorders.

5        So when I stepped through his life, it became apparent that

6    he's never been able to really develop, even in contemplation

7    or insight, as to any of these issues.  And so when I was

8    talking to him about -- and his brother about all of the things

9    that happened in their lives, I mean, it's basically a blank

10   slate, or, "That's all we ever knew," or his brother would

11   laugh.  But it's not a joking matter.  I mean, everyone in that

12   family had negative outcomes.  His brother was in 12

13   methamphetamine rehabs.

14       So when we look at this case, you know, I have to not just

15   jump to the risk assessment.  I have to kind of -- there's

16   building blocks to this, and I did psychological testing on top

17   of that.  And then, with all that information, and interviewing

18   the family, I was then able to look at some objective risk

19   assessment measures.

20           THE COURT:  All right.  Let's have Mr. Garcia ask a

21   question so you won't testify in such a narrative form.

22           MR. GARCIA:  Sure.

23   BY MR. GARCIA:

24   Q.  Based on those assessments, what did you conclude?

25   A.  So I will refer to my report, if I may.  The personality

*FABIAN - DIRECT/GARCIA*                                    106

1   assessment inventory results included evidence of antisocial

2   personality, so he acknowledged his antisocial behaviors.

3          THE COURT:  Right.  And, you know, maybe 90 percent of

4   our criminal defendants have that.

5          THE WITNESS:  Sure.

6          THE COURT:  I'm very familiar with antisocial

7   personality disorder.

8          THE WITNESS:  I'm sure.  I know you are.  Sure.  And

9   with that said, if you go to a medium security prison in

10  Indiana, you know, 40 to 80 percent will have that, but only

11  about 15 percent will be psychopaths, which he is not.  So --

12         THE COURT:  Well, you said he is a moderate

13  psychopath.

14         THE WITNESS:  Well, but -- no.  When I say a

15  psychopath, that means a 30 to 40 on that.  And that's

16  important to distinguish.

17         THE COURT:  Okay.

18         THE WITNESS:  There's a lot of -- all of the offenders

19  in a medium security prison, basically, will -- the average

20  score is an 18.  But, as far as recidivism, you're much more

21  likely to recidivate at that 30 mark, because then you are a

22  psychopath.

23         THE COURT:  My problem is, he's not just a psychopath.

24  He's a sadist.

25         THE WITNESS:  Well --

1          THE COURT:  He did some awful, evil, evil things,

2    Doctor.  You know that.

3          THE WITNESS:  I -- I'm not going to disagree.

4          THE COURT:  He tortured these little girls for five

5    years.

6    BY MR. GARCIA:

7    Q.  So let's talk, maybe going forward --

8    A.  Sure.

9    Q.  -- Dr. Fabian, knowing what you know now, based on your

10   assessment and based on some of the things that you do agree on

11   with Dr. Meloy, are you familiar with the type of treatment

12   programs that the Bureau of Prisons might offer?

13   A.  Well, we look at what his needs are.  So when I looked

14   at --

15         THE COURT:  But you agree, he's a sex -- you said he's

16   a sexual sadist?  That was -- that's in your report.

17         THE WITNESS:  No, I know.  I did -- let me -- let

18   me -- if I can explain briefly.

19         THE COURT:  Sure.

20         THE WITNESS:  I did, under my diagnosis -- one moment.

21         I believe I said it's an other specified paraphilic

22   disorder with features of sexual sadism.

23         THE COURT:  Okay.

24         THE WITNESS:  Okay?  And it's difficult in this world

25   to diagnose definitively, because a lot of folks, it takes,

*FABIAN - DIRECT/GARCIA*                                          108

1   like I said, years for someone to really dissect their modus,

2   behaviors, fantasies, et cetera.  I will say, though, that

3   given the fact that he engaged in solicited sexual acts from

4   minors in which they could have harmed themselves, and

5   certainly were humiliated, and if he was aroused to that --

6            THE COURT:  Which he said he was.  He said he would

7   masturbate to that.

8            THE WITNESS:  Right.  Then that would be more in line

9   with sexual sadism.  When I talked to him, he was -- other

10  times, he was all about power and control, domination, which --

11           THE COURT:  Is that the Machiavellism?

12           THE WITNESS:  I would -- I would agree in part.  And

13  so some folks who commit sex offenses, such as rapists

14  hands-on, they may not be sadists if their motives are

15  domination and control.  There has to be the humiliation and

16  suffering element, which I thought some of that was there;

17  okay?

18           THE COURT:  I agree.

19           THE WITNESS:  All right.

20  BY MR. GARCIA:

21  Q.  So let me see if I --

22  A.  But, if I may, with the -- this individual has evidence of,

23  you know, complex trauma, posttraumatic stress, depression, and

24  a dual diagnosis condition, because he was -- as this was

25  escalating, he was, in his report, abusing alcohol and opiates.

1  So these are treatment needs that he brings to the BOP,

2  certainly.

3           THE COURT:  Okay.

4  BY MR. GARCIA:

5  Q.  And in your experience, someone of Buster's personality,

6  and with the characteristics and behaviors that he's exhibited,

7  after reaching an age in excess of 45 and after receiving any

8  types of recommended treatment within the Bureau of Prisons,

9  what's the possibility of the risk of him reoffending once he's

10 released?

11 A.  Well, risk assessment, violence or sexual in nature, is

12 very contextual based, and I discuss that in my report.  As

13 Dr. Meloy said, the computer is his weapon.  So I am not

14 diminishing, you know, the damage and hurt done here in this

15 case, by any means, but we have to -- I have to be objective,

16 okay, and I know the science, and I do risk assessments every

17 day.

18      So we look at this as, you know, what treatment needs he

19 has and, again, building blocks or trauma, and we have

20 personality disorder and we have -- we have chemical dependency

21 issues.  But if he has no access to a computer, and I -- I

22 honor -- I honor you, Your Honor, with your concerns.  I mean,

23 that was his gun; okay?  So, I mean, if he had no access, I

24 don't think he would be dangerous.  And he hadn't been.

25      Now, I do honor the USA's concern that he's been in some

1   fights more recently, and that certainly does not help him.

2   I'm not really sure about the facts of those.  But, from a risk

3   perspective based on his offenses, I mention him being simply a

4   wallflower that did not have the audacity to harm people in

5   real life.  And he was inadequate in a closet with a mouse, and

6   he harmed people that way.  It's a very different type of

7   violence we call cyber violence, or cyber sexual violence.

8           MR. GARCIA:  No further questions, Your Honor.

9           THE COURT:  You may cross-examine.

10                      **CROSS-EXAMINATION**

11  BY MS. PRESTON:

12  Q.  Dr. Fabian, you spent quite a bit of time there talking

13  about how Dr. Meloy didn't interview Mr. Hernandez.  You know

14  the reason why, don't you?

15  A.  I know, I do, but I -- we have to look at his opinions,

16  cautionary.

17  Q.  And you did look at his opinions; right?

18  A.  But I look at them as cautionary to some degree.

19  Q.  But the thing is, sir, is that you agree, at least in part,

20  with most of them, don't you?

21  A.  Qualitatively, he has displayed some of those traits, more

22  in a vacuum on-line.  And Dr. Meloy did not specifically do a

23  risk assessment, even though he said he did.

24  Q.  Now, he did not do one because he said he didn't sit down

25  with the defendant.  However, you just said "in a vacuum."

1    There's no vacuum here, sir.  His crimes were committed

2    on-line, and they impacted real people.

3    A.  Oh, I agree.

4    Q.  They weren't fantasies; right?

5    A.  I think he had a deep level of fantasy.  I --

6    Q.  Oh, I agree.  What I'm saying is --

7            THE COURT:  Counsel, don't interrupt.  You're going to

8    drive the court reporter crazy.

9    A.  He had a deep level of fantasy.  I'm just saying that this

10   is a strange case, as Dr. Meloy admitted, that it was confined

11   to these personality traits, to his on-line offending

12   behaviors, very, very unusual.

13   BY MS. PRESTON:

14   Q.  Okay.  But you agree that, at least as far as I could tell

15   from your notes, he's at least a moderate psychopath; correct?

16   A.  Correct.

17   Q.  You saw evidence of Machiavellism; correct?

18   A.  Correct.

19   Q.  And you diagnosed him with sexual sadism; correct?

20   A.  I would say other specified paraphilic disorder with

21   features of sexual sadism, yes, but he certainly had traits of

22   it.

23   Q.  He's a sexual sadist, Dr. Fabian, isn't he?

24   A.  I gave you my opinion, ma'am.

25   Q.  Okay.  Now you conducted, like you said, a direct

*FABIAN - CROSS/PRESTON*                    112

1  assessment.  You told the defendant, before sitting down with

2  him, why you were there; right?

3  A.   Yes.

4  Q.   That you were retained by the defense?

5  A.   Yes.

6  Q.   That you were there to obtain mitigating information on his

7  behalf; correct?

8  A.   Yes.

9  Q.   And to assess his risks?

10 A.   Yes.

11 Q.   And you told him that whatever he told you, assuming he

12 gave you permission, which he did, you were going to tell Judge

13 Pratt; right?

14 A.   Ultimately, if the lawyer chose to use the information,

15 yes.

16 Q.   Which he did?

17 A.   Sure.

18 Q.   The person who is sentencing him would be given that

19 information; correct?

20 A.   Yes.

21 Q.   You also told that to Mr. Hernandez's family; right?

22 A.   Of course.

23 Q.   And, for the most part, you relied on the veracity of what

24 his family told you; correct?

25 A.   Correct.

*FABIAN - CROSS/PRESTON*                           113

1    Q.  And, for the most part, you relied on the veracity of what

2    Mr. Hernandez told you; right?

3    A.  Correct.

4    Q.  Mr. Hernandez told you all sorts of things during your

5    interview, and you memorialized them very thoroughly in your

6    report.  Now, some of those things were corroborated by family;

7    right?

8    A.  Yes.

9    Q.  Some of them were actually corroborated by what I would

10   call unbiased evidence; correct?

11   A.  Yes.

12   Q.  And some of them were not corroborated at all?

13   A.  No.  He made some inconsistent statements to me, as well.

14   Q.  Okay.  In fact, though, there were times in your report you

15   took his word alone as true; correct?

16   A.  Well, I -- I'm sure I do that with people I interview.

17   Q.  Including this person, who you interviewed?

18   A.  Sure.  And not everything he said was helpful to himself.

19   Q.  Now, that included the allegation of sexual abuse by his

20   uncle; correct?

21   A.  Yes.

22   Q.  A man whose only documented sexual offenses were with

23   girls; correct?

24   A.  Correct.

25   Q.  And at one point in your report, you say that

1    Mr. Hernandez's sexual abuse occurred been five and nine,

2    right, ages five and nine?

3    A.  I think so, yes.

4    Q.  And then, at another point, you said that it occurred

5    between ages nine and 13, on page 15 -- 50 of your report?

6    A.  That is correct.

7    Q.  And, just for the record, his mother and sisters believe

8    that it happened, they did not see it; correct?

9    A.  Correct.

10   Q.  His girlfriend of 17 years hadn't heard a thing about it?

11   A.  She didn't seem to know anything much about their family.

12   But, I mean, I'm not a fly on the wall in these folks' lives,

13   but, right, she said she did not know about it.

14   Q.  And the person he accused of sexually abusing him is dead?

15   A.  He committed suicide after he was in prison for sexual

16   abuse.

17   Q.  So we can't ask him?

18   A.  That's what I heard.

19   Q.  Okay.  You mentioned to Judge Pratt about Mr. Hernandez's

20   report of drug and alcohol abuse while he was offending; right?

21   A.  That is correct.

22   Q.  He told you he stole opiates from his mom?

23   A.  Yes.

24   Q.  Now, you're aware, Doctor, that at the time of his arrest,

25   he was offending; right?

*FABIAN - CROSS/PRESTON*                    115

1   A.  Yes.

2   Q.  He was offending up until the moment of his arrest; right?

3   A.  My understanding.

4   Q.  The moment that the agents walked in on August 3rd, 2017,

5   he was offending, wasn't he?

6   A.  Yes.

7   Q.  He wasn't living with his mother, was he?

8   A.  No.

9   Q.  In fact, he hadn't lived with his mom for at least three

10  years?

11  A.  No, but he saw her regularly, it's my understanding, but --

12  Q.  We'll get to that in a second.

13  A.  Well, he --

14  Q.  He was living with his girlfriend?

15  A.  Kimmie, yes.

16  Q.  And her grandmother?

17  A.  That is correct.

18  Q.  Okay.  And what you might not know is that the FBI had been

19  monitoring Mr. Hernandez and his Internet access from mid-July

20  until his arrest.  Are you aware of that, Doctor?

21  A.  I was aware they monitored it for a while after they

22  figured out exactly what he was doing and how he was doing it.

23  Q.  And in one month's time, he only left his residence three

24  times: once to go to a barbecue, once to take out the trash,

25  and once to run a very short errand with his dad; right?

*FABIAN − CROSS/PRESTON*                          116

1   A.  I didn't know how many -- I didn't think he was leaving

2   very often.

3   Q.  Okay.  Were you aware that when the FBI searched his house,

4   they discovered no pills?  Right?

5   A.  I don't believe they discovered any drug contraband, that I

6   recall.

7   Q.  No pill bottles?

8   A.  I don't think so.

9   Q.  No beer bottles?

10  A.  Not that I'm aware of.

11  Q.  In fact, they only found one empty bottle of liquor, that

12  was in a separate guest house that he did not occupy; isn't

13  that right?

14  A.  I think I remember that, yeah.

15  Q.  Now, are you aware that when the FBI first interviewed --

16  in fact, I know you're aware of it, because it was in your

17  report.  When they first interviewed Mr. Hernandez, he denied

18  any drug or alcohol abuse?

19  A.  I thought they were asking about that with the Miranda

20  rights, but I don't -- I remember he denied -- I thought he

21  denied being under the influence at that time.  I don't recall.

22  Q.  Have you seen the PS3 that his Pretrial Services officer

23  created when he was first arrested?

24  A.  Yes.

25  Q.  And that was the report that Mr. Hernandez knew was going

*FABIAN – CROSS/PRESTON*                    117

1    to be submitted to a California judge who was going to decide

2    if he was going to be removed through the United States Marshal

3    Service and detained or released on bond; right?

4    A.   Yes.

5    Q.   And in that report, when interviewed by his Pretrial

6    Services officer, he told them that he had, "never consumed

7    alcohol," and he had, "never used any illegal drugs"?

8    A.   Yeah.  I don't recall that, but I'm sure it's -- I trust

9    your opinion on that.

10   Q.   Okay.  So -- but you took his self-report of drug and

11   alcohol abuse as true?

12   A.   I think there was something there.  That's why I say it was

13   unspecified substance use disorder without saying it was full

14   opioid or alcohol use disorders.

15   Q.   Let's talk about some of the other things he told you.

16   Now, you noted that Mr. Hernandez engaged in criminal behavior

17   for which he was convicted for at least five years; right?

18   A.   Yes.

19   Q.   Now, it's important to you, as a forensic psychologist, to

20   understand the frequency and duration of his criminal behavior;

21   isn't that fair?

22   A.   Yes.

23   Q.   There's a big difference, from your perspective, between

24   sporadic criminal behavior spread out over five years and a

25   criminal who engages in it on a daily basis; is that fair?

A.   Yeah.  There's a lot of other factors, but I would agree
with you on those.

Q.   Now, Mr. Hernandez told you, and this is from page 33 of
your report, that he was only committing his on-line offenses
for two hours a day.

A.   Yes.  And I didn't -- I don't know if that was accurate or
not.  I thought it would be more, but I don't -- I did not have
a number.

Q.   It's not accurate, Dr. Fabian.  Were you told by the
defense in this case that, in fact, there was corroborated
information from the Title III investigation that we did,
that he was engaging in it for more like 12 to 16 hours a day?

A.   I would not be surprised.

Q.   Okay.  Now, one of the things that you just said on your
direct is that you noted this is someone who had a lack, I
think that's the word you just used, of juvenile delinquency?

A.   That I was aware of.

Q.   That you were aware of.  But I'm confused, because while
understanding he didn't receive juvenile detention, for
example, or somehow through the criminal legal process, you are
aware of several corroborated self-reported problems he had as
a child; right?

A.   So that -- so we're -- self-report from him; correct?

Q.   Well, you saw his school records, too, didn't you?

A.   Yeah, I saw them.

1   Q.  So he self-reported bullying; right?

2   A.  To me, correct.

3   Q.  Emotional blowups?

4   A.  Correct.

5   Q.  Fighting as a child?

6   A.  Correct.

7   Q.  He told you he would lose -- he would lose control?

8   A.  Correct.

9   Q.  That he would get physically violent?

10  A.  Correct.

11  Q.  And his school records noted several documented fights that

12  he had; right?

13  A.  Yes, among other things, but correct.

14  Q.  Now, you would agree with me, of course, for the record,

15  that you indicated no mental impairment in your analysis of

16  Mr. Hernandez, right, mental impairment such as knowing right

17  from wrong?

18  A.  Oh, no.  He, of course, knew the wrongfulness of his

19  conduct.

20  Q.  He did these acts intentionally?

21  A.  Correct.

22  Q.  He exhibited no cognitive impairments, is probably a better

23  phrase?

24  A.  No.  I'm a neuropsychologist, and I didn't -- I chose not

25  to do a neuropsychological evaluation on him.  I didn't sense

FABIAN - CROSS/PRESTON                         120

1    that he was -- had brain dysfunction.

2    Q.  Okay.  No evidence that he didn't know right from wrong;

3    correct?

4    A.  No, that's correct.

5    Q.  And, to the contrary, he's capable of making choices, isn't

6    he?

7    A.  We all are.

8    Q.  He is?  I'm asking about him.

9    A.  Oh, yeah.  He made choices, and they were -- many of them

10   were bad.

11   Q.  And they were discretionary choices, weren't they?

12   A.  Yes.

13   Q.  Let's talk about treatment.  You discuss his treatment

14   process on page 34, and you say he scored a six.

15   A.  Yes.

16   Q.  And you note that a score of seven to ten means he will

17   have, "obstacles to a smooth treatment process"; correct?

18   A.  Correct.

19   Q.  Now, importantly, though, regarding his score of a six, you

20   noted he was minimizing his answers; right?

21   A.  Yes.

22   Q.  Now, what you did diagnosis him with, as we discussed and

23   as you discussed in your direct examination, was antisocial

24   personality disorder?

25   A.  Antisocial personality features.

*FABIAN - CROSS/PRESTON*                    121

1   Q.   Features.  And paraphilic features, such as sexual sadism?

2   A.   Yes.

3   Q.   All right.  Which is defined, by the way, as -- oh, I'm

4   sorry, Mr. Moxley -- the intense sexual arousal from the

5   physical or psychological suffering of another person?

6   A.   Correct.  I think there was evidence of that.

7   Q.   There are no known mental health treatments for sexual

8   sadism, are there?

9   A.   Very limited, very limited.  I mean, when we look at the

10  BOP, they don't have -- their sex offender residential program

11  would be addressing this, of course.

12  Q.   They would address it, but there are no treatments for it?

13  A.   They would beg to differ, but I'm not aware of treatments

14  for sexual sadism in totality.  Some of them are related to

15  biochemical treatments, such as use of Lupron, but that's not a

16  mental health treatment.

17  Q.   You diagnosed him -- we talked about this, and you talked

18  to the judge, about moderate psychopathy and something you

19  called disordered attachment; correct?

20  A.   Yes.

21  Q.   And you noted in your report there are -- the treatment

22  gains are limited for these disorders; correct?

23  A.   Correct.

24  Q.   And you agreed with Dr. Meloy that he did exhibit sadistic,

25  psychopathic, and Machiavellian features, but you just said

*FABIAN - CROSS/PRESTON*                    122

1    that that was only his "fantasy life" on-line, right?

2    A.  In my opinion, it did not -- it was not pervasive in every

3    area of his life, which we typically see.  So I do think there

4    was a deep fantasy, dark fantasy world that he had that was

5    channeled on-line, certainly.

6    Q.  All right.  It was present when he committed his cyber

7    crimes, which affected real people; correct?

8    A.  I am in total agreement.

9    Q.  All right.  I want to talk to you a little bit about your

10   PAI on page 34.  You noted that he was elevated on an

11   antisocial behavior scale; correct?

12   A.  Yes.

13   Q.  And elevated on a social detachment subscale; yes?

14   A.  Subscale schizophrenia, which would be consistent with

15   schizoid personality disorder, which he does have in full.

16   Q.  Okay.  Now, you noted that Mr. Hernandez, because of that,

17   is "indifferent and emotionally remote from others and rarely

18   responds to the actions and feelings of others"; correct?

19   A.  Correct.

20   Q.  Now, let's talk about some of your notations regarding his

21   general risk of recidivism.  You noted, and we've already

22   covered it, that he has self-reported drug and alcohol

23   addiction; correct?

24   A.  Correct.

25   Q.  No employment history?

*FABIAN – CROSS/PRESTON*                                123

1    A.   Very little, if none, yes.

2    Q.   Deficient in -- none, Dr. Fabian?  No --

3    A.   Yeah, I don't -- he was caretaking for his girlfriend's

4    grandmother, but that wasn't really full-time, gainful

5    employment, I don't think.

6    Q.   It wasn't gainful, full-time employment, because he was

7    committing sexual offenses 12 to 16 hours a day, wasn't he?

8    A.   Well, I agree with -- that he was doing that, yes.

9    Q.   Okay.  And you said he was deficient in leisure and

10   recreation and was a social isolate; yes?

11   A.   Yes.

12   Q.   These are all risk factors to recidivating, aren't they?

13   General recidivism.

14   A.   Correct.

15   Q.   And, in fact, you noted that after testing, he rated at a

16   31 percent chance to recidivate generally over a two-year

17   period?

18   A.   Yes.  It's an actuarial instrument, yes.

19   Q.   It's a large group probability data; right?

20   A.   Correct.

21   Q.   So out of 31 -- or out of 100 offenders, 31 of them would

22   generally recidivate?

23   A.   Correct.

24   Q.   You just don't know if he's going to be in the 31 or the

25   69; right?

*FABIAN - CROSS/PRESTON*                              124

1    A.  Well, we'll never know.

2    Q.  We'll talk about that in a minute.

3        Okay.  So, you noted that, "Dr. Meloy's reasoning...that

4    Mr. Hernandez did not exhibit these characteristics and...

5    traits as an adult prior to the instant offenses," whether he

6    would have done this, "but for the Internet."  Those are your

7    words; right?

8    A.  Yes.

9    Q.  Doctor, the Internet is here to stay; right?

10   A.  Yes.

11   Q.  His weapon of choice, the computer, is here to stay, isn't

12   it?

13   A.  Correct.

14   Q.  Now, you say he didn't exhibit these characteristics --

15   these exhibits -- I'm sorry, these -- he didn't exhibit those

16   characteristics as an adult; correct?

17   A.  Many of them he did not, that I saw or learned about.

18   Q.  Now, we noted he was arrested when he was 27; right?

19   A.  Yes.

20   Q.  We noted he had been committing these offenses for which he

21   was convicted for at least five years; right?

22   A.  Correct.

23   Q.  And that before that, he committed on-line acts of

24   financial extortion and forced prostitution years before that;

25   right?

*FABIAN - CROSS/PRESTON*                                    125

1    A.  By self-report.

2    Q.  That's nearly all of his adult life, isn't it, sir?

3    A.  And I don't know if all of this happened, but, yes.  I

4    mean, he talked about these on-line endeavors, but -- and had

5    all this money that he couldn't count, but then he was

6    discussing -- or his mother said he had no money.  So I

7    don't -- I don't really know what he did or didn't do prior to

8    these offenses.

9    Q.  You say that you diagnosed him with disorganized

10   attachment.  Isn't that one of the strongest predictors of

11   becoming a psychopath?

12   A.  Disorganized attachment is relevant to psychopathy and

13   criminality, certainly.

14   Q.  Mr. Hernandez described his sex life with his girlfriend as

15   "great," and that they regularly had sex almost every day.

16   Isn't that inconsistent with schizoid personality disorder?

17   A.  Well, people -- I would agree that it's inconsistent, but

18   his girlfriend basically told me the same, so it's possible.

19   Q.  It's inconsistent with schizoid personality disorder?

20   A.  To be sexually connected to someone, yes.

21   Q.  Okay.  Now, on page 39 of your report, under item 10, under

22   "Nonsexual Offending," you wrote, "No."  But didn't he report

23   to you a history of cyber crimes that included financial

24   crimes?  Wouldn't that be nonsexual?  Was that a typo?

25   A.  Well, it may have been, or I didn't -- he did not have

*FABIAN – CROSS/PRESTON*                              126

1   convictions.  But, no, he has evidence of nonsexual criminality

2   by report.

3   Q.  You noted that, "He described getting off more on the

4   control he had over," his victims, and he, "linked that same

5   satisfaction to the control he had over law enforcement";

6   correct?

7   A.  That is correct.

8   Q.  And that, "He was gaining power, recognition, and control

9   over his offending behaviors which he enjoyed"; right?  He

10  wanted the power?

11  A.  They were gratifying.

12  Q.  He even described his methodology for ensuring that he was

13  using the most efficient way to get the most victims; yes?

14  A.  Yes.

15  Q.  Dr. Fabian, he actually ran stats on his victims, didn't

16  he?

17  A.  He told me that.  I didn't see them, and I don't know if

18  that's true, but he did share that with me.

19  Q.  When did you interview him?  Last year?

20  A.  January.

21  Q.  January of this year?

22  A.  Yeah.

23  Q.  He rattled off these statistics to you from memory; right?

24  A.  Yes.

25  Q.  In fact, he told you that, indeed, he drafted his script,

*FABIAN — CROSS/PRESTON*                127

1    his lure, to gain the attention of the most victims that he

2    could possible, yes?

3    A.   Yes.

4    Q.   That was his trick; correct?

5    A.   Correct.

6    Q.   Mr. Hernandez, in that way, told you he was using a

7    mathematical approach to committing crimes against children;

8    yes?

9    A.   Correct.

10   Q.   And that his goal was to get the "most victims"; yes?

11   A.   Correct.

12   Q.   And so he kept statistics to keep track of his success

13   rate?

14   A.   Correct.

15   Q.   Comparing his success rates by age group, for example?

16   A.   That is correct.

17   Q.   Like referring to it as a percent sex for -- or sex success

18   rate; correct?

19   A.   That is correct.

20   Q.   And he even would analyze that even if his percent success

21   rate went up, if it took too much time, it would diminish his

22   goal to get the most victims; right?

23   A.   Yes.

24   Q.   That's sophisticated criminal behavior, isn't it?

25   A.   And sophisticated computer analysis, certainly.

*FABIAN - CROSS/PRESTON*                               128

1   Q.  It's sophisticated criminal behavior, isn't it?

2   A.  I would not disagree.

3   Q.  And so, too, were his methods of obfuscation, weren't they?

4   A.  Yes.

5   Q.  Now, you acknowledge this is a sextortion case; correct?

6   A.  Yes.

7   Q.  That included threats of death and using explosive devices;

8   correct?

9   A.  Correct.

10  Q.  And you admit in your report there is no literature, that

11  you know of, that specifically has studied the rate of

12  recidivist behavior in cyber crimes that involve threats to

13  kill, kidnap, injure, or use explosive devices; right?

14  A.  I would say not to my knowledge, yes.

15  Q.  And you're unaware of literature associated with recidivism

16  rates for sextortionists; right?

17  A.  The recidivism rates of child pornography offenders with

18  sextortion, part of that group are relatively low.

19  Q.  Certainly there are no studies, that you're aware of, for

20  prolific sextortionists like this man; right?

21  A.  He's a bit of an outlier, I'd say.

22  Q.  And you spent quite a bit of time talking to Judge Pratt

23  and indicating in your report your analysis of whether

24  Mr. Hernandez would commit what you call a hands-on violent

25  crime upon his release from prison; right?

1  A.  Yes.

2  Q.  So what you're talking about is whether his crimes would

3  change upon release; correct?

4  A.  I'm looking at a contextual risk assessment, so it could be

5  whether it's on-line or hands-on.

6  Q.  Okay.  Well, let's focus on this.  Recidivating typically

7  means returning to the crime for which you were convicted;

8  right?

9  A.  Which would be on-line, yes.

10 Q.  Yes.  Not a hands-on offense; correct?

11 A.  Correct.

12 Q.  So what your focus was was on trying to decide whether his

13 crimes would escalate into hands-on offenses; yes?

14 A.  That was one contemplation I had, sure.

15 Q.  But, certainly, a relevant inquiry is whether he would

16 recidivate to the very crimes he's sitting here charged -- or,

17 I'm sorry, convicted of today; correct?

18 A.  Sure.

19 Q.  And what you noted and told Judge Pratt is, "Due to the

20 nature of cyber violence, it is different in this day and age

21 to accurately assess one's risk for future general criminal,

22 physically violent, and sexually violent conduct"; correct?

23 A.  Correct.

24 Q.  You said this was complex and contextual?

25 A.  Yeah.  The violence and sexual violence risk assessment is

1  certainly contextual in this case, any case.

2  Q.  Now, your report only goes as far as, sir, as saying, and

3  I'm quoting here, "One could argue that if he was placed in the

4  community with no Internet access, he may," emphasis on may,

5  "not present as a significant danger to the community."  You

6  said that; right?

7  A.  Certainly.

8  Q.  Just as long as he's never granted his weapon of choice;

9  correct?

10 A.  Yes.  If he did not have his computer access, and he walked

11 out the door right now and there was no computer access --

12 Q.  Utopia.

13 A.  -- his risk would be low.

14 Q.  Yes.  Now, you agree with me that Mr. Hernandez evaded

15 arrest, or at least evaded charges, for at least five years;

16 yes?

17 A.  Correct.

18 Q.  Even more if you consider his financial crimes that he said

19 he committed?

20 A.  Yes.

21 Q.  He thwarted the FBI's efforts to find him for one and a

22 half years; right?

23 A.  I think it was that long, yes.

24 Q.  And when he's released, the Court would have to put, if

25 he's released, some measure of trust in this guy to not access

1   the Internet; correct?

2   A.  Correct.

3   Q.  To not use his weapon of choice; yes?

4   A.  Correct.

5   Q.  Even though he told you it thrills him to do that?

6   A.  It did.

7   Q.  And that he obtained sexual gratification from it?

8   A.  There was that, as well.

9   Q.  Now, regarding the hands-on offenses that you noted, it's

10  true that Mr. Hernandez did not walk into the bedrooms of these

11  victims and touch them with his hands, did he?

12  A.  No.  They were traumatized in other ways.

13  Q.  He made them touch themselves?

14  A.  Yes.

15  Q.  Violently sometimes?

16  A.  Correct.

17  Q.  Inserting the hairbrushes into their vaginas and anuses;

18  yes?

19  A.  That is correct.

20  Q.  Without their consent?

21  A.  Correct.

22  Q.  And it's fair to say that if he had been a hands-on

23  offender, the number of victims he was able to victimize would

24  have been much lower; yes?

25  A.  Well, in this day and age, with, you know, Crime Stoppers

and video cameras and -- you know, it would be more difficult.

Q.  He would have had to have gone into the bedrooms of, I
think in your report you noted, 350 victims to molest or rape
them; right?

A.  Sure.

Q.  But, instead, he chose to commit a crime that allowed him
to do all of this from his home?

A.  That is correct.

Q.  You noted the family history that he had was traumatic;
yes?

A.  Yes.

Q.  Let's talk about other members of his family, some of whom
are here.  He has a loving mother?

A.  A damaged loving mother, yes.

Q.  He has two loving sisters?

A.  Yes.

Q.  He has a devoted brother?

A.  In a skewed way, yes.

Q.  And they lived in the same house that he did growing up?

A.  Yes.

Q.  And other than the drug-related crimes committed by his
brother, his mother and siblings have no convictions for
crimes, that you're aware of?

A.  That is correct.

Q.  They didn't turn out to be cyber terrorists, did they?

A.  No.  They've had, as I said, many negative outcomes, but not cyber terrorists, no.

Q.  One of the factors you noted quite frequently in your report is that, "Mr. Hernandez doesn't have a criminal history, he had no evidence of a longer criminal career."  You said that; right?

A.  That is correct.

Q.  Because you noted that that means he's at a lower risk of violence; yes?

A.  Early initiation of conduct disorder aggravates risk.

Q.  But, sir, we've already talked about, and you've agreed, that he was committing crimes for five to eight years; right?

A.  Well, I mean as a juvenile delinquent.

Q.  I know.  And you meant as an adult, too, right?  No criminal history, that's what you said?

A.  That is correct.

Q.  Okay.  And it's not that he wasn't committing crimes during that time.  It's just that he hadn't been caught; right?

A.  I don't know what he was doing, but if he was doing the cyber crimes, then his criminality would have been extended.

Q.  So if at any point between these five and eight years, if he had been caught and convicted, he would have had a criminal history?

A.  That is correct.

Q.  But, because he wasn't caught, because he was a

FABIAN - CROSS/PRESTON                    134

1    sophisticated criminal, you're giving him points for having no

2    criminal history?

3    A.  Well, it's -- I don't know exactly what is true or not from

4    his self-report, so --

5              THE COURT:  You don't?

6              THE WITNESS:  Well, no.  I mean, I --

7              THE COURT:  Then we can't trust anything in your

8    report if you don't know what's the truth and what's a lie,

9    other than what we see in those e-mails.

10             THE WITNESS:  Well, I don't have any data that he had

11   been charged, state or federal, for prior extortion cases for

12   money.  I don't know.  And so, you know, he said he was

13   sexually abused.  I think the prosecutor questioned that.  So

14   either we're going to believe parts or all.  It is a little

15   confusing here, but --

16             THE COURT:  So when you -- in doing your report, did

17   you believe him or did you not believe him, what he

18   self-reported?  In the beginning, you said you believe when

19   your patients are --

20             THE WITNESS:  Defendants.  I mean, the -- Dr. Meloy

21   and I agree that the defendants' self-interests can affect

22   their self-report in a meaningful forensic evaluation.  If you

23   read my report, he's not always self-serving in this --

24             THE COURT:  I agree.

25             THE WITNESS:  -- so it seemed to be honest.  But the

1    prosecutor did note some good evidence that he was not abusing

2    substances like he said he was.  I think if there's some smoke,

3    there's fire.  I do think he was sexually abused, and I do

4    think that he was involved with some extortion that was

5    nonsexual related before all of this conduct.  How much, I

6    really don't know.

7              THE COURT:  All right, Doctor.

8    BY MS. PRESTON:

9    Q.  You described him as lacking motivation and ambition;

10   correct?

11   A.  Correct.

12   Q.  And you said in your report, "I sense that he was a

13   daydreamer throughout his life, who was often lost in thought

14   and not driven to by really anything, but was rather a hapless,

15   lost soul."  You said that, didn't you?

16   A.  Yes.

17   Q.  Let's talk about what drives Mr. Hernandez, Dr. Fabian.

18   Your report said 196, but he actually created and maintained

19   350 alias accounts, didn't he?

20   A.  I don't know the number, but there were a lot.

21   Q.  Hundreds; fair?

22   A.  Sure.

23   Q.  From different countries?

24   A.  Yes.

25   Q.  Using naming conventions that were -- that weren't easy to

1   remember; correct?

2   A.  I would say, with that number, no.

3   Q.  He had to create those and maintain those and remember

4   them; yes?

5   A.  Yes.

6   Q.  And your report noted he victimized 350 victims; yes?

7   A.  Yes.

8   Q.  He had to send them their script?

9   A.  Yes.

10  Q.  His script.

11  A.  Yes.

12  Q.  Troll some of them on social media?

13  A.  Yes.

14  Q.  Research them?

15  A.  Correct.

16  Q.  Extort them?

17  A.  Correct.

18  Q.  Obtain their child pornography?

19  A.  Correct.

20  Q.  Message them over and over and over?

21  A.  Yes, that's --

22  Q.  Some for days?

23  A.  And longer.

24  Q.  Some for years?

25  A.  Correct.

*FABIAN - CROSS/PRESTON*                    137

Q.  He had to keep in his head where he had left off with every

victim, didn't he?

A.  Yes.  He had to keep that in mind, and it would be

difficult to do, but he certainly did it.

Q.  350 victims spread over hundreds of accounts; right?

A.  Correct.

Q.  He had to store his child pornography in various ways,

didn't he?

A.  Yes.

Q.  Remember the names and passwords of those accounts; right?

A.  Correct.

Q.  And you're aware that, we knew from our own investigation,

that Mr. Hernandez had the ability to access his collection of

child pornography quickly and at any time he wanted; right?

A.  Correct.

Q.  Because he often used pictures from one victim to terrorize

another victim, didn't he?

A.  That is correct.

Q.  Are you aware of his organization of his files, sir?

A.  I'm aware that he organized his files to a significant

degree.

Q.  He had some organization to his files, but much of it had

no rhyme or reason in his hard drive; right?

A.  I'm not clear.

Q.  And yet he was able to access it and use it quickly; right?

*FABIAN — CROSS/PRESTON*                                    138

1    A.   Correct.

2    Q.   He kept stats on his victims?

3    A.   That would be organized.

4    Q.   And he described to you over and over how he would evolve

5    as he committed his crimes; right?

6    A.   That is correct.

7    Q.   And he made sure he had, to use your records, perfected his

8    trade?

9    A.   Correct.

10   Q.   He used counterintelligence?

11   A.   I'm not exactly sure in what context, but I would agree.

12   Q.   Okay.  And he told you he was obsessive?

13   A.   Correct.

14   Q.   And that it was "easy"?

15   A.   Correct.

16   Q.   This is a man you told this Court was a daydreamer, lost in

17   thought, lacking ambition, hapless?

18   A.   He can be all of that, certainly.

19   Q.   He wasn't that to these people in the book behind me, was

20   he?

21   A.   No.  He was methodical in that context, certainly.

22   Q.   So you're aware the defense is asking this Court to

23   sentence Mr. Hernandez to 30 years in prison; correct?

24   A.   I was told that.

25   Q.   He is 29?

*FABIAN - CROSS/PRESTON*                                    139

1  A.  Yes.

2  Q.  He'll be out by 59?

3  A.  With good time, less, but yes.

4  Q.  And you think he may be fine if he can't access the

5  Internet?

6  A.  I don't think anyone could say he's a significant risk

7  without that weapon.

8  Q.  The weapon that's not going anywhere; right?

9  A.  Well, no.  We're going to have the Internet in 20, 30

10  years.

11          MS. PRESTON:  And this is my last section, Your Honor.

12  BY MS. PRESTON:

13  Q.  Now, you're also aware that he has displayed zero respect

14  for law enforcement; right?

15  A.  I agree.

16  Q.  Can you see his tattoo from where you're sitting?

17  A.  No.

18  Q.  He has "B.K." tattooed on his neck.  And you're aware why

19  he tattooed his neck in jail; right?

20  A.  I don't recall.

21  Q.  Were you aware that a cooperating witness told us -- in

22  fact, two cooperating witnesses, including the person who

23  designed the tattoo -- that he specifically tattooed his neck

24  to say "B.K." for Brian Kil?

25  A.  Okay.

1   Q.  So he's still playing games, even in jail now, with law

2   enforcement; right?

3   A.  It's still in character, right.  It's certainly poor

4   judgment.  I mean, I agree.

5   Q.  You're just saying this is his character, but this is who

6   he is and this is what he does?

7   A.  I'm not disagreeing with you.

8   Q.  Let's talk about -- and, by the way, he committed all these

9   offenses right under the nose of his girlfriend; right?

10  A.  Yes.

11  Q.  Okay.  I'd like to end by talking about Mr. Hernandez's

12  empathy.  He has deficiencies in empathy, as you noted;

13  correct?

14  A.  Correct.

15  Q.  In fact, one of his key features is emotional coldness, you

16  said?

17  A.  Correct.

18  Q.  And he told you that these women, these young women back

19  here, when they were girls, they were just, "texts on a

20  computer"?

21  A.  Correct.

22  Q.  And that he received sexual gratification from their

23  suffering; yes?

24  A.  Yes, he said that.

25  Q.  He told you that this was all a game?

*FABIAN– REDIRECT/GARCIA*                         141

1   A.   Correct.

2   Q.   And he told you that when he shut off the computer, his

3   victims didn't exist anymore; right?

4   A.   Correct.

5   Q.   He said, "The game is over.  You pause the game, or you

6   save the game and continue the game later," didn't he?

7   A.   He did.

8   Q.   Dr. Fabian, do you think his victims were able to do that?

9   A.   Absolutely not.

10          MS. PRESTON:  That's all I have, Your Honor.

11          THE COURT:  Any redirect?

12          MR. GARCIA:  Briefly, Your Honor.

13                  **REDIRECT EXAMINATION**

14  BY MR. GARCIA:

15  Q.   Dr. Fabian, you testified there were obstacles to the

16  treatment process, but not impossible; is that correct?

17  A.   No.  He showed some interest in treatment, because the PAI,

18  one can show a lack of interest, or a lack of motivation, but

19  he showed the opposite.

20  Q.   And the Bureau of Prisons does have treatment options for

21  some of the things that you identified?

22  A.   Absolutely.

23  Q.   Primarily through the Psalm Program?

24  A.   Yes, the sex offender treatment program.  I would say the

25  drug and alcohol abuse program, as well.

1    Q.  You understand that he committed these acts using a very

2    significant period of time?  It took time to send all these

3    messages; is that right?

4    A.  It is.

5    Q.  He didn't just sneak into a bathroom somewhere and flip

6    open a flip phone and send these messages, did he?

7    A.  He told me he had used his phone, but, no.  I mean, a lot

8    of it was, I think, based on his computer.

9    Q.  And by using his computer, he used very unique and specific

10   technology?

11   A.  Yes.

12   Q.  And he did so to try and remain anonymous?

13   A.  Absolutely.

14   Q.  This is not everyday software you can just go down to Best

15   Buy and get, is it?

16   A.  I'm not a computer scientist.  I know it's advanced

17   computer savvy, so to speak.

18   Q.  And so it took -- it took time to commit these crimes?

19   A.  Yes.

20   Q.  And there was complexity to committing these crimes?

21   A.  Agreed.

22   Q.  And the context was almost exclusively on-line where he

23   committed these crimes?

24   A.  Correct.

25   Q.  He wasn't using public resources to commit these crimes,

*FABIAN— REDIRECT/GARCIA*                    143

1   that you know of?

2   A.  Well, not to commit the crimes, but as a response to the

3   threats, there was public resources.

4   Q.  He wasn't going to open Wi-Fi hotspots around town, like

5   the library?

6   A.  I don't think so.

7   Q.  He was doing these in his bedroom?

8   A.  Yes.

9   Q.  Where he spent extended periods of time?

10  A.  Extended.

11          MR. GARCIA:  No further questions, Your Honor.

12          THE COURT:  Any questions on those?

13          MS. PRESTON:  No, Your Honor.  Thank you.

14          THE COURT:  Thank you very much, Dr. Fabian.

15          THE WITNESS:  Thank you.

16          THE COURT:  May he be excused or do you want him to

17  stay, Mr. Garcia?

18          MR. GARCIA:  No, I don't need him any further.

19          THE COURT:  Dr. Fabian, if you want to leave, you may.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Thank you, Counsel.

22      (Witness excused.)

23          THE COURT:  All right.  So now, Government, you're

24  going to call your victim witnesses?

25          MS. PRESTON:  Yes, Your Honor.  Just acknowledging for

1    the record, you have received a statement from Minor Victim

2    1, Victim 7, who is speaking on her behalf, as well as her

3    daughter's.  They will not be speaking today.

4           I would like to ask Mr. Mel Siefert to come forward.

5    And if -- Your Honor, I believe you have asked that he speak to

6    the Court from the witness stand; correct?

7           THE COURT:  Correct.  And Tanesa is cleaning that off.

8           David, are you okay?

9           THE REPORTER:  Yes.

10           THE COURT:  Okay.  All right.  And if you would escort

11    the witness.  And is he going to testify or just read a

12    statement?

13           MS. PRESTON:  He is going to read a statement, Your

14    Honor.

15           THE COURT:  All right, sir.  As soon as she's

16    finished, we'll let you have a seat.

17           Could you have him identify himself for the record.

18           MS. PRESTON:  Yes, Your Honor.

19           Sir, would you please identify yourself for the Court

20    and state and spell your first and last name.

21           MR. SIEFERT:  Melvin E. Siefert, M-E-L-V-I-N, E.

22    Siefert, S-I-E-F-E-R-T.

23           MS. PRESTON:  Have you prepared a victim impact

24    statement today, sir?

25           MR. SIEFERT:  Yes, I have.

1          MS. PRESTON:  Would you please now, addressing the

2     Court, read that statement?

3          MR. SIEFERT:  Yes.

4          THE COURT:  And, sir, please read slowly, because the

5     court reporter is doing stenographic transcription for me.

6     Thank you.

**STATEMENT BY MELVIN E. SIEFERT,**

8          MR. SIEFERT:  Your Honor, before I begin, I would like

9     to express my sincere appreciation to our local, state, and

10    federal law enforcement officers who worked so hard to bring

11    this case to a conclusion.  Their dedication and persistence

12    has not gone unnoticed by the staff at Plainfield High School

13    and Plainfield community.

14          Special thanks to Tiffany Preston, Andrew Willmann,

15    Kristina Korobov, and Agent Barrett, for their dedication to

16    this case has been nothing short of amazing, and their

17    professionalism went well beyond the call of duty.

18          December 17th, 2015, is a day that I wish I could

19    forget.  Unfortunately, it was the beginning of the most

20    difficult time of my professional career or personal

21    experience.  The memories from that day and the preceding

22    months can never be erased.  My heart goes out to the real

23    victims of this case, as they are the ones who have suffered

24    the most.  Our school and our community were simply collateral

25    damage to the acts of terrorism for the simple pleasure of one

1   individual.

2           To the victim from our school, I can only imagine the

3   level of fear, frustration, anger, and hurt that you felt

4   during this time.  I am sure that much of your frustration and

5   anger was directed at our administration for decisions that

6   none of us ever imagined we would have to make.  I am so sorry

7   for what you have had to endure during this time.

8           Of all the things that we had to deal with during this

9   ordeal, managing the division within our school and the

10  community was, by far, the most difficult.  Some of our parents

11  were angry at the victim and decided not to allow their

12  children to return to school until this matter was resolved.

13  Some of our parents were angry at the administration for

14  keeping the victim out of school for most of the second

15  semester.

16          I'm not sure there was a right answer to the

17  situation, or any decision was going to be angry -- was going

18  to anger some people in our community.  We understood both

19  arguments, but that did not make what we did -- make our

20  decision any easier.

21          The decision to close school was made around

22  4:00 a.m., and the whirlwind of events were in full swing.

23  Because of the nature of the threats that the defendant made,

24  the Plainfield Police Department secured dog-sniffing dogs --

25  or drug -- or explosive-sniffing dogs from the TSA at the

1   International Airport to do a sweep of our facility early on

2   the morning of December 17th.  This sweep, thankfully, found no

3   explosives, and we closed school for the remainder of the

4   winter break.

5           We had all hoped that this would be over before we

6   returned to school on Monday, January 4th, but that did not

7   happen.  During winter break, we were monitoring social media

8   as more threats were coming in and to gauge the feelings of our

9   parents and our students.  It was clear to us that many parents

10  were not comfortable sending their students to school without

11  some assurance that their children would be safe.  We decided

12  to set up a TSA-type security check as students entered the

13  building each day, using metal detecting wands, and not

14  allowing students to bring backpacks to the school.

15          On Sunday evening, January 3rd, my assistant

16  principal, Michael Menser, who is with me today, we met at

17  school to discuss our safety plan for the return to school the

18  next morning.  We had just completed our work setting up the

19  screening areas for students, and while waiting for -- in the

20  conference room for Mr. Olinger, our superintendent;

21  Mr. Todesco, our school board president; Mr. McKee, our

22  assistant police chief, to arrive, both Mr. Menser and I

23  received the following e-mail, a message from Brian Kil, that

24  read -- and I apologize, Your Honor, for the language, but this

25  is the defendant's words:

1          "Hello, Mr. Menser.  I hope someone you know and love

2     very much dies in the hail of gunfire.  Fuck you, bitch.  Watch

3     from the sidelines as I slaughter many.  Mr. Siefert, I'm going

4     to single-handily kill a large number of students right under

5     your watch.  No amount of additional security will make much of

6     a difference.  I have three years of knowledge inside those

7     classrooms.  How much knowledge do those extra security people

8     have?  I can easily place pipe bombs in places they wouldn't

9     realize to check.  Soft lock-down?  Good.  Fewer can escape,

10    bitch.  And if I have a chance to put a bullet in your head, I

11    will not hesitate.  I hope to see you soon."

12         These messages were disturbing, to say the least,

13    especially as we were working so hard to ensure the safe return

14    to school the next morning.  I spent the night at school that

15    evening in order to help the TSA do another dog sweep -- or a

16    dog search at 3:00 a.m.  I had a lot of time to think that

17    night about the defendant, what he had done to our students,

18    our parents, our school, and our community.

19         The negative impact that he had up to this point was

20    only a small part of what we would encounter over the next five

21    months.  At the end of each day, our administrative team would

22    meet to process and adjust our safety procedures to better meet

23    the needs of our students.  The following weeks were extremely

24    long, and we would soon realize that the conclusion of this

25    situation would not end anytime soon.

1         For the next five months, our administrative team

2    would arrive at school at 5:00 a.m. to search our athletes

3    arriving for early morning workouts, and not leave until all

4    students had exited the building, sometimes after 9:00 p.m.

5    Although the days were long, I felt it was necessary to provide

6    our students with a safe and secure school building.

7         Like I stated earlier, the division that the defendant

8    created in our community and our school cannot be understated.

9    Social media was brutal on all of us.  The community was

10   divided, and they made their position clear, no matter how

11   truthful or valid their statements were, oftentimes pitting

12   parents against parents, students against students, and parents

13   against the school.

14        The community was growing frustrated with what they

15   perceived as a lack of communication from the school.  They did

16   not understand that it was an ongoing investigation, and what

17   little information we had, we could not share for fear of

18   jeopardizing the case.  Public pressure mounted and it was

19   decided the public forum would be set up to hear from all

20   parties involved in the investigation.

21        A panel of agents from the FBI; the Indiana State

22   Police commander; local police; school personnel, including

23   myself, were assembled on the stage in the auditorium.  After

24   the police and the FBI gave their brief update, the audience

25   had the opportunity to ask questions.

1          A Plainfield parent asked, how are we going to keep

2     their students safe, and then proceeded to announce that he had

3     brought a gun into the meeting.  He was abruptly arrested and

4     the meeting was over.  This was yet another example of the

5     division in our community and the level of terror that the

6     defendant was able to inflict on our school and our community.

7          The emotional cost of his reign of terror can never be

8     calculated.  The students spent the next five months of the

9     school year in what many would consider an armed fortress.  The

10    normal activities of the school year were anything but normal.

11    Special security arrangements had to be made for all athletic

12    contests, prom, graduation, just to name a few.

13         If anything positive can come from a traumatic

14    experience, it is a renewed appreciation for the liberties that

15    we enjoy every day.  And it seems only fitting that the

16    defendant should lose his liberties that he once had before he

17    decided to play games in our community.

18         A saying that I often use with our students that make

19    bad choices, "When you play stupid games, you win stupid

20    prizes."  I ask the Court to award the defendant his just

21    prize.  Thank you, Your Honor.

22         THE COURT:  Thank you, sir.  You may step down.

23         MS. PRESTON:  I'll note for the record, the school to

24    which Mr. Siefert was referring is Plainfield High School, and

25    the victim to whom he referred was Minor Victim 1.

1          THE COURT:  Okay.  Thank you.

2          MS. PRESTON:  Your Honor, I'm asking Minor Victim 2

3     to step forward at this time.

4          THE COURT:  Counsel, is she going to testify or

5     just --

6          MS. PRESTON:  She is simply going to speak to Your

7     Honor.  She's giving a victim impact statement.

8          THE COURT:  All right.  Thank you.  You may.

9                   **STATEMENT BY MINOR VICTIM 2,**

10         MINOR VICTIM 2:  I want to start off by saying thank

11    you to everyone for being here to support us.

12         THE COURT:  Okay.  I need you to talk slow.

13         MINOR VICTIM 2:  Sure.  Sorry.

14         THE COURT:  Thank you.

15         MINOR VICTIM 2:  Thank you to everyone for being here,

16    victims.  Thank you for coming here.  We are -- you are not

17    alone.  This man tortured me for five years.  The emotional

18    pain that this has caused me is going to last for the rest of

19    my life, for all of these girls.  This is a life sentence for

20    them.  He deserves that, as well.

21         Think about the girls when he would take his week-long

22    disappearances.  Think about the girls that have no idea that

23    he's even been arrested, no idea.  They're probably thinking

24    that he's just going to show up one day again.  And who's to

25    say that he wouldn't perform any physical attacks on us?  He

1    wasn't in the same state.  That is not a fair statement to

2    make.

3          I have to go now through the rest of my life with

4    isolation issues that I have to keep, because I had to keep

5    this to myself for five years as a child.  No one can

6    understand that except for us victims here today.

7          He has a loving mother and a sister who was about my

8    age.  Who is to say he didn't have malicious intent for her?

9    Where was the trigger that, if this happened to her, how it

10   would affect them, and how this whole situation would affect

11   them?  There is no consideration for human life from that man,

12   none, a man that will text you over and over and over, to the

13   point where you're texting like this, with such a high level of

14   anxiety.  That's psychopathic.  A man that doesn't care about

15   the girls who are hurting themselves, or hurting young girls,

16   that is psychopathic.

17         We now have to live with this for the rest of our

18   lives, and he deserves justice when he now, every single day,

19   can think about everything he did and have pleasure for what he

20   did.  He's a dangerous and evil man.  That's another kind of

21   sick.  Mental health does not make you want to like little

22   girls.  It makes no sense.  There's no ploy in that.

23         I'm here today because I want to speak out, because he

24   deserves the justice, and we deserve the justice.  We deserve

25   to be able to go to bed with the peace of mind, knowing that

this monster will never be walking the streets again, knowing that he'll never have access to technology again, and that we didn't go through all of this for nothing.

I think that's honestly enough to be said.  He's a monster and does not deserve to be walking these streets, he's just not.  And that's pretty much all I have to say.

THE COURT:  All right.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

MS. PRESTON:  Thank you, Your Honor.

Your Honor, if I may, I'd like to ask Victim 2's mother, who is here to speak on, not only her own behalf as a victim, but on the behalf of the rest of Victim 2's family, who were also threatened with death and rape.

THE COURT:  Okay.  Is she -- does she have a number as a victim?

MS. PRESTON:  She is from Michigan, and so she wasn't given a specific victim number in the indictment.

THE COURT:  But she is the mother of Victim 2?

MS. PRESTON:  2, yes.

THE COURT:  All right.  Come on, ma'am, and have a seat.

You may.

**STATEMENT BY MINOR VICTIM 2'S MOTHER,**

MINOR VICTIM 2'S MOTHER:  Thank you.  I'm here today

as a mother of a young lady who once was a child that fell

victim to Buster Hernandez.  Our journey with this experience

started in January of 2017.  My youngest daughter, who was 16

at the time, started receiving texts, disturbing texts, and we

had no idea who this person was.  And every time we blocked the

number, he'd come up with a new number.  This person would give

information about our personal family, our personal friends,

and events that happened around us, so we knew something -- or

somehow that he was getting the information that he knew.

The police were called to our home immediately.  And

while the police were at our house, the person fired a text

message.  While my daughters gave this -- gave her phone to

police officer in his hand, and he said -- and excuse my words

-- "I told you not to call the fucking police."  So we felt

like he was literally in our backyard.

There are many emotions, but the most important one

was our family was faced with no other option than to armor up

ourselves and protect each other.  Little did we know this

person would then continue to text us and infiltrate our entire

phone accounts.  One by one, this monster would send messages

to each one of us at random occasions and at different times.

It could be in the middle of the day or it could be at 1:00 in

the morning.  Messages ranged from disguising himself as one of

our friends, our children's friends, stating he was watching us

in front of our house.

1      We continued to contact the local police department

2   for that week and a half, and all they would say is that he had

3   a savvy computer app.  The messages were very graphic by

4   leaving death poems on my personal phone, telling me he was

5   going to kill one of my daughters.  He would leave a mystery as

6   to which one it would be, and he would leave descriptions as to

7   how he would do it.

8          In one instance, he talked about getting to my

9   youngest daughter to rape her, and then he was going to gut her

10  inside and out.  He talked about standing in front of my

11  husband's bed and taking a rock and bashing his head in.

12         February 2017, after dealing with these graphic,

13  disturbing messages to my family, we finally got ahold of the

14  local FBI unit in Detroit, and they came to our house.

15  Messages got more disturbing as he would be -- as he would

16  threaten with pictures of my daughters, that he would show

17  everyone.  This monster then began threatening my daughter and

18  his -- and her friends at school.  He talked about coming in

19  and blowing her head off and killing the police and anyone

20  around her.

21         We worked with the local police department, the IT

22  department, and the school administration to figure out where

23  these messages were coming from.  It was unsuccessful and we

24  continued to get threatening messages all hours of the day and

25  night.

1    March 2017, after two months of dealing with

2  everything going on, we decided to get an alarm system, which

3  cost us quite a bit of money, but we had to do what we had to

4  do to protect our family.  My husband started collecting guns,

5  we started to get licenses for carrying a weapon.  We were

6  scared and we did what we had to do.  There was nights that we

7  would sit at the top of our stairs and sit back to back with

8  guns in each of our hands, not knowing if this monster would

9  come into my house.  Disgusting.

10    I had to sleep with a gun at my side, with my son, who

11  was eight years old, and scared to death that it would go off.

12  But I had to do what I had to do, because I didn't know if he

13  was going to be coming into my door or my window.

14    One particular day, I was sitting in my living room,

15  and he decided to start sending more text messages.  And I just

16  started putting my phone upside down, because I didn't want to

17  see the messages.  So I would kind of look at this and I would

18  see that it was an unknown person.  And then he started bashing

19  about the company, our security system, the type that we had.

20  And then he decided to say -- he would rattle off a number.

21  And after he rattled off a number, he then would talk about how

22  he would come into my house and do what he -- evil things

23  involved that he would do to my children, my little kids.

24  Disgusting.

25    March, at the end of March, my daughter and I went to

1    Cancun.  I decided to get a different phone number, thinking

2    that he would leave us alone.  I got a different phone, shut my

3    other phone off, put it in a desk.  I came back, powered it on,

4    this is just coming back from Mexico, and he said, "How was

5    Cancun?"  Sick.

6          He would continue to send messages to all of us,

7    making fun of my husband's heart issues.  He started to get

8    pictures of my son, my eight-year-old son, and he would

9    threaten that he would kidnap him, he would get him kidnapped

10   and get him molested.  My son had a picture of him -- he had an

11   injury in his mouth, and he sent that picture.  He was able to

12   have access to my -- all my kids' accounts and their pictures.

13         On June 17th -- or June 2017, this was a busy month

14   for us.  It was my middle daughter's graduating year, she had

15   prom.  We also had dance recital and dance rehearsal, and we

16   hadn't heard from Buster in probably a couple of weeks.

17   Thursday night was prom, and I was happy that I wasn't getting

18   any texts.  I shouldn't have even thought it in my head, and

19   then 20 minutes later he sends me a message and he says,

20   "Someone's going to die, one of your daughters who ends in Y."

21   He did a riddle.  He was constantly playing games and doing

22   riddles.

23         At that point I felt a sense of -- my body just lifted

24   out of -- my spirit lifted out of my body.  I didn't even know

25   what to do at that point, because I felt like I was exhausted.

1   I didn't know what else to even -- the FBI wasn't doing

2   anything, the local FBI was not doing anything, and I was

3   just -- I didn't know what else to do.

4         And Friday morning, I dropped off my son at the

5   school, and I pulled on the side of the road and I prayed and I

6   cried and just broke down, that this monster has infiltrated

7   our life, the fact that my daughters would go somewhere and I'd

8   have to call them two, three, four times, texting, where are

9   they, when are you coming home, because I was scared.  I didn't

10  know who this monster was.

11        We filed another police report, it was documented.

12  That Friday morning -- or that Friday night, I went off to my

13  daughter's dance rehearsal and I got a phone call from the FBI.

14  They were -- actually, I got the phone call from my husband.

15  The FBI was sitting -- or standing on our porch.  And we went

16  home, and the FBI told us that my youngest daughter was not the

17  victim, even though I consider every one of us, and every one

18  of you girls in here, a victim of this monster.  It was my --

19  it was my first born child that was the victim, and I had no

20  idea.

21        This is where the journey and this nightmare takes a

22  twist, and it unfolded that night.  We had learned that Buster

23  Hernandez had been sextorting my daughter since she was 12

24  years old.  My husband and I were blown away by the news, and

25  the pieces of the puzzle of XXXXXXX being very withdrawn from

1    our family seemed to make sense.

2            From the time that she was in the eighth, ninth grade

3    to the time she was 20 years old, we lost our daughter,

4    mentally, emotionally, and that's something that we'll never be

5    able to get back.  She never wanted to be home for a long

6    period of time.  We saw her personality change from this super

7    funny, laughing child to a very tired, depressed, sad, dark

8    young lady.

9            It caused so many fights between us, because we

10   couldn't understand what she was going through.  We couldn't

11   help.  We felt helpless.  I feel a lot of guilt, because I

12   couldn't see the darkness of where she was and where he put

13   her.  She was threatened on a regular, daily basis from him,

14   making her do things no child should ever have to experience,

15   no child.

16           When the FBI told us the news, they wanted to talk to

17   XXXXX, and we drove to her work.  We went inside and we told

18   her we had to talk to her.  She came out, and then the agents

19   told us to wait in our car.  We were able to see XXXXX, his

20   back was to us, and we were watching them talk to her.  And I

21   could tell, by her body language, that they must have told her

22   that they knew who -- they were going to help her.  And to see

23   her shoulders just drop, she looked over her shoulder and

24   looked at us, I felt like an angel had just taken her, the

25   relief of all the stress that she had been under, that she

1   could actually live her life.  It was a sigh of relief, but

2   we'll never get those years back.

3           From that point, I knew things were going to be okay

4   in regard to no more texting or torturing our family, even

5   though the day of the recital, this monster over here sent

6   pictures of his lap with a knife and guns to my daughters as

7   they were getting ready to perform on stage, because he's the

8   sick, twisted monster that he is.

9           I look to you, Your Honor, as a mother and as a

10  victim, as a woman, and as a human.  Buster Hernandez is a very

11  evil person who master-manipulated hundreds of young children

12  to, not only have them do the things that they shouldn't be

13  doing, but gave them the knowledge of doing things that they

14  shouldn't even know of at their age.  This monster should never

15  see the light of day nor ever have access to any type of

16  electronic device in his lifetime.

17          You see, I don't call it science.  I call it common

18  sense.  What Mr. Fabian said, he doesn't understand.  He used

19  the technology as a power to master-manipulate and torture

20  these young victims and, in many cases, try to kill themselves.

21  The fact that this person put an innocent picture of my

22  daughter on a dark Web is appalling in itself.  His goal was to

23  seek, kill, and destroy these beautiful young children by being

24  a predator and hiding behind the computer with his technology.

25          I will never be able to get my daughter back from the

age of 12 to 20.  Her life was taken away from any type of
normalcy.  She wasn't able to enjoy the things in life a child
should be able to do.  She couldn't enjoy her school friends,
her dances, her prom, her graduation, her vacations.  She
couldn't even get a good night's rest.  For years, she was so
exhausted.  She couldn't even finish college, which is very
sad.

     She was put on medication for anxiety, which
understandably so, because it's -- because of this medication,
it caused, a couple of months ago, my daughter to have a
seizure.  That seizure caused my daughter's teeth to come, and
now she has to wear braces.  These is all cause and effects of
what this monster has done.

     I pray for the other victims that will have to
continue to deal with in their heads, of how to cope for the
rest of their lives with what he's done.  I pray for strength
for my daughter and our family, and I pray for every single
child out there in the world that has gone through this and,
unfortunately, will go through this because of monsters like
him.

     Your Honor, I ask that you give Buster Hernandez life
imprisonment without parole.  I never want him to rob any other
child ever again, and the experience of just being a child.
Yes, he does not have a prior record, according to Mr. Garcia,
but like Tiffany very well stated, he had been committing a

crime every single day for many, many years and just had never

gotten caught.  That's all I have to say.

        THE COURT:  Okay.  Thank you, ma'am.

        MS. PRESTON:  Thank you, Your Honor.

        THE COURT:  You may call your next.

        MS. PRESTON:  Your Honor, we call Victim 3.

        THE COURT:  Ms. Preston, if you'd give Tanesa a

minute.

        MS. PRESTON:  Your Honor, for the record, this is

Victim 3.  She is the subject matter of Count 21, you had asked

before.

        THE COURT:  All right.  Thank you.

        You may.

        **STATEMENT BY MINOR VICTIM 3,**

        MINOR VICTIM 3:  Good afternoon, Your Honor.  My name

is XXXX XXXXXXXX.  I'm known as Victim Number 3, and that is

XXXX like the continent, so it is spelled XXXXXXX.  I will be

turning 25 in April.  If it were a normal Friday, I'd probably

be home relaxing in my apartment with my cat, Mew; and bearded

dragon, Leo.  However, this is not one of those Fridays.  This

is not like any day I imagined and, frankly, one I never

thought I'd see for many reasons, that I will be trying to put

into words.

        First, I would like to thank you, Your Honor, for

allowing myself and other victims to be heard in person due to

the circumstances, to speak our truths, our stories.

       And with that, let me take you back to September of 2014.  I turned 18 that year, I graduated high school in June, I got my first car and license in August.  I knew my life was just beginning and that possibilities were endless.  I was working that day.  I was a hostess at a restaurant and had been working there for a little over a year.  I remember my shift was halfway over when I received a Facebook message from an account with no real name or profile photo.  The message read somewhere along the lines of, "Hi, XXXX.  I have compromising photos of you and I need to know that I can trust you."  That is when my life changed forever and it became my own personal hell.

       I want to take a second to describe my feelings in that moment and the moments that followed.  After that initial contact, I was terrified.  I was a young girl who had only sent two photos to someone I trusted, in which I had on a bra and underwear I had no idea how a person I had no knowledge of could have obtained.  Knowing what I know now, I know he never had my photos.  He picked me to prey on, an innocent girl who had very few sexual experiences and very little knowledge of how dangerous the Internet and faces behind the screen could be.

       What I am about to describe is very graphic and triggering in nature, so if anyone wants to step out, now would

definitely be the time, as I know how traumatizing this has all been.

In the beginning, the requests were simple.  I would need to do as he said when he said.  And once he felt he's had enough, was board, ready to move on, et cetera, he would then reveal his identity and let me go about my life.  In hindsight, if that were the case, all this emotional, mental, and psychological abuse would all remain.  And either way, it was a lose/lose situation.

He made sure to establish trust immediately.  I was to trust him with keeping my photos and videos safe, and he was to trust me with not telling anyone, emphasis on the police.  We were each other's secret, a friendship in one of the most forcibly twisted ways, and I was compliant for a while.  We came up with a routine, and he would tell me to start with photos, which became not enough.  You can only take so many photos of you and your genitalia before it becomes, "boring or cannot get you off," his words.

Over the first year, 2014 to 2015, out of the three, I had obtained many names, but his favorite was Slave.  I was not a person.  I was more like property that was put here to serve him.  Over time, I consumed that and I believed it.  I felt horrible when I couldn't do his assignments on time.  I wanted to be better than I was before to please him as much as possible so I could be set free.

1    The assignments were awful.  He would make me very

2    descriptive lists and give me a timeframe on when they needed

3    to be submitted.  They usually consisted of a mixture of photos

4    and videos.  The photos were degrading.  Example number one,

5    take photo of inside of vagina, lift, spread open wide, with

6    flash.  The same with anus, cheeks spread wide, flash on.

7    Three, photos of you in a slutty outfit in slutty poses.

8    Video examples were even worse.  Number one, strip.

9    Start with top, then bottom.  Make it sexy and act like you

10   like it.  Number two, masturbation video.  Set camera facing

11   vagina.  Face must be visible.  If it's not how I like it, I

12   will make you do it again.  Use household objects, brush

13   handle, spray bottle, lint roller, et cetera.  Insert in as far

14   as you can and lick clean once done.  Must be 15 minutes in

15   length.  Number three, insert object into anus and go in as far

16   as possible.  Everything must be visible.

17   When it came to sodomy, I have boundaries, and I was

18   not and would not do it, along with making a sex tape with a

19   significant another.  I knew what I was risking when it came to

20   saying no and standing up for myself.  I knew every photo and

21   video I sent would go out for the world to see, and there was

22   no doubt in my mind, I knew he would do it.  He once told me he

23   would sell me to someone who would make my life even worse.

24   I remember he once sent me a screenshot of all of my

25   contacts from my phone, exactly as I named them, and their

phone numbers.  I knew he was the real deal, and he proved it,
just another way to control and abuse me.  He kept me right
where he wanted me.  Things got bad.  He would contact me
randomly, telling me just -- telling me he just came to eat at
my job and saw me, that he was watching me in the bushes.  He
said he knew where I lived and described the car that I drove.

I lived with such fear.  I cried almost every night.
I would cower in the corner of my room, curtains closed,
listening, because I was convinced I was being followed and
watched.  I remember being tired and slacking.  I just wanted
it all to go away.  I wanted a normal life with friends,
college, parties, happiness in general, and I had none of this.

I was being abused and tormented.  I thought about
suicide often in my mind.  I believed that was the only way
out.  By this time, I knew he was bluffing about letting me go.
He told me I would be married with kids and he would still be
doing this to me.  He told me I was his favorite slave, and who
would want to let their favorite go.

I wanted to die.  In my heart, I wanted nothing more.
I wanted to escape, and it was my only way out.  When
contemplating this, I angered him for not completing an
assignment, and he told me he would contact my sister, who was
11 years old at the time.  I was horrified.  Something in me
decided that I had to stay.  I needed to stay.  If I were gone,
who would tell my story?  Who would protect my sister?  And,

1  most of all, if I were gone, he would just find another

2  innocent girl to destroy.  I was easily replaceable, and that

3  scared me the most.

4        If only I knew how much more afraid I would become.

5  It's challenging to explain mental and psychological abuse.

6  The closest known disorder would be Stockholm syndrome.  I was

7  a victim, I had no one.  I was isolated, alone, afraid,

8  anxious, depressed.  He had me in a box, mental chains.  He was

9  the only one that I had, and he knew what I was going through.

10  He was there.  He became a friend, and I opened up to him in a

11  way I would a best friend.  He knew and knows so much about me,

12  who I am, how my mind operates.  I've always been a caring,

13  empathetic person, and I cared about him, despite the horrible

14  things he put me through.

15        But in time, as I was playing my cards right, he

16  opened up to me, careful not to slip any details about who he

17  was or a location.  However, I did learn about his other

18  crimes, and realized I was only one of many, thousands even.

19  He would show me other girls' photos and prompt me to be like

20  them, setting an example, making sure I was perfect, molded

21  like a piece of custom furniture.

22        He made me be him for a day, he made me watch another

23  girls' video explaining why she couldn't get her assignments

24  done.  He made me decide if I should give her another chance or

25  expose her.  And all those feelings I absolutely cannot

describe.  I cried.  That could have easily been me, and it very well may have been me.

I worked in Plainfield.  I was close to the community as I lived on the west side of Indianapolis.  When someone started terrorizing an underage girl and posting her photos on-line, threatening to bomb the school and mall, I just knew in my heart that it was him.  The mannerisms were the same, the way he typed, the words he used.  And God knows, I wanted to reach out so bad and tell somebody.  I cannot explain how absolutely awful that was to sit back and watch him terrorize another girl and not be able to do anything about it, because I was so afraid to tell somebody.  And he was also MIA for a few months, and I knew what that meant, that there was someone else.

January of 2016, I was working two jobs and started school that semester, ready to reclaim my life, but he quickly found a way to ruin that, too.  Plainfield High School held a forum for everything that was happening in the community, and he made me go.  I pleaded and begged for him not to make me do it, but we all know what would happen if I refused.  And this time, there was proof of what he could do.  He told me once that he would, and sorry for my language, he would Brian Kil my ass if I did not comply, his Plainfield terror persona.

He said I had to go, because, "no one would suspect a black girl with an afro," his words.  I complied.  He made me

voice-record the forum, he made me write down questions parents

asked, and a description of what they looked like and were

wearing, so he could continue to terrorize them on-line, like

he was actually there.  In a way, he was, through me.

        And I will never, ever forget the agent looking at me,

saying he believes the person is in that room.  And in that

moment, I could have died.  I felt awful.  I provided what he

needed me to and continued to be tormented until he was finally

caught in August of 2018 -- or 2017.

        When I learned he was finally caught, I honestly could

not believe it.  There were many stories about Plainfield High

School kids being suspect, so I thought it was another false

alarm, until I read the article.  And there it stated he made

Victim Number 3 attend the Plainfield High School forum and

told her no one would suspect a black girl with an afro.  It

was not a false alarm, and it all became real.

        I called the number listed on the bottom of the

article, asking to please call if you have any information.  My

heart felt as if it would explode.  It was beating so fast,

because I knew that he was finally caught, and I knew that I

was finally free, or at least so I thought.

        I was as free as I could be in the few happy moments

in the aftermath.  I eventually went on and I lost my mind.  I

never fully coped with what happened until I broke in August of

2019.  I tried to commit suicide.  I checked myself into a

mental health facility and, thankfully, got the help I needed.

I was diagnosed with bipolar disorder, anxiety, depression,

suicidal thoughts, and PTSD.  I joined a group of survivors of

domestic violence and sexual abuse.  I met with a victim

advocate for over a year, and I still go to therapy to this

day, and will be for a while.

I will be on medications for the majority of my life

because of my bipolar, anxiety and depression disorders.  I

still have nightmares about him not being caught.  I fear that

he would still one day contact me, and sometimes I still do.  I

struggle with forming healthy relationships, platonically and

romantically.

No one in my family knows about this or what I went

through.  How can you describe that your body was a crime

scene?  My body was not mine.  I went to other places in my

head when I was being abused, dreaming of the day I would no

longer be forced to exploit myself.

One day I would be brave and one day I will scream my

story from the rooftop.  And, Your Honor, today is that day,

the day that I have to be brave.  And I do want to ask you not

to go easy on him as he had, and clearly still has, no remorse,

no remorse for us.  He took what was supposed to be the most

pivotal years of my life.  He stole them, and that is time I

will never get back.  He tried to destroy me, diminish me, and

he almost succeeded.  But almost.  I am here as tall as I've

1    ever been, speaking my truth.  And I wish this could be a true

2    and final ending, but at the end of the day, there are wounds

3    that will never heal and psychological damage and trauma that

4    will haunt me to my grave.

5           And to my fellow survivors, I pray you find the

6    closure you need, and please know that this is not the end, it

7    is just the beginning of us living the lives that we deserve,

8    owning our bodies and becoming the beautiful women we are

9    destined to be.  Despite what he said to you, you are enough.

10   You are not alone.  You are loved and you are worthy, and you

11   did not deserve it.  From here on, you are no longer a victim,

12   you survived.  We are survivors.  We are strong, a storm to be

13   reckoned with, and he is nothing.  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          How many more victims do you have, Counsel?

16          MS. PRESTON:  Your Honor, we have -- we have -- I'm

17   sorry, Your Honor.  Let me look.

18          THE COURT:  I think we've been in court about two

19   hours, so would this be a good time to take a break?

20          MS. PRESTON:  We have two more.

21          THE COURT:  Are they -- do you want to do one more

22   before we take a break?

23          MS. PRESTON:  It's --

24          THE COURT:  David, can you do one more, court

25   reporter?

1 (Off the record.)

2   THE COURT:  Let's take a break.  We don't want to wear

3 him out.  10 minutes.

4   THE COURTROOM DEPUTY:  All rise.

5   (Recess at 2:22, until 2:34.)

6   THE COURT:  Ms. Preston, we're back on the record.

7 You may present your next victim.

8   MS. PRESTON:  Thank you, Your Honor.  I just want to

9 note for the record that Minor Victim 4 sent you a letter.

10 Minor Victim 5 is here and would like to be acknowledged by

11 the Court.  She is not speaking.  I'd just like to gesture back

12 in that direction to --

13   THE COURT:  Where are you, Minor Victim 5?

14   Thank you.

15   MS. PRESTON:  She's here with her mother.

16   And I would also like to acknowledge Victim 10.  He is

17 in the overflow room, the courtroom overflow.  And his wife is

18 with him, who was also threatened.

19   And now, with permission, I would like to ask Minor

20 Victim 11 to come up and speak.  She is giving a victim impact

21 statement.  She will not be testifying.

22   THE COURT:  All right.  Minor Victim 11, come on up.

23   All right.  You may.

24     **STATEMENT BY MINOR VICTIM 11,**

25   MINOR VICTIM 11:  You all know me as Victim 11.  I

am more than a victim.  I am outgoing, I'm bold, strong, and

independent.  But before I had become all of those things

today, I was a terrified little girl.  At 15 years old, I

received a message as I was riding shotgun in my sister's car,

pulling out of my friend's driveway.

As a 15-year-old girl, my life changed forever.  From

that day on, I've lived in fear.  Imagine every time your phone

dinged, that your heart dropped.  There were nights that I'd

rather die than continue these things that he -- that was being

threatened.

Even when I was living in this fear, I accomplished

many things.  I had a job, I played club sports.  That led me

to play in college.  I had a social life and I had

relationships.  School was harder for me than it was for my

sisters.  I had to put more hours into studying.  Grades were

important in my household.  Anytime I had anything lower than a

C, my phone was taken.

But my phone was the only source of communication with

Jare.  I know him as "Jare" due to the e-mail he contacted me

off of.  The times I'd get my phone taken would put me into a

panic, and he would say, "Well, you have to do what I say.  If

you don't respond or do it, I will exploit you."  A 15-year-old

threatened, scared, not knowing if the next day her pictures or

videos would be posted for her family and friends to see.

Family is the most important thing to me.  Nights, we

would have cousins' sleepovers.  Guess what I was doing.  I
vividly remember one night that we were watching a movie, and
all of a sudden my phone buzzed.  My first thought was,
"Please, Lord, do not be him."  I looked down at my phone, and
there it was.  "I need this, this, and this from you."

I looked around the room, my palms were sweaty, my
heart had dropped.  I was shaking, hoping that no one had just
saw my phone screen.  I tried to explain that I could do them
when I got home the next day, because I was with family.  That
was a mistake, because, all of a sudden, I'm getting
threatened.  So at the time, I did what I had to do to survive.

Speaking on family, he went after my youngest sister
with the same messages that he had sent me.  He had threatened
me to the point where, if I didn't give him my number -- or her
number, sorry, you know what would happen to me.  And, like I
mentioned earlier, his biggest thing was, you cannot tell
anyone.

So I stuck -- I was stuck between finding at -- him
finding out and exploiting me or confiding in my little sister.
So she wouldn't be scared, I went to her and I opened up about
everything, and I told her, "Do not respond.  And if you do
respond, act like you know nothing," and then drop it.

As soon as I told her what was going on in my life,
she -- I could just tell in her face, it dropped.  She was
scared for me, she was shocked.  She couldn't believe what

*MINOR VICTIM 11 STATEMENT*                                        175

1    words just came out of my mouth, but then she agreed, to keep

2    both of us safe, she would ignore him.  I thank God every day

3    he stopped and I went to her, because I remember how it felt,

4    and I would never want anyone else to feel the way that I felt.

5          For years, I was constantly threatened, but I wasn't

6    the only one who was.  He would threaten my parents, my

7    sisters, and anyone I was close to.  I did not want to do -- I

8    did not know what to do besides do what he said to keep me and

9    my loved ones safe.

10          A goal of mine was to go to college, playing the sport

11   that I love on a full-ride scholarship, so here I was at 18

12   years old doing that.  As an incoming freshman, you're excited

13   for the college experience, which I was.  But being a student

14   athlete is hard enough as it is, juggling class, practice,

15   study all hours, social life, and et cetera.  On top of that, I

16   was also trying to set up a schedule where I could send what I

17   needed to send.

18          My freshman and beginning of sophomore year of

19   college, I had to not participate or show up late to the fun

20   activities, because I had to attend to him.  I hid this part of

21   my life from my coaches, teammates, boyfriend, and friends, who

22   I was with every day.  I had to lie to them to say I was doing

23   homework or something else, because if I didn't have done what

24   Jare wanted me to do at a certain time, I would be exploited.

25          At 15 and 16 years old, I had my first boyfriend.

1   Your first love is supposed to be fun and exciting.  And at 18

2   and 20 years old, I had my second boyfriend.  Your second love

3   is deeper and more serious.  You're not supposed to feel

4   ashamed and guilt or lie and keep secrets.  I still get a pit

5   in my stomach not only thinking, but vividly remembering what I

6   was wearing, where I was, where I was about to go, of the

7   nights I begged and cried for him to stop.  Even today, the

8   thought of me finding someone and telling my story scares me,

9   not only how they would react, how they will look at me, but

10  will they look at me differently.

11        When I received that phone call from my parents in the

12  spring of 2019, asking why a detective was looking for me, I

13  truly had no idea, not until my mom said, "He said it had

14  something to do with sextortion."  When I heard those words

15  come out of her mouth, my heart dropped and all the memories

16  popped back into my head.  I told her I would call her back,

17  come to -- sorry.  And, come to find out, when you go through

18  something so traumatic, your brain shuts out that memory.

19        Back in 2017, I received a phone call from Detective

20  Andrew, and I hung up and I blocked the number, praying it was

21  fake, because a part of me did not want to relive this

22  experience.  I called Detective Andrew, and his words were, "I

23  think you may know what this is about, and I just want to let

24  you know, he will never be able to hurt you again."  There I

25  was, a 21-year-old sitting on her bed, about to go play

intramural basketball, balling my eyes out because I felt a
weight lift off my shoulders, that I didn't even know I had
been carrying around.  I felt free.  I was scared, and I was
confused.  I was angry.

     After I received this phone call, I began trial
preparations.  During this time, my mental state plummeted.  I
didn't go to class.  I called my mom saying I was leaving
school, and I was driving nine hours home that night because I
couldn't do it anymore.  She convinced me to stay and finish
out my two weeks, and I did.  I went back for my senior year
and I thought, mentally, I was ready.  The trial kept getting
pushed back, and I kept mentally preparing myself, and then it
would be taken.

     I was in such a deep and dark depression I've never
experienced before.  I didn't know if there was a way out.  I
began therapy, I did EMDR.  It's an eye movement therapy.
During my sessions, old memories that had been locked away to
keep myself safe were revealed.  Having these memories come
back up were hard.  I could live with the fact that this has
happened to me.

     Once it was brought, like, to my parents, I feel as if
I had disappointed them.  The guilt I feel of my parents that
found out that their little girl was being hurt and abused
kills me.  My mom has said to me, "I try to look back to see
the signs.  I don't remember any.  How could a mother not see

her daughter was hurting?  I wish I could have done something differently."  And I always reminded her, "I was not going to show you.  There was no way for you to tell, because I continued to live my life."

My dad doesn't show much emotion, and when things hurt him, it's not -- he's not easy to talk to.  The other night, right before I flew on a plane out here, I sat down on the couch next to him.  And he turned around and he looked at me, and he said, "How are you feeling?"  I explained that I wrote my statement, and I guided him through what I was planning on saying.  He looked at me while tears filled his eyes and said, "I am so proud of you, and so strong."  I have never seen my dad cry.

Looking back, I want to hug that 15-year-old little girl who felt so alone, ashamed, and petrified; and I want to hug that 21-year-old girl who wanted to drop out because she felt like she couldn't do it anymore, because now, as a 23-year-old, I am succeeding.  I'm about to graduate grad school, I have a full-time job, I have my own place, and I just bought my first car.  I'm doing it.

And for you, the guy who had control over my life for so long, I have so many questions that I want to ask.  Why for so long?  Why tear down little girls?  Why try and ruin families?  Why put this on your own family?  Why not just live and enjoy your own life?  And just why?  I could come up with a

1  hundred more questions, but I know I will never have any

2  answers to these, and I have come to peace with that.

3         I have a journal full of letters that I've written to

4  you over the past few years, some filled with anger, some with

5  sorrow, and some with compassion.

6         One letter I wrote, I title as, "A letter to the man

7  who thought he could ruin my life."  "For years you had control

8  over me, you made me scared, but for some reason I could block

9  you out.  I went through two relationships while I had you in

10  my life, and you did not ruin me.  You made me a strong woman.

11  And now that you are gone for good, I can be who I truly am.  I

12  will be able to give the next person every side of me.  Because

13  of you, I had to hide.  I don't have to hide anymore.  I don't

14  hate you for what you did to me, because it made me who I am."

15         And in another letter I wrote out of anger, "You are a

16  coward, you're pathetic, and I feel sorry for you.  You did not

17  ruin me.  And I will not thank you for what you have done, but

18  I am strong and I can conquer anything.  I have lived my life,

19  I have loved, and I have done everything that I was supposed to

20  do.  You took advantage of my kindness, my big heart, and my

21  vulnerability.  I should hate you for everything that you put

22  me through the years, but I don't.  And I never let -- because

23  of you, I will never let someone walk all over me, take

24  advantage of my kindness, make me feel less than ever again.

25  You thought you had control.  And, in reality, I lived my

life."

          Your Honor, just because he is no longer going to be a part of my life physically doesn't mean this won't have an effect on my life for the -- or, sorry -- effect on me for the rest of my life.  He has tortured, emotionally drained, abused, and taken advantage, and so much more of not only me, but to so many girls and families.  He had control over our lives for too long.  Now you are in control.  Please don't allow him to ever hurt another person again.  Allow us to have the peace that we deserve.  Please allow us to close this chapter of our life and to grow from the hurt and live in fear not any longer.  Thank you.

          THE COURT:  Thank you.

          All right.  Ms. Preston, come and escort your witness.

          MS. PRESTON:  Thank you, Your Honor.

          THE COURT:  You have one more?

          MS. PRESTON:  Your Honor, yes, but briefly, for the record, Minor Victims 12 and 13 are appearing virtually.  If they feel comfortable, they can turn on their video, it's been turned off, to be acknowledged, if they would like.  But I did want them to know that you know that they are here and they are listening, Minor Victims 12 and 13.  They both sent letters to you, Your Honor.

          THE COURT:  And the Court did read those letters.

1        MS. PRESTON:  I can see on the video screen now Minor

2   Victim 13 is sitting there with Mr. Jared Barnhart, who

3   assisted us greatly in this investigation, and so I'm glad that

4   they are here.  And I think that Minor Victim 12 is also

5   trying to turn on her video.

6        Your Honor, you received a letter from Minor Victim

7   17, and our last victim is Minor Victim 20, and she is giving a

8   victim impact statement.

9        THE COURT:  Okay.

10       MS. PRESTON:  Oh, and I see, just for the record,

11  Minor Victim 12, I see her right there, and she's looking into

12  the camera.

13       THE COURT:  I don't see her on my camera.

14       All right.  Thank you.  I can now see Minor Victims 11

15  and 12.

16       MS. PRESTON:  12 and 13.

17       THE COURT:  12 and 13.

18       MS. PRESTON:  Thank you.

19       THE COURT:  Which is 12?  Which one of you is Minor

20  Victim 12?

21       MS. PRESTON:  Can you raise your hand, Minor Victim

22  12?

23       There she is.

24       THE COURT:  Okay.

25       MS. PRESTON:  And can you raise your hand, Minor

1  Victim 13.

2          Thank you.

3          THE COURT:  All right.  Thank you, ladies.

4          Okay.  And this is Minor Victim --

5          MS. PRESTON:  20.

6          THE COURT:  -- 20 on the witness stand.

7          You may.

8                 **STATEMENT BY MINOR VICTIM 20,**

9          MINOR VICTIM 20:  I just want to say thank you to

10  everyone that is here.  This is definitely a new experience for

11  me, and this is probably going to bring me a lot of closure and

12  a lot of people here closure.  I was identified maybe two weeks

13  ago, so this is very new for me.

14          THE COURT:  So this young lady is one with the

15  information that was just recently detected by the FBI?

16          MS. PRESTON:  Yes.

17          THE COURT:  Okay.  Very good.

18          MINOR VICTIM 20:  So how do I capture, you know, as

19  much hurt as I felt in that moment, and just -- you know, where

20  does one go here?  I had just turned 15, and it was

21  January 2015.  I got my first phone.  I was blonde.  You know,

22  I was born blonde.  I die my hair now, black.

23          I was ice-skating with some friends when I got a

24  message from a Facebook account called "Cut Down," no photos,

25  no videos attached to it.  Someone said something along the

lines of, "I have private photos of you.  If you don't do what I say, then I will release them to your friends and family." Of course, everyone knows how it goes.  You know, a billion girls have been up here saying the same thing.

It was my first phone.  I was so excited to have social media for once, which, you know, sucks now.  I hate social media because of this instance.  But I was ice-skating, and I -- that was the first time I had felt pure panic in my life, the first time.  This man gave me the first anxiety panic that I have felt, like -- and I remember that feeling, but the rest of it is all kind of a blur, so I'm going to try my hardest to get through it.

But so, yeah, the video -- I mean the account had no photos or videos attached to it.  And he claimed to have private photos of me, and that if I did not obey him or send more, he was going to send them to my family.

So when I got home that night, I complied with what he wanted, which was just a picture of me in a bra showing my face.  I did that with the understanding that after that, it would be over.  And I fell into the trap.  In the next several hours, I struggled through what I was told to do, and sending the nude photos of -- and if my body was in a wrong position or my hands and fingers weren't where he said to place them, then I would be punished, which would mean I would have to stay up longer or that the photos would be posted or sent to my family.

1    I ended up, in that first night, sending several pictures and

2    several -- for several hours.  And in each photo, I am crying.

3           The first night, I fell asleep silently, sobbing on

4    the bathroom floor, with my head next to the toilet.  After

5    what had felt like torture, I woke up.  I crawled into bed,

6    crying, and I fell asleep.  And this was the first time I had

7    felt absolute heartbreak.

8           And the next morning, I woke up still crying.  I was

9    already scarred, nervous that he would message me again.  And

10   soon he did, and the panic fell over me again.  I was

11   petrified.  I was too far in, and I was convinced that there

12   was no way out.  And I did what I was told, because I truly

13   felt like the consequences of disobeying him would ruin my life

14   forever.

15          That only lasted for a month, but during this time my

16   GPA went down to a 1.9 and never recovered.  I lost an

17   unhealthy amount of weight and hair.  I didn't eat or shower.

18   I disconnected from my friends and family and teachers.  I was

19   made to leave class and take photos in the bathroom, family

20   dinners, and even at church.  I was getting in trouble for

21   sleeping in class and having my phone, not doing my homework.

22          I was paranoid of who everyone around me was texting.

23   I had thoughts like, "Is this going to last forever?  Is this

24   my life now?  Is it someone I go to school with?  Is it someone

25   I see every day?"  Even the thought of it being a family

member.  I thought maybe it was more than one person harassing me, because I wasn't getting any sleep, so how were they?

I knew I was dealing with someone dangerous, maybe a future rapist.  I wondered if these photos would come back to haunt me, that if I was ever successful in music, that the world would see my 15-year-old body.  And these thoughts never leave me, no matter how old I get.  I'm 21 now.

So, finally, I ignored him after some time, and my biggest fear came to life when I got a Facebook request from myself.  It was my name, but it was not me, and it had all the photos that I had sent.  So, again, if I didn't send more photos, or kept ignoring him, a friend request would be sent out to my family.  But I didn't give in, and after awhile the account got taken down by Facebook.  But it wasn't long until another one was put up, and I felt like I got punched in the face.  And at that point, I was done.  I was just ready to be done, and the damage was there.

To this day, if I hear the text tone that I had at the time, it sends me into a spiral.  I know the exact note, I play piano, it's a A.  Do you know how many phones have an A?  Every single one of them.  Even when a doorbell rings or a door opens at a convenience store, ding, that's all it takes to trigger.

When I get calls from unknown numbers, or texts, I get sick to my stomach until I have clarification on who is contacting me.  Social media will always be a huge fight.  And

1    that is one of the biggest things that I do now, and I hate

2    every second of it, but it makes me a lot of money, so I don't

3    mind.  I will always be a private person.  And the account he

4    made was finally taken down, and I just prayed that he would

5    stop.  And eventually it did.

6          This man not once touched me, I never saw his face,

7    but I have never felt more violated in my life, even after

8    being sexually assaulted physically.  It does not compare.  And

9    I hate that, because the only good thing about the person who

10   did it is that he is not someone that I know.  Other than that,

11   I am disgusted and embarrassed that I was ever taken advantage

12   by someone who I would have never talked to unless I was forced

13   to.

14         If I could save my younger self, save her little

15   heart, and keep her from messaging back, I know my quality of

16   life today would be better.  And the only thing I can do is

17   move on and do what I can to control what I have.  But the

18   long-lasting effects on me as an adult will continue to say who

19   I am, but there is something in me that I cannot describe, that

20   will never be renewed.  I can't.  So, that's all I have.  Thank

21   you.

22         THE COURT:  All right.  Thank you.

23         MS. PRESTON:  Thank you, Your Honor.  That is all.

24         THE COURT:  Okay.  Thank you.

25         All right, Mr. Garcia, at this time, Counsel, you and

1    your client may present any evidence and argument.

2           And, Mr. Hernandez, sir, you're allowed to make what

3    we call a statement of allocution, which means you can say

4    whatever you'd like to say on your behalf.

5           And if I haven't already stated it for the record, the

6    Court has reviewed both parties' sentencing memorandums.  I've

7    reviewed all of the letters in support of the defendant, also.

8    Mr. Garcia, how will you proceed?

9           MR. GARCIA:  I believe Mr. Hernandez is going to make

10   a statement, and then I will argue on behalf of the defense,

11   Your Honor.

12          THE COURT:  Okay.

13          MR. GARCIA:  Would you like him to just do it from

14   counsel table?

15          THE COURT:  He can do it from right there.

16          THE DEFENDANT:  Can you hear me?

17          THE COURT:  I need you to talk into the microphone.

18          Can we get it a little closer to him?

19          THE DEFENDANT:  Can you hear me now?

20          THE COURT:  Yes.

21          THE DEFENDANT:  I guess I'd like to start by

22   apologizing to all the families that were involved in this.  I

23   know just my family alone has went through a lot, and they're

24   still going through a lot, because of the things that I've

25   done.  And my poor mom and sister support me so much that they

flew down here from California to be here today, just so I
wouldn't be alone.  And I hurt them a lot.

And, most importantly, I think the families of the
victims that were -- that were impacted by this, I'd like to
apologize to you guys.  Some of you guys are here today.  I
heard -- I read some of the letters that were written to
Ms. Pratt, and I think they were really powerful.  And I'm just
sorry to the families.  I wish I can go back and do things a
little differently and -- not a little differently, a lot
differently; right?  But I'm sorry, you guys.

And to the victims, I'd like to apologize to you guys,
as well.  I went through some of the -- some of the messages
leading up to this, and they're just really bad, they're awful,
and I can't even believe that I'm the author of them.  I'm
sorry.  I don't know if you can hear me.  I can't believe that
I was the one who authored those texts, being four years old,
and I just -- it's awful.

After today, hearing some of the impact statements, I
feel awful.  I feel terrible.  And I know there's nothing I can
say that will make you guys feel any better about what
happened, but I just want to extend my apologies to you guys
that are here today, and those who aren't here today, as well.
I would like to apologize.

And I know the FBI is still working on this case.  And
when I pled guilty, I agreed to -- I agreed to cooperate and

1   help them find any other victims or help them with anything

2   that they needed help with.  And even after -- even after

3   today, if there's anything you guys need help with, that maybe

4   I can help you with, the door is always open.  I will always be

5   willing to help you guys.

6           It's hard to explain.  There is no explaining this.

7   But, again, I just -- reading the texts, I just can't believe

8   that I'm the one who did it, but it was me who did it, and I

9   take ownership of it, and I apologize.  And I hope you guys can

10  move past -- move past all of this, all of you guys.  And you

11  know, I'll leave it at that.  Thank you.

12          THE COURT:  All right.  Thank you.

13          Mr. Garcia?

14          MR. GARCIA:  I going to use the podium.

15          THE COURT:  Certainly.  You may.

16          MR. GARCIA:  Fear, trauma, pain, suffering, harm,

17  hardship, abuse, and a need for treatment.  These are all words

18  that can be used to describe the feelings and emotions and

19  experiences that the victims in this case have experienced.  I

20  sincerely believe Mr. Hernandez's apology, and I hope it offers

21  just a slight, at least, amount of help that they heard it from

22  him today.

23          These words can also be used to describe the

24  experiences of Mr. Hernandez's childhood and his life.  And I

25  think it's fairly certain that the etiology, in part, of his

1    crimes here can be explained by his upbringing, or lack

2    thereof.

3            And while today's hearing is certainly one of the more

4    emotional ones that we have to experience as legal

5    professionals, and one I hope that the civilians involved don't

6    have to experience again, I want to point out that the focus is

7    on what is a reasonable and not greater than necessary

8    punishment and sentence for Mr. Hernandez.

9            The Court is going to look at this particular

10   defendant and these particular crimes and determine, after

11   consulting with the guidelines and the 3553(a) factors, what a

12   just punishment is.  We start with the guidelines.  The

13   guidelines range is life, life in prison for a man who is just

14   30 years old.  We do not believe, when consulting with the

15   factors under 3553(a), that that is appropriate, and, in fact,

16   greater than necessary here.

17           In 2015, the last statistics that I could find from

18   the Sentencing Commission, only 153 offenders in the country

19   were sentenced to life.  Another 168 were sentenced essentially

20   to life given the number of years imposed upon them.  This

21   accounts for less than 1 percent of all federal sentences that

22   year.  And what it shows us, and what no doubt we know already,

23   life sentences are rare.  They're reserved for the worst of the

24   worst, the worst crimes and the worst offenders -- murder,

25   significant drug trafficking, kidnapping, violent crimes,

violent firearm related offenses -- generally involving repeat
offenders with terrible criminal history.  This is not Buster
Hernandez.

While the courts determine the appropriate guideline
range of life is applicable here, that's not the end of the
examination, and we believe multiple reasons exist for a
downward variance.

Under 18 U.S.C. 3553(a), we look at the nature and
circumstances of the offense, and the history and
characteristics of the defendant.  Beginning with the nature
and circumstances, it's undisputed, this was one of the most
prolific cases of sextortion that we have seen, not just in
this district, but in this country.  Untold harm to a countless
number of victims, harm that will require treatment for those
here today and, no doubt, treatment for those who don't yet
realize they were involved.

The on-line threats to the school and the community
were taken very, very seriously.  People were afraid and they
were concerned, and law enforcement efforts were directed at
keeping people safe from an unknown threat.  But the nature of
how these offenses were committed, and how Buster unfolded them
and behaved was limited exclusively to an on-line environment.
Sure, there were some other instances of misbehavior that he's
had, but none of them remotely compare to what he did here
on-line.

1          And he needed two things, time and technology.  This

2     was not simply a situation where he borrowed somebody's phone,

3     hopped on a Starbucks Wi-Fi, and started harassing people

4     on-line.  It was calculated and methodical.  It took

5     technology, software, and hardware to remain anonymous.  If you

6     take away his access, you take away his ability to be

7     anonymous, he's rendered much more harmless.  And I think that

8     was pretty evident from the testimony earlier.

9          By all accounts, outside of his bedroom, away from his

10    computer, he was nonconfrontational.  He wasn't a troublemaker,

11    and he wasn't threatening.  As the Court has heard from both

12    sides, and read, this was a game to Mr. Hernandez.  As sad as

13    it --

14          THE COURT:  Mr. Garcia, what about his encounters in

15    the jail?  He was fighting in the jail.  He --

16          MR. GARCIA:  Well, certainly, Your Honor.  As someone

17    who is --

18          THE COURT:  He disobeyed the rules by tattooing Brian

19    Kil insignia on his neck.  That's not very --

20          MR. GARCIA:  Well, and I think the record --

21          THE COURT:  -- peaceful.

22          MR. GARCIA:  I think the record also needs to reflect

23    that while the initials are B and K, the tattoo actually

24    reveals Buster and Kimmie, who is his girlfriend.  So I think

25    there's a fair amount of disagreement on our side as to what --

1       THE COURT:  Well, that's not what he told his

2  cellmates.  But, go ahead, Mr. Garcia.

3       MR. GARCIA:  Yeah.  So -- and with respect to the

4  skirmishes he experienced in prison -- or, I'm sorry, in --

5       THE COURT:  The jail?

6       MR. GARCIA:  -- the jail, you know, he's -- he has a

7  lot of notoriety, he's a target.  Certainly, almost everyone in

8  jail has some sort of ability to pick on him.  And I think when

9  you look at the grand scheme of things and his life in total,

10  while there were these crimes, there were these financial

11  crimes, there's not a lot of other indication that he was

12  involved in any trouble.  He was quiet, he was reserved, he

13  kept to himself.

14       As I was saying, this was a game to him, and as sad as

15  that is to these victims here, he was doing this for the

16  achievement.  He was driven for the achievement.  And once he

17  closed his computer, he wasn't offending.  He literally walked

18  away from it.

19       Let's talk about his history and characteristics.  He

20  wasn't a problem at school, he wasn't a problem for his mom.

21  And, by all accounts, he was genuinely likable.  You've read

22  the letters that his family and friends have submitted on

23  behalf of him.  They didn't see any of this behavior.  You

24  know, he wasn't out torturing cats or assaulting kids at the

25  playground.  His exclusive method for harming these victims was

1   over the computer.

2          His past was full of physical and psychological

3   trauma.  He was beaten and his injuries were ignored by his

4   parents, as documented in the medical records.  His siblings

5   were assaulted by other family members.  He lacked a stable

6   household and upbringing, lacked direction, parental oversight.

7   He never developed proper morals, ethics, or emotions.  Now,

8   that's not to say that it all excuses this behavior, that's not

9   what I'm saying, but it at least explains, to some degree, how

10  he turned out to be the person he is and what allowed him to

11  commit these crimes that he committed.

12         As Dr. Fabian indicated, the first time he believes

13  he, Buster, or his sisters have ever talked about any of this

14  trauma was when they talked with them.  He was never afforded

15  the opportunity for any reasonable treatment.  It wasn't like

16  he was just going to pick up the phone and call his

17  psychologist.  The ACE examination, the Adverse Childhood --

18         THE COURT:  You know, a lot of people do that,

19  Mr. Garcia.  They know they've got -- if I knew I was doing the

20  things he was doing and thinking the way he was thinking, I

21  would have gone to a psychiatrist.

22         MR. GARCIA:  I understand, but I --

23         THE COURT:  And the reason he probably didn't is

24  because he's a psychopath, even according to your witness.

25         MR. GARCIA:  Certainly there are very significant

1    mental health differences between you and him, that is for

2    certain.

3            THE COURT:  Okay.

4            MR. GARCIA:  If you look at the factors under the ACE

5    exam, he's a 10 out of 10.  It is no surprise to Dr. Fabian

6    that he wound up committing these types of actions, developing

7    these types of addictions and personality disorders.

8            THE COURT:  What about the government's evidence that

9    he didn't really even have these addictions, that they watched

10   him for -- how long did they watch him?  A month?

11           MS. PRESTON:  A month, Your Honor.

12           THE COURT:  And he only left the house three times,

13   and there were no drugs or alcohol.

14           MR. GARCIA:  I think that's a small snapshot, to say

15   over -- in one month, that he wasn't using these things.

16           THE COURT:  Okay.  Okay.

17           MR. GARCIA:  When he went on-line, he could be bold

18   versus timid, he could be aggressive versus passive, demanding

19   versus accommodating, threatening versus withdrawn, and hateful

20   versus loving.

21           The need for the sentence to be imposed must reflect

22   the seriousness of the offense, promote respect for the law,

23   and provide a just punishment.  Here, unquestionably, a 30-year

24   sentence that we requested is incredibly long.  He would be

25   punished within the confines most likely of the United States

1    prison under harsh and restrictive conditions.  A 30-year

2    sentence will reflect the seriousness of these offenses,

3    promote respect for the law, and provide a just punishment when

4    you take into consideration all of the factors that the Court

5    must take into consideration here.

6            We believe it will deter others from thinking about

7    committing these crimes, because it is not a light sentence.

8    It is three decades.  And it's going to be followed by a

9    lifetime term of supervised release, which will ensure that

10   once he is released, if he's released, the public will be

11   protected, because he will have a United States probation

12   officer, someone who is going to be very familiar with his

13   record, very familiar with what he is capable of.  And,

14   frankly, we don't know what type of monitoring abilities the

15   Probation Department is going to have in three decades.  Look

16   how far we've gone in the past three decades with technology.

17           Finally, a 30-year sentence will allow Mr. Hernandez

18   to receive proper sex offender maintenance programming, drug

19   and alcohol abuse programming, and any other necessary mental

20   health treatment that the Bureau of Prisons determines he may

21   need.

22           Finally, the types and kind and sentencing range

23   that's established by the applicable guideline range.  So,

24   certainly, the Court has found that it's life, but when you

25   take into consideration the 3553(a) factors, it's apparent that

1    a life sentence is not appropriate.  It should be reserved for

2    the most heinous and serious offenses.  And that doesn't mean

3    these weren't, but there are some that are greater, that

4    deserve life.

5            Finally, we've noted a number of different sentences,

6    in this district and nationally, that we believe pair up with

7    the offense here to avoid unwarranted sentencing disparities.

8    We also believe 30 years will provide significant time for

9    restitution to be paid when Mr. Hernandez is working inside the

10   Bureau of Prisons.

11           And, finally, having sat through this hearing today,

12   and having been a part of this case for the better part of two

13   years, I want to acknowledge the difficulty, extreme

14   difficulty, that this case has and presents to the Court.  We

15   understand that.  There is no easy solution here, other than to

16   say it's life in prison.

17           But we believe 30 years will send a strong message to

18   Mr. Hernandez and to others who might commit this crime.  It

19   will provide some assurance to the victims that he's not going

20   anywhere for a very long time, and that if he does survive a

21   30-year prison sentence, which I think there's statistically a

22   chance he won't, they'll know that he'll be on lifetime

23   supervision, his whereabouts will be consistently monitored,

24   and he will never be able to commit these crimes again.

25           So, for those reasons, we'd ask Your Honor to impose

 1    the sentence that we've requested, with the programming that

 2    we've requested, and we ask that you recommend to the Bureau of

 3    Prisons that he be recommended placed at the United States

 4    prison in Tucson, Arizona, to receive some of these treatments.

 5    Thank you.

 6              THE COURT:  Thank you, Mr. Garcia.

 7              Ms. Preston?

 8              MS. PRESTON:  Thank you, Your Honor.  Am I allowed to

 9    share my screen?  I just wanted to make sure that --

10              THE COURT:  You may.

11              MS. PRESTON:  Thank you.  One minute, Your Honor.  I

12    apologize.  I'm trying to make sure I find it here.

13              Thank you, Your Honor.

14              Your Honor, before I begin, just to make a quick

15    record, again, the slides that will be presented today, this

16    evidence has all been turned over to the defense prior to

17    today.  In fact, much, if not all of it, was ruled upon by Your

18    Honor before the trial date was set.

19              And because -- the messages here, really, Your Honor,

20    are the crime, but Your Honor has read so many of them, so I'm

21    not going to quote from a lot of messages today.  I'm going to

22    display them, however, on the slide, so I just wanted to make a

23    record of that, as well, and how they relate to the 3553(a)

24    factors.  And I'd like to say just again, for the record, the

25    slides will be submitted under seal, because they do have

nonpornographic photographs of the victims.

THE COURT:  Okay.

MS. PRESTON:  Your Honor, Mr. Hernandez's criminal behavior falls so far outside the most basic understanding of human decency and compassion that it defies belief.  For at least five years, Mr. Hernandez relentlessly terrorized and exploited more than 100 children in a way that was so vicious and intentionally inhumane that it shocks the conscience of anyone who has a soul.

He has finally been brought to justice and today stands before you to be held to account for the suffering that he has caused to so many children, young women, and their families for so long.  Two experts in the field of forensic psychology told you today that he's a psychopath, or a moderate psychopath, and that he is a sexual sadist, among other things. Dr. Meloy told you that Mr. Hernandez is motivated by the sexualization of domination, control, deception, excitement. Put another way, he has sexualized the suffering of other human beings.

His own expert, Dr. Fabian, diagnosed him with a paraphilic disorder called sexual sadism, and told you that he experiences sexual arousal from the physical and psychological suffering of another person.  In other words, Your Honor, the man standing before you derives sexual pleasure from psychologically torturing children.  He derives sexual pleasure

from tricking them and terrifying them.  He derives sexual

pleasure from controlling and dominating them.  He derives

sexual pleasure from listening to them beg for mercy, and he

derives sexual pleasure from forcing them to violate their own

bodies.  And, Your Honor, he derives sexual pleasure from

telling children to kill themselves, children, teenagers, and

young women, to kill themselves.

         This defendant brought an entire community to their

knees.  He used counterintelligence to make parents think twice

about their children's safety, not just in Plainfield, but some

of the parents sitting here today.  He taunted and threatened

to kill police officers, and he told Dr. Fabian that that made

him feel thrilled, and that thrilling himself became the goal.

Your Honor, what causes normal human beings, with even an ounce

of a soul, to shudder in horror causes the man standing before

you in judgment to orgasm.

         You have to decide today, as set forth in Title 18

United States Code, Section 3553(a), what manner of sentence is

sufficient, but not greater than necessary, for Mr. Hernandez,

a convicted cyber and prolific sexual terrorist, who weaponized

the Internet so that he could get, in his words, as many

victims as he could.  It is the position of the United States

that the only sentence that is sufficient and that is

absolutely not greater than necessary in this case is life.

         A life sentence is necessary to account for the nature

and circumstances of the offense, the seriousness of the offenses, to deter others, and to protect the community in light of the history and characteristics of this defendant, but it's also important to provide just punishment that accounts for the unimaginable suffering he has inflicted on so many people for so long.

I'd like to actually start a bit out of order.  The defendant in this case cited to a number of studies about sentencing disparity, and I just want to address that because it was not in my brief.  I'll start with the statistics on which he relied.

He cited statistics for typical child pornography cases, but I don't think those are helpful to this Court.  That's not what this is.  He's a prolific sextortionist who forced children to violate their own bodies and threatened to blow up towns.  And he did this because he -- oh, then he decided to disseminate these images.  And, in fact, I think one of the victims even talked about this today, because, to use his words, "I decided to distribute the images and expose or humiliate them or to establish control and dominance over them because I got bored."  So what he's saying is, when he disseminated their images, he had decided, for some of them, to toss them out like they were yesterday's trash.  This is not your typical child pornography case.

Your Honor, I know this is very small to read, but --

and I can answer specific questions that you have, but on the
screen are some of the cases that Mr. Garcia cited as being --
or saying that they pair up to this case.  And, Your Honor,
they just don't.

The *Finkbiner* case was a one-year scheme in which the
defendant misrepresented his identity to victims to produce
child pornography via webcam.  He very quickly accepted
responsibility, and with no pretense of trial, not putting the
victims through what they went through, waived venue in other
areas, and accepted his responsibility.

*Trevor Shea*.  Shea was 19 years old.  He only had ten
victims.  He had sadistic threats, yes, but no distribution.

*Austin Williams*, his conduct only involved five minors
and occurred in less than a year's period of time.  And his
exchanges, by the way, weren't even sextortionate until he
actually posted one on a fake page.

*United States v. Be*k.  He plead guilty pursuant to a
cooperation agreement.  He was a substitute teacher who set up
a Facebook page belonging to a teenage female, and he induced
them to produce based on a scheme that was teen-to-teen trade,
and there was no mass dissemination.

In *Gunn*, Gunn pretended to be a new kid in school.  He
also pretended to be Justin Bieber.  So he tricked his victims
into self-producing child pornography for only a three-year
period, and only a few months, at most, with each victim.

1    We've got victims here, Your Honor, who were with him for five

2    years.

3           The other three cases are similar -- similarly

4    dissimilar.   Two years for *United States v. Muzio*, 14 victims.

5    He posed as a teenage boy who pretended to have cancer.

6           *Broxmeyer*, a high school athletic director, had sex

7    with five teenage victims that he groomed.

8           And *Jacob*, which wasn't even an sextortion case at

9    all.

10          Your Honor, we think, as we cited in our brief, and I

11   won't repeat my reasoning, that this is much more like the

12   *Lucas Chansler* case, the only difference being they had a

13   similar number of victims, similar age range.   Some of his

14   crimes were two -- lasted two to three years.   But in that

15   particular case, Mr. Chansler, who got 105 years, 105 years,

16   confessed on the scene, immediately cooperated, had a list of

17   his victims, helped immediately, so the United States in that

18   case could help change children -- or help save children, and

19   that guy got 105 years, unlike Mr. Hernandez, who waited, as is

20   his choice, but it was his choice, two and a half years to

21   provide information leading to only two identifications so far.

22          Now, if Lucas Chansler got 105 years under those

23   facts, while it pairs up better, to use Mr. Garcia's phrase, it

24   doesn't compare even with those facts, because Mr. Chansler

25   didn't bring an entire community to a halt, threaten to blow up

1    two schools and shut down a town.

2         So, Your Honor, I'll start by -- I'll move on from

3    disparity to talking about the nature and circumstances of the

4    offense.  For approximately five years, he sexploited young

5    girls and some boys.  He is a serial sextortionist who

6    obsessively, strategically, and relentlessly spent nearly every

7    day for five years targeting and psychologically torturing

8    children.  He wasn't successful, Judge, by happenstance.  This

9    wasn't luck.  He was a highly sophisticated criminal who used

10   cutting-edge technology, discipline, and even math to meet his

11   goals.  Mr. Hernandez actually ran stats on his victims.

12        And you heard -- or, I'm sorry, you read the cold and

13   calculating way he rattled off his criminal statistical

14   methodology to Dr. Fabian.  He picked out what he noticed, he

15   said, was the most efficient age group, girls who are 17 to 21,

16   and he said they were "super easy."  So he wanted a challenge,

17   and he tried younger victims, who were 15 to 17.  He said that

18   was a little harder.

19        He told Dr. Fabian, "I originally came up with the

20   script where I don't have to do anything, but I'm just going to

21   sort of trick them into thinking that I have something.  I

22   tried all the age groups, and the percent rate is if it's just

23   copy and paste, your percent rate turns out to be 4.5 percent."

24   This script, Your Honor, is what we described in our brief as

25   the defendant's lure.  And the defendant used a complex web of

1  315 alias e-mail and social media accounts to send that lure to

2  thousands of prospective victims in an effort to rope in as

3  many young girls as possible.  The script was chillingly simple

4  as it was brilliantly effective.

5          As you can see on your screen, and you heard even

6  today, the pattern, as these victims were talking with you, he

7  designed this script because he knew it would work, and he

8  tricked and manipulated these young girls with it.  What's

9  truly abhorrent about that, Your Honor, is that he

10 intentionally used their love for their families, their sense

11 of self-worth, their fear of disappointing their parents

12 against them.  He banked on these girls and so many others,

13 that they would choose to suffer in silence and endure all this

14 pain rather than disappoint the people they love the most.  If

15 that isn't sadistic, I don't know what is.

16         His use of this script is demonstrated on the screen

17 in front of you.  This is just snippets from just four of his

18 315 accounts and capture only a few minutes of the day.  Just

19 look at all of those names.  These are all human beings, Your

20 Honor, human beings that he collected like baseball cards,

21 defaced, and then threw away.

22         And the fact that we're talking about the number of

23 victims being well over 100 today demonstrates -- or more than

24 100 today, demonstrates just how good he was at his trade and

25 how well his methodology worked.  His trade that he approached

1    like a criminal mathematician, copying and pasting that script,

2    keeping track of the success rate, remembering it years later

3    when he talked to Dr. Fabian, and engaging in sort of a time

4    reward calculation, where if he just put in a little more time

5    and, he said, engaged in light conversation, he would yield one

6    result, but, boy, would that affect his goal of collecting the

7    most victims.  So he went back to using his script, because he

8    realized that, even though his success rate went down, the goal

9    was to get as many as possible, and that meant he had to use

10   his time wisely.

11        All those names on the screen, Your Honor, are real

12   children.  They weren't baseball cards.  They were human

13   beings.  And the next set of slides show you in real time how

14   one of those human beings -- how it worked on one of those

15   human beings, who happens to be sitting in the back, Minor

16   Victim 1.  Minor Victim 1 was young.  That's what she looked

17   like back then, Judge.  She's a young woman now, but she was a

18   kid when this happened to her.  She had a robust social media

19   presence, and her posts made it clear that she cared about her

20   friends, her family, and her image.  She was the perfect target

21   for Mr. Hernandez.

22        His first set of messages to her are on the screen,

23   and you can see, through those messages, how he intentionally

24   employed deception, fear, control, degradation, and time

25   pressure to coerce her.  Using an alias account, he messaged

1    her, using that cut-and-paste script, you can see it right

2    there, "Hi, Minor Victim 1.  I have to ask you something.

3    Kinda important."  There's his script.  And, like a fisherman

4    casting a hook into an ocean of fish, he would just wait to see

5    who would bite.

6           And, unfortunately, tragically, Minor Victim 1 said,

7    "Okay."  There it is.  Mr. Hernandez preyed on her fear and

8    threatened to expose her.  He used time pressure against them.

9    He wants new ones taken right now.  And then, of course, he

10   tricks them and he tells them that if they just comply,

11   everything will go away, it will all be over.  Well, we know

12   that's not true.  Deception, fear, control, degradation, and

13   time pressure.

14          And once he forced them to take that first picture,

15   and you can see it there in Count 1, that was the first picture

16   that Minor Victim 1 ever took of herself, he truly held all the

17   cards.  To use his words, Your Honor, these are words from

18   Dr. Fabian's report, he said, "He would walk these victims into

19   dipping a toe" -- actually, these aren't Dr. Fabian's words,

20   these are the defendant's words.  Mr. Hernandez said, "He would

21   walk these victims into dipping a toe in the water to a leg to

22   now they're swimming, and they cannot get out of the water."

23   Those are his words.  They were trapped in his game.

24          You read so many examples in our brief showing what

25   they were forced to endure.  You heard it in their voices

1   today.  Some of these victims, Your Honor, experienced these

2   messages, not just for a few hours on a Friday, Judge, every

3   day for a year, two years, three years, four years, five years.

4       Mr. Hernandez would threaten to expose them, and then

5   he teased them, asking, "If I were to expose you, I don't think

6   your boyfriend is going to be very understanding."  He even

7   threatened to kill their loved ones and their friends, and they

8   did absolutely nothing to deserve that.

9       Your Honor, he degraded them.  I think you heard

10  Victim 3 talk about how it felt to receive messages like this.

11  Your Honor, he forced these girls to do things to their bodies

12  when they were so young and in their formative years.  This is

13  one of his screenshots.  He wanted to be so efficient.  And he

14  was also, at the same time, somewhat lazy, that instead of

15  typing this out every single time, he did what he told you he

16  did, he did a cut-and-paste.  So we have all of these

17  screenshots that he would send to these poor girls.

18      This is just one example of what he was making them

19  do.  He forced them to penetrate their bodies, Your Honor, with

20  foreign objects, and even record sex acts with their

21  significant others, thereby victimizing them, too, Judge.

22      And you heard the victims today talk to you about

23  this.  He made sure they had to do it just right, down to where

24  their hands and fingers were.  It had to be just right or they

25  couldn't go to sleep.  They had to do it again until he did

1    it -- they did it to his specifications.  Oh, and they better

2    have a compliant attitude.  They better not display, like he

3    said here to Victim 4, negative energy.  And sometimes he made

4    them do these acts, as you heard, for 15 minutes, a 15-minute

5    video that you had to make for the perpetrator of your offense.

6         Your Honor, you saw the quotes in my brief.  It didn't

7    matter if they told him they were in school, it didn't matter

8    if their family member had died, and it never mattered how much

9    they begged.  From the moment they looked down and saw that

10   first message from this criminal, their lives were no longer

11   their own.  They were forced to play his soul-crushing game and

12   become, like Victim 3 said today, molded like a custom piece

13   of furniture.

14        And that's what this was to him, Your Honor, it was a

15   game.  And the victims were just, to use his words, text on a

16   computer, that he forgot the minute he turned it off.  In fact,

17   Judge, when you saw this bear out, the more they delayed, the

18   more they pleaded, the more they resisted, the more he made

19   sure they suffered.  Even when they told him they just couldn't

20   go on, Hernandez would double-down.

21        And, Your Honor, they even were told that he was going

22   to target their younger siblings, and you heard Victim 11

23   talk about that today.  And he didn't just do it with her.  He

24   did it with Victim 2, as well, Victims 2 and 11, and so many,

25   so many more.  And those children were much younger.

1          Your Honor, he even, as you can see on these slides,

2     slide 38, he told victims to kill themselves.  And you heard

3     today that some of them wanted to.  Let me repeat that.  He

4     told young children, "I want you to kill yourself," while they

5     begged, "Please, just let me go."  He made sure they knew, deep

6     in their souls, that he was their master and that their bodies

7     belonged to him.

8          There are no words that can adequately describe the

9     horror of Mr. Hernandez's messages.  And make no mistake, his

10    messages are who he is.  But it's not just what he said in this

11    case, it's what he made them do.  I mean, we've already seen

12    the screenshots of these instructions, but what that means is

13    that a child had to masturbate, pose, dance for him, penetrate

14    their bodies, even when, and you saw this in the sentencing

15    brief, she was telling him she didn't want to do that because

16    it hurt, even when they told him that they were virgins.

17         He made them victimize their own loved ones.  And on

18    many occasions, even when they complied, when they did what he

19    was asking them to do, even when they begged, he still

20    distributed their images and videos to their friends, family,

21    even their teachers, anyone.  And, by the way, when he did

22    that, Your Honor, those images now are out there forever.  We

23    can't call them back.  They are out there forever, and we can't

24    get them back.

25         Anyone who suggests that this wasn't a violent crime

1    because it wasn't a hands-on offense does not come close to

2    appreciating the cool nature and circumstances of this offense.

3    If being forced without your consent to penetrate your vagina

4    and anus with a brush isn't sexual violence, I don't know what

5    is.

6            As the judge in the *Chansler* case reasoned right

7    before she sentenced him to 105 years, the fact that Chansler

8    didn't do these sexual acts himself doesn't make him less of a

9    criminal.  She said, in fact, by making them do these things to

10   themselves for his pleasure, then they blame themselves.  They

11   thought it was their fault because they didn't get help,

12   because they were too afraid.  You heard some of that today,

13   Judge.

14           Your Honor, he may not have been in the room for them,

15   but it was as though he reached through their computers and

16   their phones and raped them.  And you heard that today, too.

17   That's how they felt, sometimes every single day, sometimes for

18   years.  And as Dr. Meloy explained to you, even the gaps, and

19   this was in his report, between messaging was also damaging to

20   them, because they lived in a constant state of fight or flight

21   when what they should have been doing, Judge, is going to

22   dances, meeting their first loves, focusing on their studies,

23   and doing what kids are supposed to be able to do.

24           Many of these victims, as you heard, still experience

25   trauma when they hear a message on their phone.  And can you

1    blame them?  Your Honor, Mr. Hernandez's prolific sextortion of

2    at least a hundred minor children alone merits a life sentence,

3    without even getting to the other terrible things that he did.

4         But we know that he did more.  He was a prolific

5    sextortionist, yes, but he's also, to use his own description

6    of himself, a cyber terrorist.  He brought the Plainfield,

7    Danville and surrounding communities to their knees with his

8    terroristic threats, all because this loving mother sitting

9    back there discovered the atrocities that had been happening to

10   her daughter for 16 months, and she had the audacity to tell

11   Mr. Hernandez that she was going to the police.  That's what

12   caused him to make all of these threats to Plainfield and

13   Danville, that mom said no.

14        Your Honor, he threatened to bomb Plainfield High

15   School, kill students, kill first responders.  He threatened to

16   bomb Danville.  And this was right, if you can recall, in

17   December of 2015, at some of the height of school shootings,

18   these horrifying messages.

19        And in those horrifying messages, you know that he did

20   something just as sinister.  If you look at the message -- I'm

21   sorry, I have to go back -- right on the screen, something that

22   he did is something that Mr. Siefert talked about today.  He

23   said in that first line, "I asked for a simple apology," a

24   simple apology, "from Minor Victim 1."  His victim, he wanted

25   her to apologize.  He wanted her mother to apologize.

1           And then you know what?  Because he blamed her, a

2   teenager whom he had been sextorting for 16 months, who did

3   nothing wrong, you know what?  When people are scared, they do

4   terrible things that maybe they otherwise wouldn't do.  And a

5   lot of people in that town blamed that poor girl, they blamed

6   her.  I was at that community forum, I heard some of the things

7   that they said.  Now, they were wrong to do that, but how they

8   manifested their fear and ostracized a teenage girl is his

9   responsibility, too.

10          But all of that wasn't enough for Mr. Hernandez.  He

11  wanted to make sure that parents would, as he said it, think

12  twice about their children's safety.  So he engaged in the

13  counterintelligence methods we already talked about.  He sent

14  Victim 3, who you heard from today, to that community forum.

15  There were a thousand people there, Judge, it was in an

16  auditorium in Plainfield High School.

17          And you know why they were there?  They were there

18  looking for any measure of comfort from law enforcement that

19  their children were safe in school.  And you know what he did?

20  He sent her there to record the meeting and take notes, posting

21  details that no one would have known unless they were present,

22  to make it seem as though he was living among them and could

23  hurt their children at any moment.  He caused panic.  This type

24  of counterintelligence is used by some of the most

25  sophisticated and terrible criminals out there, which he is one

1    of them.  He used an asset, Judge, to gain law enforcement

2    information and instill fear at the same time.

3            And if you notice, look how duplicitous he is.  He

4    says to Victim 3, as she read to you, "I can't go.  I fit the

5    profile for the," subject.  "They will be looking for me."  Do

6    you know how underhanded and calculating he is?  Even after he

7    forced her to go, he wanted to make sure that she still

8    believed that he was close enough to attend the forum when he

9    was all the way out in California.  He didn't even want his

10   asset to know that he couldn't hurt her.

11           He could have said, "Hey, I'm in another state,

12   there's no way I can make it.  You need to go."  He said, "No,

13   I can't go...they'll be looking for me," so that still she

14   would be afraid, as she said, that he would come out of the

15   bushes or show up at her work.  His criminal mind is always

16   strategizing, always calculating.

17           Judge, when you threaten to blow up schools and

18   buildings and shoot students, it creates lasting repercussions

19   in a community, and you heard about that from principal Mel

20   Siefert today, and you read about it in Victim 10's impact

21   statement.  And he is here in the other courtroom, Judge.  He

22   was a Plainfield board member.  Even after schools and

23   buildings reopened, things weren't the same.  People kept their

24   children home, kids carried clear backpacks, and people blamed

25   the administration and even law enforcement and, most

1    tragically, that poor girl back there.

2         Hernandez's reprehensible crimes deserve the most

3    serious punishment, and his victims and the public deserve to

4    know he will never be free.  Now, those threats, Your Honor, I

5    know you're well aware of, you had already seen how he uses

6    threats as a way to control his victims and instill fear in

7    them, but he also threatened people for other reasons, just for

8    the fun of it.  He regularly threatened to kill victims'

9    families, family members.  He retaliated against witnesses like

10   Victim 7, Minor Victim 1's mother.  That's why he's been

11   convicted of numerous counts of threats to injure, kidnap, and

12   rape, and witness retaliation, separate conduct distinct from

13   extortion, from his acts of extortion.

14        Your Honor, this is Victim 2 and what she looked like

15   a long time ago, when all of this started for her, and you

16   heard from her today.  And this part is difficult for me to --

17   even me talk about, even though I've been with this case for

18   five years.

19        As you know, we finally caught Mr. Hernandez in the

20   summer of 2017 when an employ we used revealed, finally, his

21   true IP address.  But what you might not know, Judge, is how

22   close we came to having him slip through our fingers again.

23   After nearly a year and a half of obtaining a search warrant

24   for nearly 100 of his accounts, more actually, we were tracing

25   these accounts, meticulously looking through them, trying to

1   find a screw-up just one time and show us his IP address.  And

2   he didn't, because he was that good and disciplined.  Months

3   and months of this agent, sitting next to me, reading thousands

4   of these heinous messages, knowing what these victims were

5   going through in real time, and feeling -- or at least shortly

6   after, and feeling utterly powerless to help them.

7           Then we finally had our breakthrough when, through one

8   of the defendant's screenshots that he was using to terrorize

9   another community, he made a mistake.  He accidentally revealed

10  the operating system that he was using currently.  That gave us

11  our first opportunity to catch him.

12          And in that instant, our case went from painfully and

13  frustratingly meticulous and slow to an outright race against

14  the clock.  Now that we finally knew what his operating system

15  was, we had to do three things, and quickly.  We had to

16  quickly -- the FBI had to quickly acquire an employ, a network

17  investigative technique, that worked against his operating

18  system and could function hidden inside of a video.  We had to

19  obtain lawful process to use it.

20          And we had to find a victim he was currently

21  victimizing, currently extorting, but that we knew we could

22  trust.  And that was a more difficult thing than one would

23  imagine, Your Honor, because, as you heard Victim 3 describe

24  today, I think she said it was a friendship in a forcibly

25  twisted way.  Some of these victims experienced, as you read in

1    Dr. Meloy's report, traumatic bonding.  They developed an

2    attachment to him, so we had to carefully read their messages

3    to make sure that if we approached them, that he -- that those

4    victims themselves wouldn't tell him that we were trying to

5    capture him, that we knew what his operating system was.  So

6    that was a real concern.

7          It was already late May, and as of June 13, 2017, we

8    knew that the NIT that we had would expire, because the

9    operating system was going to go through a scheduled publicly

10   announced update.  We were running out of time.  And just in

11   time, with the help of Minor Victim 13, who is listening, and

12   Jared Barnhart of the Washington County, Maryland, Sheriff's

13   Office, we found Victim 2.

14         Special Agents Willmann and Barrett drove to where

15   Victim 2 lived and went to her home, and you heard her mother

16   talk about that.  She wasn't there, her father was.  Her mother

17   is here today, with some of her siblings.  By the time they got

18   there, this family had been so terrorized by Mr. Hernandez that

19   they were afraid to open the door, even when the agents

20   displayed their badges.

21         And I want to put some of the Victim 2's mother's

22   comments into context briefly in light of what she told you.

23   For years -- well, for a long period of time, it was their

24   impression that Mr. Hernandez was targeting, not Victim 2, but

25   one of her other siblings, who are sitting present here today.

1   Why?  Because of his counterintelligence.

2          What he did was, after he had spent years sextorting

3   and controlling Victim 2, he also trolled her entire family's

4   social media accounts, forced her to give up their contact

5   information, forced Victim 2 to give him the name and

6   description of their security codes, and then he started

7   messaging her family and threatening to kill them, just to mess

8   with her, just to mess with her.

9          And so when we finally found them, that's what they

10  were experiencing already.  When we told Victim 2's mother what

11  had been happening to her, she finally understood why her once

12  bright, vibrant daughter had turned, as she said today, quiet

13  and dark, because she had been sextorted by then, by him, for

14  five years.  They drove to her work.  Her parents brought her

15  outside.  And, Your Honor, when Special Agent Willmann told

16  Victim 2 who they were, that they knew what she was going

17  through, and that she didn't have to hide it anymore, all she

18  could say was, "Can you help me?"  And for the first time in a

19  year and a half, Special Agents Willmann and Barrett finally

20  got to say, "Yes."

21          And, you know, as it turns out, Judge, Victim 2

22  helped us.  She agreed to create a video for Mr. Hernandez so

23  we could use that NIT.  We could hide it inside of her video, a

24  non-pornographic video, and have her send it to him, for him to

25  open, so that we had the hope that it would work and finally

1    reveal his IP address.  And she agreed to do that, and her

2    family agreed to do that, knowing the risks.  Your Honor, she

3    created this video, and it's short, Government Exhibit 1500,

4    which I'm trying to play.

5              Hold on.  The agent is going to help me.

6              THE COURT:  Ms. Preston?

7              MS. PRESTON:  Yes, ma'am.

8              THE COURT:  Would you come talk to Tanesa?

9              MS. PRESTON:  Yes, ma'am.

10        (Off the record.)

11             MS. PRESTON:  Your Honor, had that video played, but

12   you can see, I'll play it just without sound, it's so short,

13   but that's Victim 2 back on June 9th of 2017.  Oh, there's a

14   "Stop share."  I'm sorry, you can't see it.

15             Can you allow me to screen share again?

16             THE COURTROOM DEPUTY:  You are screen sharing.

17             THE COURT:  I think I see it.

18             MS. PRESTON:  Oh, okay.

19             THE COURT:  I see it at the bottom.

20             MS. PRESTON:  If you see the video --

21             THE COURT:  I see the screen, but it's not --

22             THE COURTROOM DEPUTY:  You're showing -- you're screen

23   sharing your PowerPoint.

24             MS. PRESTON:  Okay.

25             THE COURTROOM DEPUTY:  Maybe close the PowerPoint.

1          MS. PRESTON:  All right.  I'll try again.

2          There it is.

3          Now, I know you can't hear it, Judge, and I don't --

4     there it is, it's working now.

5          THE COURT:  Okay.

6          MS. PRESTON:  But this is finally Victim 2, at our

7     request, sending this video to Mr. Hernandez, telling him that

8     she has no -- he has no power over her anymore, that it was

9     done, that she had told her family, that everyone knew what had

10    been happening to her, and she told him that she was done.

11    Now, when she sent that, she knew that there were risks based

12    on what he had told her before, about what she would experience

13    if he ever failed -- if she ever failed to comply with him.

14    And she was right.

15          We owe her, Your Honor, and I want to say it publicly,

16    and her entire family a debt of gratitude, Your Honor, because

17    of what she did, because she had the audacity to not send him

18    exactly what he asked her, because what he was asking her for,

19    of course, was to send a video of child pornography.  Instead,

20    what he got was a video of her saying, "We're done.  I'm never

21    doing this.  It's over."

22          Now, of course, she didn't tell him that what was

23    hidden inside that video was that network investigative

24    technique.  And it did work, and we finally knew who he was and

25    where he was.  And, boy, did it happen just in the nick of

1    time.  That was June 9th.  That NIT would not have worked four

2    days later.  Four days is how close we came.  And look how much

3    of a price she paid.

4             Can you see my screen, Judge?

5             Is it not sharing, Tanesa?

6             COURTROOM DEPUTY:  No, it's not sharing.

7             MS. PRESTON:  Okay.  Can you see now?

8             THE COURT:  Yes.

9             MS. PRESTON:  Thank you.

10            Judge, this is what they had to endure, because this

11   is what happens to Mr. Hernandez's slaves, as he calls them,

12   when they don't give him what he wants.  These are text

13   messages that are sent -- that were sent by Mr. Hernandez to

14   this victim's family.  And you saw these in my brief, and I'm

15   going to move through them quickly, but remember how Victim 2's

16   mother said that he had found some way to find her

17   eight-year-old son's picture where he had an injury to his

18   face?  And what he did was, he used that picture, sent it to

19   her own mother, and said that his lips would be good for

20   servicing someone, an eight-year-old boy.  That's how he

21   terrorized these people sitting behind me.

22            Hernandez is a sadistic, vicious, and shrewd predator

23   who derived pleasure from the suffering of at least 100

24   children, their families, and communities, and he enjoyed doing

25   it.  He is a cyber terrorist, and the aggravating nature of his

1    criminal offenses more than merits a life sentence, but that's

2    just what he did.

3            We all know who he is, and we all know a lot now about

4    his personal characteristics.  Your Honor, this is a person who

5    was 26 when we arrested him, no job, never, no driver's

6    license, no credit card, no ATM card.  He lived under the

7    radar.  He lived off of his devoted long-time girlfriend for --

8    that he had had for more than a decade.  While she was working

9    long hours every day, he was back home committing these crimes

10   behind her back.  And to this day, she's still devoted to him,

11   she still talks to him.

12           He had, not one, but two opportunities to go to

13   college, something a lot of people would love to do.  But he

14   dropped out, not because he wasn't smart enough, not because he

15   doesn't have a good work ethic, but because, to use his words,

16   it didn't interest him.  What interested him?  The things that

17   he obsessed over, the things that he poured himself into, what

18   he was willing to spend day in and day out, every single day,

19   for 12 to 16 hours, doing, ruthlessly targeting children.

20           And why?  You heard from two psychologists today.  He

21   is a psychopath.  He is a psychopath.  His own doctor calls him

22   a moderate psychopath.  He's a psychopath.  His own doctor says

23   he's a sexual sadist.  And, yes, he is.  That's what he is at

24   best.  That's his own doctor, moderate psychopath and a sexual

25   sadist.

And if you look carefully, his own expert wasn't
willing to go out on much of a limb and say, "He'll be just
fine if he's released."  This is as far as his expert was
willing to go:  "He may not present a significant danger to the
community.  It's difficult to say.  It's contextual, it's
complex."  And he always couches it on whether he'll have
access to a computer.  I don't know about anyone else, but I
don't call that a glowing endorsement from Dr. Fabian.

Dr. Meloy told you he's a sexual -- he's a sadist,
he's Machiavellian, he's psychopathic, he's narcissistic, and
there are no known treatments for any of those except with
respect to narcissism.  Either way, Judge, he's not safe in
society.

You heard about his background.  And, certainly, there
are elements of his background that were difficult, but not so
difficult here to merit a downward variance and let him out.
They may explain that -- of why he became who he became, but
they -- those factors will never change or excuse what he did
and who he is now.  And who he is now is not going to change.
There is expert testimony that the Court has that there is no
treatment, no mental health treatment, for psychopathy and for
sexual sadism.  He's going to be this, Your Honor, at 60, 70,
80, 90 years old.  He will still experience sexual
gratification from the suffering of others.  He will still be a
psychopath.

1        And you know what?  One of the victims put it so

2   bluntly today, he'll have in jail his brain with him and the

3   ability to close his eyes for the rest of that time and think

4   back and harken back to all the suffering he's caused and

5   masturbate to it.

6        The defendant has no criminal history, yes, but we've

7   already talked about what he spent his entire adult life doing,

8   committing crimes.  He just got away with it for a long time

9   because he was so good at it.  Mr. Garcia says, "Well, he

10  wasn't out torturing cats."  That's because he was busy

11  torturing people.

12       Your Honor, the Court must, must consider the

13  information we put before the Court during the March 10th

14  hearing that was under seal, and we do incorporate our

15  arguments that we made from Wednesday into today and simply

16  state he is not entitled, for all those reasons, to a downward

17  variance from life.

18       And you saw his allocution today, Judge.  Someone who

19  is incapable of remorse, who's gratified by the suffering of

20  others, isn't capable of sincere remorse.  There was nothing

21  sincere about that.  He says he feels terrible because he read

22  letters and heard statements, went back, read his messages, as

23  though it just dawned on him how terrible this was.  He said,

24  at the end, that his door is always open if we need his help.

25  Your Honor, for the reasons I stated on the record on

1    March 10th, we needed his help on the day of his arrest.  His

2    help came too late.

3           The public needs protection from Hernandez.  He is a

4    sophisticated criminal who operated on a higher level.  His

5    tradecraft was unparalleled.  He's smart, he's calculating.

6    And based on, not just what you know and saw, but based on the

7    diagnoses you heard from, or the opinions you heard from today,

8    he is always acting in his best interests, to advance his

9    goals, so that he can play his games.  And why is that

10   important?  Because he will be the same guy when he gets out,

11   with the same urges, the same obsessions.  No matter how long

12   he has been in or how technology has changed, he has the mental

13   capacity and sophistication to figure out how to commit these

14   crimes again.  Personality trumps technology, Judge.

15          The level at which he was capable of operating

16   forecasts what he'll be able to do.  You heard when I

17   questioned Dr. Fabian, and he told you what this criminal does

18   is, to use Mr. Hernandez's words, evolve.  He always evolves.

19   He will evolve when he gets out and figure out whatever he has

20   to do to get what he wants.

21          He has no respect for the law, and there is no utopia

22   out there, Judge, where he won't be able to access the Internet

23   unless he's forced to be in jail where, hopefully, he's kept

24   away from it.  He won't age out of these crimes.  You don't

25   need physical strength to sit at your computer and ruin lives,

1    so you have to trust that he'd abide by supervised release

2    conditions imposed by this Court, enforced by Probation.  But,

3    come on, he has demonstrated zero respect for law enforcement,

4    zero.  He gets off, to use his words, on controlling law

5    enforcement.  He enjoys burning through law enforcement

6    resources.  He enjoys messing with the police.

7            This wasn't, by the way, a sextortionist who shied

8    away from attention from the police.  He was thrilled by it.

9    And he always upped the ante and taunted the agents and

10   officers who were investigating him, and taunted us, even after

11   we charged him, by tattooing that on his neck.  He's still

12   playing games.  There is ample evidence that he will have no

13   respect for any rules imposed by this Court and Probation.  He

14   isn't safe in society.

15           Your Honor, I only have two more points left.  There

16   is a need for general deterrence here.  My view of specific

17   deterrence is that nothing is ever going to deter him.  We just

18   need to be protected from him.  But there is a need for general

19   deterrence, and a life sentence would serve that purpose.

20           Sextortion is a new age crime, Your Honor.  And while

21   not every criminal is as sophisticated and shrewd as

22   Mr. Hernandez, there are many out there who need to understand

23   that just because you committed the crime from your home and

24   you didn't put hands on anybody doesn't mean you won't be

25   punished.  The message needs to be clear.  If you commit these

1  heinous offenses, we will find you, no matter how long it takes

2  and how hard it is, and then you will be punished severely for

3  it.

4       Sextorting more than a hundred girls is not a

5  nonviolent offense any more than threatening to kill and blow

6  up schools.  It's like pulling a fire alarm.  People are who

7  out there using the dark Web to exploit children and terrorize

8  communities need to know that the punishment will be severe

9  when they are caught.

10       Your Honor, I'll end by talking about the victims of

11  Mr. Hernandez's brutal crimes.  As you know, we've only found

12  25 of them, 25.  They've waited a long time, those that know

13  that this is even happening today, for this day.  They'll have

14  to wait even longer, because Mr. Hernandez is still calculating

15  and planning to appeal, as is his right, but that will prolong

16  this for them.

17       Those who don't know, and we hope to find more of

18  them, are likely waiting, wondering if he's going to resurface

19  in their lives again, thinking maybe, perhaps, he was picked up

20  for another less serious offense, and when he gets out of jail

21  he's going to come back and appear on their phones again to

22  play his psychological shell game.

23       Your Honor, you've read these letters from these

24  victims, you've heard their words, you've seen the anguish in

25  their faces, heard the heartbreak of their mothers, heard them

1    say to you that, from the moment he came into their lives,

2    their life was hell, their bodies weren't theirs, their bodies

3    became crime scenes.

4            Your Honor, these are the victims in this case.  This

5    is what they looked like when this started.  They were just

6    teenagers, children.

7            When will this be over for Minor Victim 1?  She wants

8    the Court to understand that his jail sentence won't end

9    things.  This will be with her forever.  When will Victim 1's

10   mother get to see her once vibrant, full-of-life little girl?

11   When will Minor Victim 1's sister stop being afraid of the

12   dark?

13           When will Victim 2 get her entire adolescence back?

14   This is something that she said in that brave video that she

15   sent to him, that we used.  She said, "I've been doing this

16   since I was 14 years old.  I'm now 19, about to be 20."  This

17   is not how anyone on this planet should ever live, ever.  She

18   won't get to redo her first sexual experiences while being

19   forced to engage in by this nameless, faceless monster.

20           When will Minor Victim 2's mother ever get those

21   years back with her girls, her son, with her babies?  When will

22   she ever get to stop worrying that her child will have another

23   panic attack and lose her teeth again?

24           When will Victim 3, who you heard from today, stop

25   blaming herself for what happened at the community forum and

1    start to heal?

2           When will Victim 4, whose victim impact statement you
3    have, stop hating herself?  When will she stop asking, "Why did
4    you do that?  You could have not answered."

5           When will Victim 5, who is here today, feel safe
6    again?

7           When will Victim 10, who's upstairs, be able to go
8    out without looking over his shoulder?

9           When will Victim 11, who you heard from today, not get
10   that pit in her stomach and always look around and wonder if
11   people are thinking of her differently?

12          You saw Victim 12's statement.  When will Victim
13   12 know that the police officer who threatened to put her in
14   jail is a huge jerk who doesn't understand a thing about
15   sextortion?  It wasn't her fault, and she didn't do anything
16   wrong.  And his reaction became a part of her victimization.

17          And when will Victim 13, who is listening today, and
18   who sent you a letter, be able to get a text without feeling
19   like she's going to throw up?  And when will Victim 20 be able
20   to hear music and not make her think of this terrible thing
21   that happened to him?

22          He treated them and made them feel like slaves.  It's
23   so evident in what they said to you.  They used words in their
24   messaging over and over, and so many of those messages were the
25   same.  They kept saying, "Let me go.  Please let me go.  I want

1    to be free."

2         Victim 3 talked about living in a box, in mental

3    chains.  He made them feel like property, his property.  The

4    answer to all of those questions I just asked, Judge, when will

5    this day come?  Probably never for these victims.  They'll

6    never be the same again.  Their innocence will never be

7    restored.  Their trust has been irreparably broken, their self

8    was shattered, their adolescence gone.  They are all serving

9    life sentences, trapped in the world that he created for them.

10        The game might be over for Mr. Hernandez, but it will

11   never be over for them.  They deserve just punishment, they

12   deserve to know he will never get out.  Mr. Garcia is right,

13   life sentences are rare and reserved for the worst of the

14   worst, but that's who he is.  He deserves a life sentence.

15   Words fail to adequately capture the magnitude of the suffering

16   he's caused.  These victims are serving a life sentence for

17   what he did to them.  His sentence should reflect theirs.

18   Thank you, Your Honor.

19        THE COURT:  Okay.  Mr. Garcia, you get the final

20   comment.

21        MR. GARCIA:  Your Honor, I didn't address it, but

22   since Ms. Preston did, I'll, I guess, add to it, that we would

23   incorporate, also, our arguments and evidence that was before

24   the Court earlier this week as it takes into consideration the

25   3553(a) factors.  I believe the Court should make a finding

1    with respect to that for the record.

2            A 30-year sentence is clear, severe punishment to this

3    30-year-old.  He will spend an amount of time equal to his life

4    behind bars.  He'll get the treatment that he needs, and he'll

5    start towards the path of rehabilitation.  Thank you.

6            THE COURT:  Okay.  I think I'm going to give the court

7    reporter a 10-minute break and then I will -- we'll come back

8    and the Court will pronounce sentence, so just a very brief

9    recess.

10           MS. PRESTON:  Thank you.

11           THE COURTROOM DEPUTY:  All rise.

12        (Recess at 4:15, until 4:24.)

13           THE COURT:  We are back on the record.  And, Counsel,

14   at this time, the Court is prepared to state what the sentence

15   will be.  And, Counsel, you will each have a final opportunity

16   to state any legal objections before sentence is finally

17   imposed.

18           Pursuant to the Sentencing Reform Act of 1984, it is

19   the judgment of the Court that the defendant, Buster Hernandez,

20   also known as Brian Kil, Brianna Killian, Brian Mil, Greg

21   Martain, Purge of Maine, uygt9@hushmail.com,

22   jare9302@hushmail.com, dtvx1@hushmail.com, Leaked Hacks1,

23   Closed Door, Closed Color, Clutter Removed, Color Rain, Plot

24   Draw, and Invil Cable, is hereby committed to the custody of

25   the Bureau of Prisons, to be imprisoned for terms of 360 months

1    on each of Counts 1 through 8, 890 months on each of Counts 9
2    through 11, 120 months on each of Counts 12 through 22 and 33
3    through 41, 60 months on each of Counts 23 through 32.  The
4    terms of imprisonment shall be served concurrently to produce a
5    total sentence of 890 months, which is 75 years.
6          As to Counts 9 through 11, this sentence is a
7    variance, which takes into account the matters that were
8    discussed on the record at the May 10th hearing -- March 10th
9    hearing.
10          The Court also has considered the nature and
11   circumstances of these offenses, the history and
12   characteristics of the defendant, the seriousness of the
13   offense, the need to promote respect for the law, provide just
14   punishment for the offenses, afford adequate deterrence to
15   criminal conduct, protect the public from further crimes of the
16   defendant, avoid unwarranted sentencing disparities, and to
17   provide restitution to any victims of the offenses.
18          The defendant shall make restitution of $10,000 to
19   each of Victims 1 through 6, 11 and 12, for a total of
20   $80,000.  Any payment made that is not payment in full shall be
21   divided proportionately among the named victims.  The payment
22   is to be made directly to the clerk of this Court for
23   disbursement to the victims.  The defendant shall notify the
24   United States Attorney for this district within 30 days of any
25   change of his mailing or residence address that occurs while

1    any portion of the restitution remains unpaid.

2         Any unpaid restitution balance shall be paid during

3    the term of supervision at a rate of not less than 10 percent

4    of the defendant's gross monthly income.  The defendant shall

5    notify his probation officer of any material change in economic

6    circumstances that might affect his ability to pay restitution.

7    The Court finds that the defendant does not have the ability to

8    pay interest and waives the interest requirement.

9         The Court is not imposing a fine or JVTA assessment,

10   because the defendant is indigent and unable to pay them in

11   addition to the restitution.

12        The defendant shall forfeit all property seized by the

13   government on August the 3rd, 2017, and April 18, 2019, and all

14   data from the e-mail and social media accounts he used to

15   commit the charged offenses and all relevant conduct.  Specific

16   property subject to forfeiture is documented in paragraphs 21

17   through 23 of the Presentence Investigation Report, as well as

18   the government's filing on the motion for forfeiture.

19        The Court is going to impose supervised release on

20   Counts 1 through 17 for a term of life.  For Counts -- for

21   Counts 3 -- I'm sorry, three years for each of Counts 18

22   through 41, all to be served concurrently and produce a term of

23   life based on the nature of the offenses, the defendant's

24   personal history and characteristics, and the need to protect

25   the public.

1        While on supervised release, the defendant shall not

2   commit another federal, state, or local crime; he shall

3   cooperate with the collection of a DNA sample; refrain from any

4   unlawful use of a controlled substance; submit to one drug test

5   within 15 days of placement on supervised release and at least

6   two periodic tests thereafter as directed by his probation

7   officer.  The defendant shall comply with the requirements of

8   the Sex Offender Registration and Notification Act as directed

9   by his probation officer.

10       The Court intends to impose the additional conditions

11  of supervision that are listed in the Presentence Investigation

12  Report.  Mr. Garcia, have you and your client had an

13  opportunity to review those conditions?

14       MR. GARCIA:  We have, Your Honor, and we would waive

15  the reading into the record.

16       THE COURT:  And you have no objection to any of those?

17       MR. GARCIA:  No, Your Honor.

18       THE COURT:  Thank you.

19       And the same questions, Ms. Preston.  Have you

20  reviewed the conditions, does the government have any objection

21  to any of those conditions, and will the government also waive

22  a formal reading?

23       MS. PRESTON:  No objection, and we waive formal

24  reading.

25       THE COURT:  Mr. Hernandez, I'm going to order all the

additional conditions of supervised release that are listed in your Presentence Investigation Report.  A majority of these conditions are administrative requirements of supervision. Some of these conditions are going to assist your probation officer in monitoring you and provide for public safety.  If you do, in fact, have a substance abuse problem, they will address your history of substance abuse and monitor your behavior and get you the treatment that you need.

The Court is also going to order that you pay the mandatory special assessment fee of $100 for each count, for a total of $4,100, which is due immediately and is to be paid directly to the Clerk of this Court.

The sentence that the Court intends to impose is a downward variance from the advisory guideline sentence of life imprisonment based upon the factors stated on the record and argued on the record at the March 10th, 2021, sealed hearing. In particular, Mr. Hernandez assisted authorities by providing information to the BAU regarding other activities.

And his allocution on that date has offered law enforcement the opportunity to discover and offer services to an additional, according to the defendant, an additional 275 victims, two of whom have since been discovered based upon his statements as described in the sealed hearing on March 10th.

The Court is mindful that a sentence should be sufficient, but not greater than necessary, to accomplish the

1   goals of sentencing.  As we all know, federal judges do not

2   sentence based upon emotions, public sentiment, or the judge's

3   personal beliefs or philosophy.  Instead, the Court must impose

4   a sentence viewed in the context of the policy goals and

5   empirical data of the United States Sentencing Commission as

6   determined by the advisory sentencing guidelines, which the

7   Court is not bound by the guidelines, because they are advisory

8   in nature.  The Court has considered the nature and

9   circumstances of these 41 offenses.

10       Buster Hernandez is a 31 -- a 30-year-old man before

11  the Court for sentencing for 41 counts, which include sexual

12  exploitation of children through production of child

13  pornography; coercion and enticement of a minor; distributing

14  and receiving child pornography; threats to use explosive

15  devices; threats and extortion; threats to kill, kidnap, and

16  injure; witness tampering; obstruction of justice; and

17  retaliation against a witness or victim.

18       Mr. Hernandez's reign of terror began in 2012 and

19  lasted over a period of five years until his arrest.  The

20  defendant terrorized hundreds of victims and engaged in sexual

21  exploitation of hundreds of minor victims, forcing them to

22  create thousands of images and videos of child pornography that

23  he obtained by threats to expose by posting the photographs and

24  videos on social media accounts, which he did, in fact, post;

25  by threatening to kill or injure victims; and using explosive

devices at two schools, Plainfield High School and Danville

High School, a movie theater, a mall, the Shops at Perry, and a

Walmart store, all located in the Southern District of Indiana.

The defendant created a sophisticated criminal

tradecraft and methods to conceal his identity from law

enforcement for several years.  Mr. Hernandez intentionally

selected child victims who participated in extracurricular

activities and were involved in their schools and their

communities.  His rationale was that the more a child cared

about how they were perceived by their teachers, their friends,

their coaches, and their family, the more they had to lose if

they -- if he exposed their nude and sexual images, and the

more they would be willing to comply with his demands.

Although Mr. Hernandez has no prior criminal

convictions, he informed his expert, Dr. Fabian, that he began

cyber terrorism prior to 2012.  The defendant stated he found

it easy to commit financial crimes to make money over the

Internet.  He began hacking e-mail accounts to engage in credit

card fraud and identity theft.  He graduated to blackmail in

which he sought out information that people posted on their

Facebook accounts and used that information to confront and

harass them with the threat that he intended to use the

information against them unless they sent him money.

He reported to Dr. Fabian that he participated in this

form of extortion, "for a few years and made thousands of

1  dollars."  In the course of his Internet financial extortion

2  activities, Mr. Hernandez reports to Dr. Fabian that he

3  observed that many people, especially young people, would

4  exchange nude and sexually explicit photographs of themselves

5  over the Internet.

6       Mr. Hernandez reported to his doctor, to Dr. Fabian,

7  that he became board with cyber crime as a way to make money

8  and he began to use the videos and images to turn his victims

9  into what he termed "sex slaves," who would sell themselves to

10  make money.  He reports doing this for a while until he no

11  longer needed the money.  Thereafter, Mr. Hernandez describes

12  that he began the sextortion of minor teenage girls in 2012 as

13  a game.  He referred to his minor victims as his slaves and

14  himself as their master.

15       Through a sophisticated methodology, the defendant

16  would fish through hundreds of e-mail accounts until he could

17  convince someone to respond.  If the victims did not comply

18  with his request to produce child pornographic images, he would

19  post the sexually explicit material on Facebook and Instagram

20  accounts that he created.

21       The defendant drafted a lure script to gain attention

22  of the most victims possible.  He used a mathematical approach

23  to commit crimes against children, kept statistics to track his

24  success, compared his success rate by data and age group, and

25  analyzed the amount of time it would take, with the goal to

1  lure the most victims as possible.

2       If the victims told their parents what was happening,

3  he threatened to harm, rape, and kill the child victim, their

4  siblings, and their parents.  When law enforcement and school

5  authorities became involved, he threatened to kill, rape, and

6  otherwise harm those officials, threatened to shoot and bomb

7  and kill students in the two school districts -- the two

8  schools within that district, the mall, the Walmart, the movie

9  theater.  He taunted his victims, he taunted law enforcement

10  for several years.

11       This defendant's criminal behaviors were horrific.

12  The defendant has continued to show disrespect for the law

13  while in jail by getting into fights and even getting a tattoo,

14  regardless of whether "B.K." means Brian Kil or Brian and

15  Kimmie.

16       The Court next considers the history and

17  characteristics of the defendant.  Mr. Hernandez was born into

18  the marital union of his parents, who remained married until

19  his father died in 2019.  Mr. Hernandez experienced a great

20  deal of trauma during his childhood.  He was raised in poverty

21  in Bakersfield, California.  His father was physically and

22  verbally abusive, and an alcoholic, who battered the defendant

23  and his siblings, as well as the defendant's mother.

24       The defendant's mother was a stay-at-home mother with

25  physical disabilities, in part, that were due to the domestic

battery that was inflicted upon her over the years.  His father
was sometimes not employed, and the defendant's basic needs --
food, clothing, and shelter -- were not always met.  He was
raised in impoverished neighborhoods, where he reports there
was crime and drug abuse.  The defendant and some of his
siblings were molested by an uncle who later committed suicide.
And his uncle's criminal behaviors were never reported to law
enforcement.

But we know that, unlike some criminal defendants,
Mr. Hernandez was never abandoned, never neglected, or abused
by his mother.  He was raised by a loving and supportive mother
and siblings.  We know that he continues to be loved and
supported by the letters that the Court received and by the
attendance of his mother and sister, who have flown here from
California to be with him today.

The defendant reports that his mother is awesome, that
he loves her, and she has always been a source of support, and
they are very close.  Unfortunately, during his childhood, his
mother, who was physically limited, was simply unable to shield
the defendant from his father's abuse, as well as the abuse of
his uncle.

We know that Mr. Hernandez is highly intelligent
because of the sophisticated methods that he utilized in
committing his cyber crimes.  He graduated from high school
with a 3.0 GPA.  He attended some college, but reports having

1  no motivation, so he quit.  We know that Mr. Hernandez

2  possesses great intelligence because of the technological steps

3  that he took to avoid detection.

4          His skills were remarkable and not something the

5  average person could comprehend or implement with as much

6  success as Mr. Hernandez.  His techniques were so

7  sophisticated, that the FBI and other federal authorities were

8  unable to detect or decipher his methods over the course of at

9  least a year and a half.  Had Mr. Hernandez not voluntarily

10 decrypted his devices after his plea hearing, the government,

11 with all of its technological resources and wherewithal, would

12 still likely not be able to gain access to them.

13         The defendant is now 30 years old, he's never held a

14 formal job.  He has not applied himself to his academic

15 endeavors.  The defendant reports being a polysubstance abuser.

16 He reports that he began using alcohol and marijuana at age 13,

17 and in his early 20s became addicted to pain pills, which he

18 would steal from his mother and sister.  However, the

19 government has presented proffers and evidence that may put

20 that into doubt.

21         Mr. Hernandez has never married and has no children,

22 but prior to his arrest, he was in a 15-year relationship with

23 his live-in girlfriend.  The defendant reports good physical

24 health, other than hypertension, for which he is not presently

25 prescribed medication.  He, himself, reports good mental

1    health.  He reports that he has no history of mental illness or

2    psychological treatment.  However, as we've heard from the two

3    doctors who testified today, the defendant does have some

4    mental health concerns that the Court will address in just a

5    few.

6          In deciding this downward variance from the guideline

7    life sentence, the Court has considered the defendant's trauma

8    and abuse by his father, the molest by his uncle, but also

9    notes that he always experienced the love and support of his

10   mother and siblings.

11          What is most apparent regarding the defendant's

12   characteristics is that Buster Hernandez was a Dr. Jekyll and

13   Mr. Hyde.  He led a double life.  His mother writes that her

14   son is kind, loveable, and caring, and that she did not raise

15   her children to cause harm to others.  His siblings write that

16   they have all been close and provided love and support for one

17   another during their difficult childhood.  His friend,

18   Christopher, writes that he spent a considerable amount of time

19   hanging out and socializing with Buster at family get-togethers

20   and holidays, where they would joke and laugh and eat together.

21          Both doctors, even the defendant's expert, agree that

22   this defendant has no empathy for others.  As argued by the

23   government, he is coldhearted, engaged in psychological

24   torture, inflicted cruelty on minor victims and families and

25   several communities within the Southern District of Indiana, as

1   well as throughout the United States and, he says, at least one

2   other foreign country.  He says he did these things for fun

3   without any record whatsoever on the impact to the victims.

4          The seriousness of these offenses cannot be

5   overstated.  The defendant derived pleasure and purpose from

6   control and manipulation.  His desire was insatiable.  He

7   admits to Dr. Fabian that he victimized girls as young as 12

8   years old.  Over time, he began threatening their family

9   members and communities.  When law enforcement made it clear

10  that they were looking for him, he taunted them, as well.  He

11  reports that he did these things for the sexual gratification,

12  that he would masturbate to the photographs and videos, and to

13  feed his ego, which was out of control.

14         It may have started with a perverse appetite to extort

15  minor victims, but the defendant's activities grew into a need

16  to take more and more drastic steps to feed his ego.  His

17  arrogance was on full display prior to his arrest, and it had

18  not waned until his plea of guilty.  Until February 6, 2020,

19  this defendant bragged to at least two inmates that he was

20  above the law and he thought he was untouchable.

21         Although Mr. Hernandez did not have person-to-person

22  contact with his victims, because he distributed and posted his

23  materials, his actions perpetuate a great deal of harm to those

24  victims, who will forever be haunted with the fact that their

25  images may forever be in the cyber world, where they could be

1    traded and visualized over the Internet.

2         The impact on the victims is extreme.  As we heard

3    from the victims who have written victim impact letters, and

4    those who testified today, Mr. Hernandez robbed hundreds of

5    young girls of their innocence, and the scars will remain

6    forever.

7         The Court next considers the need to impose just

8    punishment, protect the public from further crimes of the

9    defendant, and to afford adequate deterrence to others who

10   might commit these types of crimes.  After pleading guilty, the

11   government retained the forensic psychologist, Dr. Reid Meloy,

12   to render a psychological diagnosis and risk assessment of

13   Mr. Hernandez.

14        Mr. Hernandez refused to be interviewed or participate

15   in a forensic interview with Dr. Meloy, and Dr. Meloy's

16   opinions are based on the voluminous discovery materials.  The

17   Court gives great weight to Dr. Meloy's opinion that

18   Mr. Hernandez exhibits personality traits that can be described

19   as a dark tetrad, which is composed of the four domains:

20   Machiavellianism, one is contract crafty, which was displayed

21   by Mr. Hernandez's lack of morality; and manipulation to gain

22   and retain power over his victims; narcissism, a quality -- a

23   felt quality of perfectionism; and the defendant's complete

24   lack of empathy.

25        Both doctors agree that the defendant has the traits

of moderate psychopathy, which is manifested by interpersonal
manipulation, affective deficiencies, impulsive lifestyle, and
antisocial personality trait to engage in criminal behaviors.
And both doctors opine that the defendant is a sadist, someone
who engages in cruelty and enjoyed others' sufferings.  This
defendant found pleasure, satisfaction, and excitement when he
expressed that it was fun, and he enjoyed the suffering and
domination of his victims.

In Dr. Meloy's opinion, these characteristics are
stable and enduring and unlikely to change.  It is Dr. Meloy's
opinion, within the limits of psychological certainty, and
based on the information that he reviewed -- he has also now
had, after his -- prior to his testimony today, he also had the
benefit of reviewing Dr. Fabian's report, and indicated that
that did not change any of his opinions, that his personality
will remain the same as he grows older, but his specific
behaviors may vary depending on the constraints, opportunities,
privileges, and freedom that he will enjoy.

Mr. Hernandez did participate in an interview with
Dr. Fabian.  However, Dr. Fabian testified today that he doubts
the veracity of some of the information that the defendant gave
him.  It is Dr. Fabian's opinion that Mr. Hernandez is a sexual
sadist, he has moderate psychopathic traits, but he did not
consider the defendant to be a psychopath.

Dr. Fabian's psychological testing revealed some

1    amenability to treatment.  In his report, Dr. Fabian describes

2    in detail the trauma that the defendant experienced in

3    childhood.  He concedes that Mr. Hernandez did not offer

4    descriptive and appreciative Insight into his traumatic

5    childhood experience and opines that the defendant has never

6    processed it and has never had any psychological or psychiatric

7    mental health treatment for it.

8            The Court also considers that Dr. Fabian relied

9    heavily on the self-reporting of Mr. Hernandez that is riddled

10   with inconsistencies and untruths.  Dr. Fabian reports that due

11   to the nature of cyber violence, it is difficult in this day

12   and age to accurately assess one's risks for future criminal

13   physical violence and sexual violence.  His diagnosis is a

14   personality disorder, antisocial personality disorder, which he

15   concedes is enduring and well ingrained and pervasive in

16   nature.  He does opine that psychotherapy may be beneficial,

17   and he concludes that the sentencer should consider the

18   aberrant hand that Mr. Hernandez was dealt that had its

19   derivation in profound childhood trauma, and the Court has done

20   that.

21           A goal of sentencing is to provide an offender with

22   correctional training through treatment and to assist him in

23   abstaining from new criminal behavior.  Due to the nature of

24   the offenses, and both parties agree, it is necessary that the

25   defendant participate in sex offender treatment while in

prison; as well as psychotherapy, which may or may not be
beneficial considering the defendant's personality traits.  The
Court will recommend that he get that treatment.

The Court has also considered the need to avoid
unwarranted sentencing disparities.  The Court has looked at
the data and statistics that Mr. Garcia provided in his memo,
but I agree with the government, that those statistics are for
your typical sexual exploitation cases, and this is not a
typical sex exploitation case.

On the issue of disparity, the parties presented
citations and summaries of numerous sextortion cases around the
country.  Many were sentenced to between 360 and up to 150
years' imprisonment.  The Court concludes that Mr. Hernandez's
crimes are more serious than all of the defendants presented in
the parties' sentencing memorandum, because his crimes were
committed for a longer period of time, at least five years
against many more victims.  He reported to Dr. Fabian at least
350, and we know the government knows of at least 100
throughout the United States and, according to the defendant,
at least one foreign country.

Thousands and thousands of images of child pornography
were produced by this defendant or distributed by and received
by this defendant.  The defendant admits to having at least 350
on-line identities to conceal his identity and avoid detection.
He admits that some of his victims were as young as 12.  And,

most significantly, when comparing Mr. Hernandez to the other sextortion defendants, none subjected their victims to the degree of threats of violence; threats to shoot the victims; to stab them to death; to rape them; to bash them in the head; to use explosive devices to destroy two high schools, a shopping mall, a Walmart, and a movie theater.  And his reign of terror lasted for at least five years.

The Court agrees that the closest comparison is the *United States v. Lucas Chansler*, which is from the Middle District of Florida.  And in that case, Mr. Chansler received a sentence of 105 months' (sic) imprisonment, but Mr. Chansler did not cooperate or provide the assistance that the defendant provided.

The Court has also considered the relevant factors presented by defense counsel and given them appropriate weight. The Court recognizes that the defendant has admitted his guilt and pled guilty, albeit on the eve of trial.  He did save these victims the trauma of having to testify at trial, but they've been traumatized anyway, because they had to come and testify at sentencing.  His offense level was reduced by two levels for his acceptance of responsibility.

The Court has considered that, for the first time, Mr. Hernandez has expressed remorse.  And I don't know whether it's genuine or not, but he did express it, so the Court takes that under consideration.

1          The Court has considered the defendant's mental and

2   emotional health conditions and his childhood abuse and trauma.

3   The Court gives this defendant credit for his attempt to

4   cooperate, for providing law enforcement with information about

5   himself.  The Court wants the record to reflect that he did not

6   cooperate against any others.  Mr. Hernandez acted alone, and

7   his cooperation relates only to his actions.

8          The government concedes that Mr. Hernandez provided

9   truthful and reliable information during his proffer.  He also

10  attempted to be as complete as possible under the

11  circumstances.  However, because he waited two and a half years

12  to provide information, the substance and timing of his

13  information was severely diminished.  It severely diminished

14  its value, and the government can no longer consider his

15  efforts to be substantial assistance under 5K1.1.

16         The defendant can no longer remember passwords for the

17  accounts that he revealed were all closed after two and a half

18  years.  Some accounts were shut down by the company after no

19  activity for one year and 90 days.  The Court finds no fault

20  with the government's decision not to file a 5K1.1 motion or a

21  motion under 3553(e).

22         Concerning the belated timing of cooperation, the

23  Court accepts Defendant's explanation that he decided to plead

24  guilty on the eve of trial, which was his right.  And he admits

25  that it was not until Victim 12 had been identified in an

image found on his cell phone that he believed the government could make their case by -- beyond a reasonable doubt.  And he did not plead guilty out of remorse or to help bring closure to these victims.  He plead guilty because he believed at that point he could be convicted.

But for Mr. Hernandez's assistance, Victim 20, who we heard from today, would never have been located and given the opportunity to give a victim impact statement.  And, hopefully, this young lady can now have an opportunity for closure. Hopefully, additional victims can still be detected.

I 100 percent agree with the government that there's no evidence that Mr. Hernandez cares anything at all about any of these victims, and his sole purpose for cooperating is to get a lesser sentence.  The defendant presents as one who has no feelings whatsoever, no empathy with respect to his victims, based upon the horrible, awful things that he did to them over long, long periods of time.  To use his words, when he shut off his computer, it all went away and he didn't think about them at all.  They were just, to use his words, "text on a computer" to him.

In his sentencing memorandum, Mr. Garcia reminds the Court that his client's in-depth interview gave the government the ability to psychologically examine the behaviors and mindset of one of the most prolific sextortionists in American history, but that recognition cuts both ways.  Buster Hernandez

1    is not your typical sextortionist.  He is manipulative,

2    narcissistic, sexually sadistic, and a psychopath.  He is

3    incapable of empathy.  He is, for a lack of better phrasing,

4    not amenable to living a law-abiding lifestyle, because he has

5    no concern for anyone other than himself.

6           Unfortunately, these characteristics come with a heavy

7    price.  Under statute, Mr. Hernandez cannot be sentenced to a

8    term of imprisonment of less than 15 years in Counts 1 through

9    8, the maximum penalty in Counts 9 through 11, and the penalty

10   for those counts under the guidelines is life imprisonment.  A

11   life sentence would be justified, because this defendant's

12   conduct will affect his hundreds of victims for the remainder

13   of their lives.  There will be no closure when he's

14   sentenced -- there will be some closure when he's sentenced,

15   but the trauma will endure and torment them for decades.  It

16   cannot be erased, undone, or forgotten.

17          However, the defendant's cooperation since his arrest

18   does warrant consideration in this sentence.  The Court

19   believes that this sentence, which produces 890 months, which

20   is 75 years, is sufficient, but not greater than necessary.  If

21   the defendant behaves himself, he will be in his late 80s or

22   early 90s when he's released from prison.

23          So, lawyers, those are the reasons the Court intends

24   to impose the stated sentence.  Government, do you know of any

25   reasons, other than those already argued, why sentence should

1  not be imposed as stated?

2          MS. PRESTON:  I don't, Your Honor.  I want to make a

3  couple of notations for the record, but I can do that when Your

4  Honor asks me to.

5          THE COURT:  Okay.  And, Mr. Garcia, do you know of any

6  reasons, other than those already argued, why sentence should

7  not be imposed as stated?

8          MR. GARCIA:  Not at this time.

9          THE COURT:  The Court at this time imposes the

10  sentence as stated.

11          And, Mr. Garcia -- Mr. Hernandez, I'm going to give

12  you your appellate rights.  Sir, you have a right to appeal

13  your sentence if you believe there was some fundamental defect

14  in the proceedings or if you believe your guilty plea was

15  somehow unlawful or involuntary.  You also have a right to

16  appeal your sentence if you believe it is contrary to law.

17          With few exceptions, any notice of appeal must be

18  filed within 14 days after written judgment is entered in your

19  case.  If you cannot afford the filing fee or cannot afford to

20  pay a lawyer to appeal for you, a lawyer will be appointed to

21  represent you in appeal.

22          If you intend to appeal, you can tell me now and I'll

23  have the clerk of court prepare the notice of appeal for you

24  immediately, or you have up to 14 days to let Mr. Garcia know

25  your wishes.

1          Do you know what you want to do, Mr. Garcia?

2          MR. GARCIA:  I think, because of some of the different

3   timeframes that we're working with, Your Honor, I think filing

4   it promptly makes sense.

5          THE COURT:  So you want me to go ahead and have

6   Tanesa --

7          MR. GARCIA:  Yes, ma'am.

8          THE COURT:  Okay.

9          So, Tanesa, as the clerk, would you go ahead and put

10  in his notice of appeal?

11         COURTROOM DEPUTY:  I will do it now.

12         THE COURT:  Okay.

13         All right.  Are there any other matters for the

14  government?

15         MS. PRESTON:  Yes, Your Honor.  I just want to confirm

16  on the record that, because I couldn't remember if we did this

17  before, that Mr. Hernandez received a physical copy of the PSR

18  within the allotted time under the rules.

19         MR. GARCIA:  He did.  He returned the form to the

20  Probation Department.

21         MS. PRESTON:  I'm sorry, Your Honor.  I just wanted to

22  make sure.

23         THE COURT:  Right.  They always -- Probation is very

24  good at making sure that gets taken care of.

25         MS. PRESTON:  The other thing I want to confirm on the

1   record, I know that Your Honor has set forth its reasons for

2   granting a downward variance associated with the matters that

3   we discussed under seal on March 10th and that were set forth

4   in docket 166.  What I also want to make sure is that the Court

5   did not consider the facts we obtained postconviction as

6   relevant conduct or in any way to his detriment when arriving

7   at his sentence.

8           THE COURT:  I did not.

9           MS. PRESTON:  And then that is -- and just to correct

10  for the record, when you were discussing the *Chansler* case,

11  Your Honor, I believe you misspoke.  He was sentenced to 105

12  years, not months.

13          THE COURT:  I'm sorry.  That's correct, 105 months --

14  years.

15          MS. PRESTON:  Years.

16          THE COURT:  Years.

17          MS. PRESTON:  Mr. Chansler did -- just to correct,

18  again, keeping very close track of the record -- did cooperate

19  immediately, he cooperated on the date of his arrest, so I just

20  wanted to state that for the record, and provided a list of

21  victims to law enforcement.

22          THE COURT:  Okay.

23          MS. PRESTON:  Okay.  Thank you, Your Honor.

24          THE COURT:  Thank you for those corrections.

25          Okay, Mr. Garcia, I know you did want the Court to

1    make a recommendation regarding the facility?

2         MR. GARCIA:  Yes.  USP Tucson.

3         THE COURT:  Okay.  The Court will make a

4    recommendation that the Bureau of Prisons designate the

5    facility USP Tucson, and that's because he can get programming

6    and closer to family.

7         MR. GARCIA:  The Psalm program and RDAP, yes, ma'am,

8    if you'll make those recommendations.

9         THE COURT:  And the Court makes that recommendation.

10        Anything else?

11        MR. GARCIA:  Not from the defense, Your Honor.

12        THE COURT:  All right.  We are adjourned, and the

13   defendant is remanded to the custody of the United States

14   Marshal.

15        MS. PRESTON:  Thank you, Your Honor.

16        THE COURT:  Thank you, lawyers.  You both did a good

17   job.

18        MS. PRESTON:  Thank you.

19        THE COURTROOM DEPUTY:  All rise.

20      (Proceedings adjourned at 5:01 p.m.)

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3

4          I, David W. Moxley, hereby certify that the

5    foregoing is a true and correct copy of the

6    transcript originally filed with the clerk of court

7    on April 8, 2021, and incorporating redactions of

8    personal identifiers requested by the following

9    attorney of record: Tiffany J. Preston, Esq., in

10   accordance with Judicial Conference.  Redacted

11   characters appear as X's in the transcript.

12

13

14

15   /S/ David W. Moxley                May 19, 2021

16   DAVID W. MOXLEY, RMR/CRR/CMRS
     Official Court Reporter
17   Southern District of Indiana
     Indianapolis Division

18

19

20

21

22

23

24

25